IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

INMATES OF THE PENNSYLVANIA          :          CIVIL ACTION
DEPARTMENT OF CORRECTIONS,

                 Plaintiffs          :

     v.          :

THE PENNSYLVANIA DEPARTMENT
OF CORRECTIONS, et al.,          :

                Defendants          :          No. 02-2687

## ORDER

AND NOW, this          day of          , 2005, upon consideration of Commonwealth defendants' motion for summary judgment and plaintiff's response thereto, it is hereby ORDERED that said motion is GRANTED. Judgment is entered in favor of defendants Catherine McVey, Allen Castor, Barbara Descher, Michael Green, Jeffrey Imboden, Gary Lucht, Benjamin Martinez, Nicholas Muller, Sean Ryan, Robert Shannon, William Ward, Michael Webster, Lloyd White, and Brenda Wildenstein and against plaintiff Jessica Elaine Wolfe.

BY THE COURT:


_____
EDUARDO C. ROBRENO, J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| INMATES OF THE PENNSYLVANIA DEPARTMENT OF CORRECTIONS, | : | CIVIL ACTION |
| Plaintiffs | : | |
| v. | : | |
| THE PENNSYLVANIA DEPARTMENT OF CORRECTIONS, et al., | : | |
| Defendants | : | No. 02-2687 |

<u>COMMONWEALTH DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, defendants Catherine McVey, Allen Castor, Barbara Descher, Michael Green, Jeffrey Imboden, Gary Lucht, Benjamin Martinez, Nicholas Muller, Sean Ryan, William Ward, Michael Webster, and Lloyd White ("Parole Board defendants") and Robert Shannon and Brenda Wildenstein ("DOC defendants")(collectively, "Commonwealth defendants") move for summary judgment in their favor and against plaintiff Jessica Elaine Wolfe. As more fully set forth in the attached memorandum of law, the Court should grant this motion for the following reasons:

1. There is no genuine issue of material fact, and based on the undisputed, or indisputable facts of record, defendants are entitled to judgment as a matter of law on Wolfe's ex post facto and retaliation claims.

2. No reasonable jury could find that the Parole Board defendants violated Wolfe's rights under the Ex Post Facto Clause:

2

a)  It is undisputed, or indisputable, that Wolfe is serving a five to fifteen year sentence for a rape conviction; his rape conviction has not been overturned, reversed, or vacated; his need to participate in sex offender programming has been part of his Prescriptive Program Plan from the time of his reception in the DOC; and he has repeatedly refused to participate in the sex offender program.

b)  Prior to the December 18, 1996 amendments to the Parole Act, an inmate's participation in a sex offender program was a factor used in considering whether to grant parole.

c)  Commonwealth defendants have consistently and repeatedly advised Wolfe to participate in sex offender programming.

3.  No reasonable jury could find that Commonwealth defendants retaliated against Wolfe for any of his protected activities:

a)  Wolfe cannot present more than a scintilla of evidence of any causal connection between any of his protected activities and Commonwealth defendants' denial of parole or recommendation to deny parole, or that such decisions were substantially motivated by any of his protected activities.

b)  The undisputed facts of record show that Commonwealth defendants had legitimate, non-retaliatory reasons for denying or recommending denial of parole, including the refusal of Wolfe, a convicted rapist, to participate in a sex offender treatment program.

4.  Because the decision to deny parole is an adjudicatory or quasi-judicial duty, the Parole Board defendants have absolute quasi-judicial immunity from Wolfe's damage claims.

5.  The DOC defendants are entitled to qualified immunity:

a) It is not clearly established that recommending that the Parole Board deny parole to a convicted rapist who refuses to participate in a sex offender program amounts to an adverse action sufficient to make a prima facie First Amendment retaliation case; and

b)  Regardless of the date of an inmate's conviction or the existence of his lawsuit, it was objectively reasonable for prison officials in DOC defendants' positions to recommend that the Parole Board deny parole to that inmate, a convicted rapist, given his refusal to participate in the sex offender program.

6.  Wolfe's claims for injunctive relief are moot:

a)  Wolfe's claims against DOC defendants either their individual or official capacities are moot, because (i) in 2001, Wolfe was transferred to the State Correctional Institution at Graterford, where he is still confined; (ii) DOC defendants in their individual capacities are assigned to the State Correctional Institution at Frackville; and (iii) DOC defendants' successors are assigned to the State Correctional Institution at Mahanoy.

b)  Wolfe's claims against Parole Board defendants in either their individual or official capacities are moot, because (i) of the six who participated in Wolfe's parole decisions, none is still a Parole Board member; and (ii) Wolfe has not alleged and cannot show that any of the Parole Board defendants' successors must be enjoined from violating his rights under the Ex Post Facto Clause or the First Amendment.

c)  Wolfe's injunctive claims against the present Chairman of the Parole Board, Catherine McVey, are moot because McVey did not take part in any decision to deny Wolfe parole, and the denial of parole to convicted rapist who refuses to participate in sex offender programming does not violate either the Ex Post Facto Clause or the First Amendment.

This motion is supported by the attached memorandum of law and the following pleadings and exhibits:

1.  Third Amended Complaint

2.  Answer to Third Amended Complaint

3. Deposition of Jessica Wolfe

4. DOC documents[1]

    Sentence

    Reclassification Summary

    Transfer Rationale dated September 16, 1996

    Vote Sheet dated September 16, 1996

    Transfer Petition

    Prescriptive Program Plans

    Initial Classification Data dated April 10, 1997

    Re-Classification Data dated July 10, 1997

    Re-Classification Data dated July 16, 2001

    Re-Classification Data dated February 21, 2001

    Transfer Routing Slips

5. Deposition of Brenda Wildenstein

6. Deposition of Thomas Ritko

7. Declaration of Benjamin Martinez

    A. Sentence Status Summary

    B. Notice of Board Decision ("Green Sheet") dated March 20, 2001

    C. Green Sheet dated September 24, 2002

    D. Green Sheet dated July 22, 2004

8. Deposition of Mark Youngerman

---

[1] The attached DOC documents are true and correct copies of documents from Wolfe's inmate file ("DC-15"). They were included among those attached as Exhibit 2 to Defendants' Response to Plaintiff's Request for Production of Documents.

WHEREFORE, Commonwealth defendants respectfully request the Court to enter an order substantially in the form attached hereto, granting this motion for summary judgment in their favor and against plaintiff Wolfe, and granting any such further relief as is proper and just.

THOMAS W. CORBETT, JR.
ATTORNEY GENERAL

BY:    s/ Beth Anne Smith
       Beth Anne Smith
       Senior Deputy Attorney General
       Identification No. 47162

       Susan J. Forney
       Chief Deputy Attorney General
       Chief, Litigation Section

OFFICE OF ATTORNEY GENERAL
21 S. 12th Street, 3rd Floor
Philadelphia, PA 19107-3603
Telephone: (215) 560-2130

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

INMATES OF THE PENNSYLVANIA          :          CIVIL ACTION
DEPARTMENT OF CORRECTIONS,

                Plaintiffs          :

    v.          :

THE PENNSYLVANIA DEPARTMENT
OF CORRECTIONS, et al.,          :

                Defendants          :          No. 02-2687


MEMORANDUM OF LAW IN SUPPORT OF COMMONWEALTH
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

INTRODUCTION

       Plaintiff Jessica Elaine Wolfe, also known as James Elliott Wolfe, is a

prisoner in the custody of the Pennsylvania Department of Corrections ("DOC")

serving a five to fifteen year sentence for rape.  He has sued, under 42 U.S.C. §

1983, members of the Pennsylvania Board of Probation and Parole[2] ("Parole

Board") claiming that their decision to deny him parole violated his rights

under the Ex Post Facto Clause, and was made retaliation for his previous

lawsuit, grievances, and request slips, in violation of the First Amendment.  He

also asserts retaliation claims against Robert Shannon, the former

Superintendent of the State Correctional Institution of Mahanoy ("Mahanoy")

and Brenda Wildenstein, a former Unit Manager at Mahanoy, for

---

[2] The present Chairman of the Parole Board is Catherine McVey, the successor
to Green in his official capacity.  The current members of the Parole Board are
Michael Green, Jeffrey Imboden, Benjamin Martinez, Gerard Massaro, Sean
Ryan, Michael Webster, and Lloyd White.  See www.pbpp.state.pa.us.

recommending that the Parole Board deny Wolfe parole. Wolfe seeks damages and declaratory and injunctive relief.

On August 26, 2004, in ruling on defendants' motion to dismiss, the Court entered a Memorandum and Order which dismissed counts I, II, III, and VI but allowed Wolfe to proceed for the time being with his ex post facto claim (count VII) against the Parole Board defendants and Wolfe's First Amendment retaliation claim (count VIII) against defendants Wildenstein and Shannon ("DOC defendants") and the members of the Parole Board in their individual capacities. Wolfe v. Pennsylvania Dep't of Corrections, 334 F.Supp.2d 762 (E.D.Pa. 2004).

Commonwealth defendants now move for summary judgment. Given the undisputed, or indisputable, facts of record, there is no genuine issue of material fact, and Commonwealth defendants are entitled to judgment as a matter of law.


STATEMENT OF UNDISPUTED OR INDISPUTABLE FACTS

In 1996, Wolfe pled guilty to the rape of his eight year old stepdaughter and is serving a five to fifteen year state sentence for that offense (Wolfe deposition, at 4, 20, 118; see also Sentence). His rape conviction has not been overturned or reversed (Wolfe deposition, at 119).

As an inmate in DOC custody, Wolfe was classified first at the Western Diagnostic and Classification Center, then at the Central Diagnostic and Classification Center ("CDCC") at the State Correctional Institution at Camp

Hill, Pennsylvania ("Camp Hill")(see Reclassification Summary, at 2).  The Director of the CDCC issued a memorandum supporting Wolfe's transfer to Mahanoy, noting that Wolfe "is a recidivist who is serving his first state incarceration" (Transfer Rationale dated September 16, 1996; see also Vote Sheet dated September 16, 1996).  The CDCC Director wrote that prescriptive program planning recommendations for Wolfe included sex offender therapy (id.).

Wolfe arrived at Mahanoy on November 19, 1996[3] (Transfer petition).  He was housed in A-Unit, a "special needs unit," due to his gender dysphoria or transgender issues (Wolfe deposition, at 45, 98).  A special needs unit is a protective unit where there is extra programming and more staffing to meet the needs of inmates with special needs, including mental health cases, medical cases and those who may need protective custody (Wildenstein deposition, at 10).  Defendant Brenda Wildenstein was the Unit Manager of A-Unit (Wolfe deposition, at 45).

Wolfe had a good relationship with Wildenstein, because he found her to be empathetic and helpful (Wolfe deposition, at 45).  As Unit Manager, Wildenstein repeatedly advised Wolfe to participate in the sex offender treatment program at Mahanoy (Wolfe deposition, at 51).

---

[3] Wolfe was later transferred to the State Correctional Institution at Graterford ("Graterford"), where he is presently confined (Wolfe deposition, at 3-4).

Wolfe's Prescriptive Program Plan

As indicated above, an inmate is classified in the DOC's diagnostic and classification center in Camp Hill; recommendations for his prescriptive program plan are made at that time (Wildenstein deposition, at 68). Shortly after an inmate's arrival at a state correctional institution, his assigned counselor develops his Prescriptive Program Plan (Wildenstein deposition, at 68). The Plan is good for one year (Wildenstein deposition, at 68). At the end of that year, the Plan is reviewed for compliance and a new Plan is developed (Wildenstein deposition, at 68-69).

Wolfe's first Prescriptive Program Plan at Mahanoy was initiated on November 19, 1996. As the Plan expressly stated, "While all participation in all programs is strictly voluntary, progress or lack of progress in dealing with weaknesses and/or problem areas will be one of the factors taken into consideration for all actions requiring staff support such as recommendations for program level changes, job changes, pre-release, commutation, or parole" (Prescriptive Program Plan dated November 19, 1996).

Under "Recommended Actions," Wolfe's counselor checked the following items needed to be addressed: Maintain a misconduct-free record during the review period; maintain positive work and housing reports; participate in a Stress and Anger Management group; be evaluated for Drug and Alcohol counseling and follow through with recommended programs; participate in a Sex Offender Program; maintain contact with mental health support staff; contact Mr. Wall for a work assignment; and participate in a vocational

program, if available" (Prescriptive Program Plan dated November 19, 1996 (emphasis added)).  One year later, Wolfe's counselor noted under "Results Achieved" that Wolfe was misconduct-free, received average work and housing reports, was on the waiting lists for Stress and Anger and Drug and Alcohol groups, maintained contact with the mental health support staff, and had been assigned as a block janitor.  The counselor further noted, however, that Wolfe refused to participate in a Sex Offender Program, and had no vocational involvement (id. (emphasis added)).

Wolfe's counselor then developed a new Prescriptive Program Plan, which again recommended that Wolfe participate in a Sex Offender Program ("SOP")(Prescriptive Program Plan dated July 25, 1997).  One year later, the counselor noted that Wolfe had "no involvement in SOP" (id.).

The next Prescriptive Program Plan contained an identical list of Recommended Actions, which included participation in a Sex Offender Program (Prescriptive Program Plan dated July 23, 1998).  One year later, Wolfe's counselor noted that Wolfe was "on the waiting list for Basic Sex Offender Education class" (id.).

Wolfe was initially reluctant to attend the sex offender program and refused despite Wildenstein's repeated suggestion that he try (Wolfe deposition, at 51).  Nonetheless, in or around October 20, 2000, Wolfe sat in on one session.  He walked out, however, after the counselor, seeing Wolfe with his eyes shut, yelled at him for not paying attention (Wolfe deposition, at 52-53,

67).  He made no further attempt to participate in the sex offender program at Mahanoy (Wolfe deposition, at 53).

Wolfe's counselors continued to list his need to participate in the Sex Offender Program as part of his Prescriptive Program Plan (Wildenstein deposition, Ex. P-2 (emphasis added).  Wolfe still refused to attend the program (id.).

Wolfe continued to refuse to participate in the sex offender program, even after his transfer to Graterford (Wolfe deposition, at 54).  The sex offender program was the only program on Wolfe's Prescriptive Program Plan in which he failed or refused to participate (Wolfe deposition, at 67-68, 119-20).

Wolfe's Previous Lawsuit

At his deposition, Wolfe made it clear that the "protected activity" element of his retaliation claim is not the instant case, but his previous lawsuit against the DOC regarding his medication (Wolfe deposition, at 9-10)

In 1997, Wolfe sued the DOC, various DOC and Mahanoy officials, as well as several physicians under contract with the DOC to provide health care to inmates, essentially claiming that their refusal to provide him with hormone treatment and a sex change operation violated his rights under the Eighth Amendment (see Wolfe v. Pennsylvania Department of Corrections, et al., No. 97-3114 (E.D. Pa.), docket entries on PACER, at www.edpa.uscourts).  On August 19, 1997, the district court, per the Honorable Anita B. Brody, ordered service of the summons and complaint upon the named defendants.  With the

exception of the DOC Secretary, all of the Commonwealth defendants were granted summary judgment in January 2001. The district court dismissed the DOC Secretary in May 2002 after the case settled out of court.

As the docket entries in Civil Action 97-3114 show, neither Shannon nor Wildenstein was ever named as a defendant in Wolfe's previous lawsuit. Nor was the Parole Board or any of its officials or employees ever named as a defendant in that case.

Wolfe's Custody Level

After an inmate is classified at a particular custody level, his counselor initiates reclassification on an annual basis (Wildenstein deposition, at 66-67). Factors that determine the inmate's custody level include the nature of his offense, his age, the length of time remaining on his sentence, his housing and work reports, program compliance, and his misconduct, if any (Wildenstein deposition, at 67). The information is inputted and results in a score that determines the inmate's custody level (Wildenstein deposition, at 67). As Unit Manager, Wildenstein reviewed the annual custody level reclassifications. It was within her power to override the custody level (Wildenstein deposition, at 67).

At the CDCC, Wolfe was a custody level "3" inmate (Transfer Rationale). Even following his transfer to Mahanoy, his custody level at first remained a "3" (Initial Classification Data dated April 10, 1997), then an "override custody level 3." His counselor at the time, Michael Vuksta, stated that the reasons for

7

recommending override included "Sex Offender, Heinous Crime, and Psychological." He further explained, "Due to the nature of inmate's offense coupled with his gender identification disorder (he wants a sex change), he requires closer custody" (Re-Classification Data dated July 10, 1997). The override was approved by Donald Williamson of the DOC's Central Office (id.). Thus, the first override of Wolfe's custody level predated, by over one month, Judge Brody's order of August 19, 1997 to effectuate service of process of Wolfe's lawsuit.

From 1998 to July 2001, Wolfe was a custody level "2" inmate. However, on July 16, 2001, Wolfe's counselor at the time, Tamara Boris, recommended a custody level override, identifying "Sex Offender, Heinous Crime, Psychological, and Other" as the reasons. She explained that the override was due to the nature of Wolfe's offense, coupled with his gender identification disorder and non-compliance with his Prescriptive Program Plan ("PPP"), adding that "Closer supervision is needed" (Re-Classification Data dated July 16, 2001). John Johnson of the DOC's Central Office approved the override (id.).

When Wolfe learned that his custody level had changed from a "2" to a "3," he submitted a request slip to Brenda Wildenstein objecting that an inmate's custody level could be changed only for behavioral reasons. In response, Wildenstein wrote:

"We have received direction that because programs are emphasized, those who are refusing … are to be considered for override. CL2 is a minimum

security [level] which should be earned – via program participation among other things.

"All similar cases will be reviewed either upon annual or when being staffed.

"Central office has approved your CL3 status and thus it will remain." Wildenstein deposition, P-2, p. 2.

Wolfe then submitted a grievance complaining of the change in his custody level.  Defendant Robert Shannon, then the Superintendent of Mahanoy, responded that "You must maintain Program Compliance to be a CL-2 inmate" (Third Amended Complaint, ¶ 78).

A change in custody level from "2" to "3" is in fact a minimal change that makes no difference to the Parole Board (Youngerman deposition, at 46).


Staffing for Parole

Any time an inmate comes up for parole, the prison's unit management team has a "staffing" to vote on an institutional recommendation for parole. The unit management team consists of the unit manager, the inmate's counselor, the inmate's psychologist, and a (cell) block[4] officer, if available (Wildenstein deposition, at 55-56).  The team meets with the inmate and questions him.  If the inmate is a sex offender, the team asks whether he has

---

[4] "Housing unit" is the current DOC terminology for "cellblock."  In the DOC, the Unit Manager is responsible for the overall running of the housing unit (Wildenstein deposition, at 12).  As the A-Unit Manager at Mahanoy, Wildenstein had shared supervision with officers and psychologists, and direct supervision over two counselors and a clerk (Wildenstein deposition, at 12-13).

addressed that issue and taken responsibility for the offense.  The team

determines whether the inmate conducts himself properly or has received any

misconducts.  It looks at the inmates' behavior and work reports (Wildenstein

deposition, at 56).  As Wildenstein summarized, "We try to take that all into

consideration.  It's a tough process, but during his interview, you can kind of

tell.  It's your own personal opinion, do you think he's going to be a good

candidate or not" (Wildenstein deposition, at 56).

Each member of the unit management team votes, and may comment on,

whether or not to recommend parole.  The votes and comments are recorded on

a "vote sheet" which is forwarded to both Deputy Superintendents and, finally,

the Superintendent (Wildenstein deposition, at 57).  The Superintendent votes

last, and only his vote counts: it is the Superintendent who determines the

institutional recommendation.  He may consider the votes and comments of the

unit management team and the Deputies, but he is not obliged to do so.  Even

so, the Superintendent's vote results in <u>only</u> the institutional recommendation:

the Parole Board has the final say as to whether to grant or deny parole

(Wildenstein deposition, at 57).  The institutional recommendation is only one

of many factors considered by the Parole Board in determining whether to

grant parole (Martinez declaration, ¶ 17).

In Wildenstein's view, a sex offender who refuses to admit his guilt is not

taking responsibility for the offense (Wildenstein deposition, at 62).  She

reasons that the inmate was found guilty in a court of law, and it is not for the

DOC to confirm or deny his guilt (Wildenstein deposition, at 62).  The DOC is

not the judge or jury: rather, it accepts that the inmate was found guilty and recommends programming related to his offense (Wildenstein deposition, at 62). As Unit Manager, it is not Wildenstein's job to retry an inmate's criminal case (Wildenstein deposition, at 65). So, if a convicted sex offender refuses to participate in the sex offender treatment program because he refuses to admit his guilt, she is not likely to recommend that inmate for parole (Wildenstein deposition, at 62). When considering whether to vote yes or no during a staffing for a parole recommendation, Wildenstein also considers the inmate's plans, whether he has family support, and how much treatment he has received in prison for his problems (Wildenstein deposition, at 64-65). She also considers the inmate's adjustment in prison, misconducts, and attitude (Wildenstein deposition, at 66).

Wolfe was first eligible for parole consideration in 2001, the year his minimum sentence expired. On February 21, 2001, his counselor at the time, Tamara Boris, prepared a Reclassification Summary to be submitted to the Parole Board. In the summary, she noted that Wolfe had maintained a clear conduct record since his reception into the DOC. The summary further indicated that Wolfe had completed the Employability Skills course and was assigned to the Painting Crew and received average work reports. Boris recorded that Wolfe had completed Drug and Alcohol Education, Therapy, and Relapse Prevention, and also completed Stress and Anger Management and Impulse Control. She added, "However, Mr. Wolfe refuses to participate in the recommended Sex Offender Programs" (Reclassification Summary, at 3).

Staff (i.e., the unit management team) did not recommend parole at minimum, "due to the nature of his offense and his need to complete the recommended Sex Offender Programming" (Reclassification Summary, at 3).

Defendant Robert Shannon, the Superintendent of Mahanoy, voted to deny parole (Reclassification Summary, at 3). As a result, Wolfe received a negative institutional recommendation for parole.

When asked at deposition to state the reason for his belief that Wildenstein would have voted in favor of recommending parole had he not filed a lawsuit, Wolfe answered, "I can't say" (Wolfe deposition, at 75). He gave the same response with respect to defendant Shannon (Wolfe deposition, at 76).

In December 2001, Wolfe was transferred from Mahanoy to Graterford, first as a temporary transfer for court, then on a permanent basis for medical reasons (see transfer routings slips). Neither of the DOC defendants works at Graterford or even Mahanoy: they now both work at the State Correctional Institution at Frackville ("Frackville"), where Shannon is Superintendent and Wildenstein is Inmate Program Manager. Thus, since February 2001, neither the DOC defendants nor their successors at Mahanoy have had any further role in decisions regarding Wolfe's requests for parole.

Denial of Parole

In March 2001, defendant Allen Castor, a now former Parole Board member, and David Withers, a now retired Hearing Examiner, interviewed Wolfe for parole and both voted to deny parole. Consequently, on March 20,

2001, the Parole Board issued a "green sheet" denying parole at Wolfe's minimum.  The Parole Board stated: "Following an interview and review of your file, the Pennsylvania Board of Probation and Parole has determined that the fair administration of justice cannot be achieved through your release on parole.  You are therefore refused parole[.] … At your next interview, the Board will review your file and consider: whether you have participated in/successfully completed a treatment program for: sex offenders; whether you have received/maintained a favorable recommendation for parole from the Department of Corrections; and whether you have received/ maintained a clear conduct record and completed the Department of Corrections' prescriptive program(s)" (Martinez declaration, Exhibit B, Notice of Parole Board Decision ("Green Sheet") dated March 20, 2001).

In September 2002, defendant Barbara Descher, a Parole Board member who has since resigned, and Harold Shalon, a now retired Hearing Examiner, interviewed Wolfe and both voted to deny him parole.  Thus, on September 24, 2002, the Parole Board denied Wolfe parole, stating "Following an interview and review of your file, the Pennsylvania Board of Probation and Parole has determined that the fair administration of justice cannot be achieved through your release on parole.  You are therefore refused parole[.]… At your next interview, the Board will review your file and consider: whether you have successfully completed a treatment program for sex offenders; whether you have received a favorable recommendation for parole from the Department of Corrections; [and] whether you have maintained a clear conduct record and

completed the Department of Corrections' prescriptive programs" (Martinez Declaration, Exhibit C, Green Sheet dated September 24, 2002).

In July 2004, Hearing Examiner Anthony DiBernardo[5] and defendant Castor[6] interviewed Wolfe for parole and both voted to deny him parole.  As a result, on July 22, 2004, the Parole Board refused to parole Wolfe.  The Board determined that "your best interests do not justify or require you being paroled/reparoled; and, the interests of the Commonwealth will be injured if you were paroled/reparoled [sic]."  (See Martinez Declaration, Exhibit D, Green Sheet dated July 22, 2004.)  The Board indicated that the reasons for its decision included Wolfe's refusal to accept responsibility for the offense committed, his lack of remorse for the offense committed, the recommendation by the Department of Corrections, and Wolfe's need to participate in additional institutional programs (see id.).   The Board indicated that Wolfe will be reviewed for parole in or after July 2006 (see id.).  The Board indicated that, at that time, it would review Wolfe's file and consider whether Wolfe has participated in a treatment program for sex offenders, whether he has received a favorable recommendation for parole from the Department of Corrections, and whether he has maintained a clear conduct record and completed the Department of Corrections prescriptive programs (see id.).

---

[5] Like Withers and Shalon, DiBernardo is now retired.  Since retiring, both DiBernardo and Shalon have worked as annuitants.

[6] Castor's term expired on June 14, 2005.  He now serves as a Hearing Examiner for the Parole Board.

ARGUMENT

    SUMMARY JUDGMENT STANDARDS

    Summary judgment is authorized by Rule 56(c) of the Federal Rules of

Civil Procedure, which states:

> The judgment sought shall be rendered forthwith if the
> pleadings, depositions, answers to interrogatories, and
> admissions on file, together with the affidavits, if any, show
> that there is no genuine issue as to any material fact and
> that the moving party is entitled to a judgment as a matter of
> law.

Fed.R.Civ.P. 56(c).  The party seeking summary judgment "bears the initial

responsibility of informing the district court of the basis for its motion, and

identifying those portions of `the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any,'

which it believes demonstrate the absence of a genuine issue of material fact."

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The motion must be

granted unless the nonmoving party designates specific facts in discovery

materials or affidavits showing a genuine material factual issue that can only

be resolved by a trial.  Id., at 324; Fed.R.Civ.P. 56(e).

    "Material" facts are those that might affect the outcome of the suit under

the substantive law governing the claims made.  An issue of fact is "genuine"

only "if the evidence is such that a reasonable jury could return a verdict for

the nonmoving party" in light of the burdens of proof required by substantive

law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 252 (1986).  Stated

another way, the court must enter summary judgment against a nonmoving

party who fails to make a factual showing sufficient to permit a reasonable jury to find an element essential to that party's case, and on which that party will bear the burden of proof.  Celotex Corp. v. Catrett, supra, at 323.  Evidence that is "merely colorable" or "not significantly probative" will not defeat the motion.  Anderson v. Liberty Lobby, Inc., supra, at 255; Colburn v. Upper Darby Township, 946 F.2d 1017, 1020 (3d Cir. 1991).  A party resisting summary judgment cannot rely upon mere suspicion or speculation.  Gans v. Mundy, 762 F.2d 338 (3d Cir.), cert. denied, 474 U.S. 1010 (1985).

NO REASONABLE JURY COULD FIND THAT THE PAROLE BOARD DEFENDANTS VIOLATED THE EX POST FACTO CLAUSE

Wolfe claims that the Parole Board defendants' decision to deny him parole violated his rights under the Ex Post Facto Clause.  As a matter of law, his claim cannot succeed.

The Ex Post Facto Clause "forbids the enactment of any law which imposes a punishment for an act 'which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed.'" Coady v. Vaughn, 251 F.3d 480, 487 (3d Cir. 2001)(quoting Weaver v. Graham, 450 U.S. 24, 28 (1981)).  Here, Wolfe alleges that he was denied parole "based solely on [his] refusal to participate in the Sex Offender Program" (Third Amended Complaint, ¶¶ 87, 89).   However, he cannot show that the Parole Board defendants' decisions to deny him parole for his refusal to participate in sex offender programming amounted to the imposition of additional punishment.

Prior to the December 18, 1996 amendments to the parole law, the Parole Board denied parole to inmates based on their failure to participate in sex offender programming.  See Weaver v. Pennsylvania Board of Probation and Parole, 688 A.2d 766 (Pa. Commw. 1997)(claims relating to Aug. 31, 1995 parole board decision); Eldridge v. Pennsylvania Board of Probation and Parole, 688 A.2d 273 (Pa. Commw. 1997)(claims relating to Sept. 14, 1995 parole board decision); Ramos v. Vaughn, No. 94-2596, 1995 WL 386573 (E.D. Pa. Jun. 27, 1995).  In each of these cases, the Parole Board denied parole to a sex offender who refused to participate in sex offender programming.

Wolfe cannot present even a scintilla of evidence that the Parole Board did not include a convicted rapist's participation in sex offender programming as a factor in parole consideration prior to the December 18, 1996 amendments to the parole law.  Indeed, conditioning the grant of parole on participation in programming was not and is not limited to sex offenders and sex offender programs.  Prior to December 1996 as well as after, the Parole Board refused to parole non-sex offenders who were not program compliant or who were only minimally involved in programming.  See, e.g., Shain v. Com., Pennsylvania Bd. of Probation and Parole, 558 A.2d 630, 631 (Pa.Commw. 1989)(court would not review denial of parole based on inmate's refusal to participate in prison's General Education Diploma program); Reider v. Com., Pennsylvania Bd. of Probation and Parole, 514 A.2d 967, 968 n. 1 (Pa.Commw.1986)(parole denied due to inmate's minimal involvement in available programs); Garcia v. Chairman of Com. of Pennsylvania Bd. of

17

Probation and Parole, 1986 WL 14724, *1 (E.D.Pa.) (E.D.Pa.1986)("[T]he Board has the power to set conditions, such as participation in a drug rehabilitation program, before approving an application").

In sum, Wolfe's repeated refusal to participate in the DOC's sex offender program would have warranted the denial of his parole prior to the December 1996 amendment to the parole statute. Nothing in the record supports Wolfe's claim that the Parole Board defendants' consideration of that fact resulted in more punishment than would have been imposed had Wolfe been considered for parole prior to December 1996.[7]

Wolfe also argues that the application of the December 18, 1996 amendment to the Parole Act violates his rights under the Ex Post Facto Clause, because it places public safety over the "liberty interest" of inmates (Third Amended Complaint, ¶¶ 95-100). But this argument is meritless, for several reasons. First, it is well-established that in Pennsylvania, inmates have no liberty interest in the grant of parole. Bonilla v. Vaughn, 1998 WL 480833, at *8 (E.D.Pa. Aug.14, 1998)("Because a decision as to parole eligibility rests solely in the discretion of the Board, inmates in Pennsylvania have no state created liberty interest in a grant of parole."); Cohen v. Horn, 1998 WL 834101, at *3 (E.D.Pa. Dec.2, 1998) ("It is well-established that in Pennsylvania, prisoners have no liberty interest in a parole decision.").

---

[7] In addition to his admitted refusal to take the sex offender program, it is undisputed that Wolfe has never obtained the DOC's favorable recommendation for parole. As the Third Circuit has noted, an unfavorable recommendation from prison staff was in itself a significant factor under pre-1996 guidelines. See Mickens-Thomas, 321 F.3d 374, 379 n.8 (3d Cir. 2003).

Second, as Parole Board member Benjamin Martinez explains, "[t]he The Board has not exercised its discretion to parole offenders differently since the 1996 amendment of § 1 than it did before December 18, 1996.  Both before and after the 1996 amendment to § 1, the Board would not release an offender when, in the Board's opinion, the interests of the Commonwealth in preventing crime would be injured by the offender's release" (Martinez Declaration, ¶ 6). The Board interprets the amendment not as a change in public policy as to which offenders should be paroled or when they should be paroled, "but rather as a legislative emphasis of the Board's statutory charge to make paroling decisions in accordance with the original intent of § 19 and Pa. Stat. Ann. Tit. 61, § 331.21 (West 1999) (hereinafter referred to as § 21)-whether "the interests of the Commonwealth will be injured" by the release of the offender.  It has always been the Board's mandate to protect the safety of the public."  In other words, "[t]he Board interprets the amendment of § 1 as only a reemphasis of the pre-existing consideration of public safety contained in § 21" (Martinez Declaration, at ¶ 7).  No new standards, criteria or interests in the decision-making process were applied to Wolfe; rather, "the Board applied to James Elliott Wolfe only the standards, criteria and interests for deciding whether to parole an offender that the Probation and Parole Law contained when he committed his crime" (Martinez Declaration, at ¶ 8).

In short, in denying Wolfe parole, the Parole Board has not imposed new standards or criteria which amount to additional punishment in violation of the Ex Post Facto Clause.  Inmates were denied parole for non-compliance with

programming, or even minimal involvement in programming, long before

December 18, 1996. The Court, therefore, should grant summary judgment in

favor of the Parole Board defendants with respect to Wolfe's ex post facto claim.

NO REASONABLE JURY COULD FIND THAT COMMONWEALTH
DEFENDANTS RETALIATED AGAINST WOLFE ON ACCOUNT OF HIS
PROTECTED ACTIVITIES

Wolfe claims that in violation of his First Amendment rights, the Parole

Board defendants denied him parole in retaliation for his previous lawsuit

(Wolfe deposition, at 145-46). Similarly, he claims that the DOC defendants

voted for a negative institutional recommendation for parole in retaliation for

his previous lawsuit, grievances, and request slips. No reasonable jury could

find in Wolfe's favor.

To make a prima facie case of retaliation under Section 1983 and the

First Amendment, a plaintiff must show that: (1) he engaged in a protected

employee activity; (2) the defendant took an adverse action after or

contemporaneous with the protected activity; and (3) a causal link exists

between the plaintiff's protected activity and the defendant's adverse action.

Sloan v. City of Pittsburgh, 2004 WL 1932633, *3 (3d Cir. 2004)(citing Weston

v. Pennsylvania, 251 F.3d 420, 430 (3d Cir.2001)). Once the plaintiff has made

a prima facie case of retaliation, the defendant bears the burden of showing

that he or she would have acted no differently in the absence of the protected

conduct. See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274,

287 (1977).

In this case, it is undisputed that Wolfe filed a previous lawsuit against the DOC and various DOC and Mahanoy officials, and that he also submitted grievances and request slips. But Wolfe cannot present more than a scintilla of evidence of any causal link between his protected activities and any decision relating to the denial of his parole, or show that his lawsuit, grievances or requests slips were a substantial or motivating factor in that decision.

As a threshold matter, none of the Commonwealth defendants was named as a defendant in Wolfe's previous lawsuit. No reasonable jury could infer that any of the Commonwealth defendants had the requisite motive to retaliate against Wolfe for that previous lawsuit where none of them was involved in that case.

In addition, Wolfe's lawsuit and the alleged retaliatory decisions are far removed in time. Wolfe's lawsuit was filed and served in 1997. The decisions regarding his parole and change in custody level were not made until approximately four years later, in 2001. Thus, while "suggestive temporal proximity" may be relevant to causation in a retaliation case (see Rauser v. Horn, 241 F.3d 330, 334 (3d Cir. 2001); Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280 (3d Cir.2000)), such suggestive timing does not exist here. The extreme lack of temporal proximity in this case supports summary judgment in favor of defendants and against Wolfe with respect to his retaliation claim. Compare Allah v. Al-Hafeez, 208 F.Supp.2d, 520, 535 (E.D.Pa.2002)(holding that where inmate's constitutionally protected behavior and the adverse actions

21

were separated by months, defendants were entitled to summary judgment on inmate's retaliation claim).

At his deposition, Wolfe could not identify one reason to support his speculative belief that Shannon and Wildenstein had voted to recommend against parole on account of his 1997 lawsuit (Wolfe deposition, at 75-76). Furthermore, his reason for believing that they retaliated against him on account of his grievances and request slips is based on nothing more substantial than his observation that Wildenstein was "direct" and "short and sweet" when she met with him to discuss the change in his custody level (Wolfe deposition, at 136).  Of course, the decision to override Wolfe's custody level from "2" to "3" was made <u>before</u> Wolfe submitted a request slip complaining of that fact.  The override decision therefore could not have been made in retaliation for Wolfe's request slip.  In any event, being direct or short and sweet with an inmate is insufficient evidence of retaliatory motive.

When asked what reason he had to believe that the Parole Board defendants denied him parole because of his lawsuit, Wolfe pointed to two summarizations in his parole file which briefly referenced the settlement of his previous lawsuit (Wolfe deposition, at 12, 145).  But as Wolfe concedes, these two documents were generated in 2002 and 2004 (id.).  The Parole Board's decision to deny Wolfe parole at the expiration of his minimum was made in 2001, and it was based on Wolfe's refusal to participate in the sex offender program: Wolfe concedes as much (Third Amended Complaint, ¶¶ 87, 89).

Wolfe cannot show any causal connection between his lawsuit and the Parole Board defendants' initial decision to deny him parole.

Admittedly, Wolfe was again denied parole on two subsequent occasions, and he argues that those denials of parole were also retaliatory. But as the green sheets show, nothing had changed between the initial denial of parole and the later denials: as before, the decision was based, at least in part, on Wolfe's refusal to participate in the sex offender program.

The parole summarizations which refer to the settlement of Wolfe's previous case do not show any causal connection between the 1997 lawsuit and the 2002 and 2004 decisions to deny Wolfe parole. This information was included in the parole summarizations only because Wolfe mentioned his lawsuit during his interviews with the parole agents (Youngerman deposition, at 41-42; Ritko deposition, at 102-04). An inmate cannot prove that his protected activity was a substantial or motivating factor in a decision simply by bringing that protected activity to the attention of the decisionmaker. Otherwise, every inmate would have a viable retaliation claim following the denial of parole just by electing to discuss his lawsuit, grievance, or request slip with the parole agent during the parole interview.

In any event, nothing in the record suggests that any Parole Board member who considered Wolfe's application for parole denied him parole on the basis of his lawsuit, grievances, or request slips. They did not cite his lawsuit, grievances, or request slips in any of the green sheets. Rather, they

23

consistently cited Wolfe's failure to participate in a sex offender treatment program as a basis for their denial of parole.   Martinez Decl., Exs. B, C and D.

But even if Wolfe could show a causal link between his protected activities and the decision to deny him parole, Commonwealth defendants would still be entitled to summary judgment.  As the Third Circuit has stated, even if "a prisoner has demonstrated that his exercise of a constitutional right was a substantial or motivating factor in the challenged decision, the prison officials may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest."  Rauser, 241 F.3d at 334 (emphasis added).

Here, in view of the quantum of evidence that Commonwealth defendants based their parole decisions on Wolfe's repeated refusal to participate in sex offender programming, the Court should hold that defendants' decisions were not retaliatory, but within the broad discretion that must be afforded prison and parole officials.  Carter v. McGrady, 292 F.3d 152, 159 (3d Cir. 2002)(citing Thornburgh v. Abbott, 490 U.S. 401, 413 (1989)).  Because he is a convicted rapist serving a five to fifteen sentence for the rape of his eight year old stepdaughter, Wolfe's refusal to participate in sex offender programming was "so clear and overt" a factor against parole that this Court cannot, as a matter of law, say that the decisions against him were retaliatory.  Compare Carter, 292 F.3d at 159.  On the contrary, "there is no genuine issue of material fact that such action was 'reasonably related to legitimate penological interests'" and Wolfe would have been denied parole, and a favorable parole

recommendation, notwithstanding his lawsuit, grievances, and request slips.
Compare Carter, 292 F.3d at 159 (quoting Turner v. Safley, 482 U.S. 78, 90
(1987)).  See also McGrath v. Johnson, 155 F.Supp.2d 294, 306 (E.D.Pa.2001)
(holding that prisoner's retaliation claim failed as a matter of law where
defendants showed legitimate reasons for recommending against parole,
including prisoner's failure to comply with programming).

Accordingly, Commonwealth defendants are entitled to summary
judgment on Wolfe's retaliation claims.


## PAROLE BOARD MEMBERS ARE ENTITLED TO ABSOLUTE IMMUNITY FROM WOLFE'S DAMAGE CLAIMS

To the extent that Wolfe seeks damages against the Parole Board
defendants for their decisions to deny him parole, the Parole Board defendants
are entitled to absolute quasi-judicial immunity from such damages.

In its August 26, 2004 Memorandum and Order, the Court declined to
address the issue of absolute immunity given that the matter had not been
briefed as well as the "fact-intensive nature of the inquiry." Wolfe, supra, at
n.12.  In so ruling, the Court relied on Desi's Pizza, Inc. v. City of Wilkes-Barre,
321 F.3d 411, 428 (3d Cir.2003).  Desi's Pizza, however, involved absolute
prosecutorial immunity, a more factually complex issue than the inquiry
involved here.

Since 1977, the Third Circuit has held that parole board officials are
entitled to absolute immunity from damage claims arising out of their
performance of adjudicatory duties.  Wilson v. Rackmill, 878 F.2d 772, 775 (3d

Cir.1989); <u>Harper v. Jeffries,</u> 808 F.2d 281, 284 (3d Cir.1986); <u>Thompson v. Burke</u>, 556 F.2d 231, 238 n.13 (3d Cir.1977)(parole board members' adjudicatory functions include their ability to affect the length or terms of imprisonment, as well as the times when convicts may be paroled or discharged).  In order to determine absolute immunity, the court must examine the allegations of the plaintiff's complaint, <u>see</u> <u>Wilson</u>, 878 F.2d at 775-76 and, in particular, the nature and function of the parole defendants' alleged actions. <u>Kulwicki v. Dawson</u>, 969 F.2d 1454, 1465 (3d Cir.1992).

The courts of the Eastern District have consistently followed these decisions.  <u>See, e.g.</u>, <u>Nellom v. Luber,</u> 2004 WL 816922, *6 (E.D.Pa. 2004)(to the extent plaintiff's claims attack the Parole Board's decisions, the Parole Board defendants are entitled to absolute immunity); <u>Hayes v. Muller,</u> 1996 WL 583180, *4 (E.D.Pa.1996)(dismissing claims asserted against Parole Board Chairman as barred by doctrine of absolute immunity); <u>Munyan v. Traister,</u> 1990 WL 135695, *1 (E.D.Pa.1990)(because decision to revoke parole is adjudicatory in nature, parole officials are entitled to absolute immunity from § 1983 suits for damages).

"Our quasi-judicial immunity cases demonstrate that the primary function to be protected is judicial or quasi-judicial decision making.  This is true of cases challenging discretionary conduct by a quasi-judicial body like a parole board[.]"  <u>Richman v. Sheahan</u>, 270 F.3d 430, 436 (7th Cir. 2001), <u>cert. denied</u>, 535 U.S. 971 (2002).  Adjudicatory acts that entitle a parole official to absolute immunity include hearing evidence, making recommendations as to

whether to parole a prisoner, and making decisions as to whether to grant, revoke, or deny parole.[8]  Breslin v. Brainard, No. 01-7269, 2002 WL 31513425, at *7 n.10 (E.D.Pa. Nov.1, 2002)(citing Wilson, 878 F.2d at 776).

In this case, Wolfe alleges that the Parole Board defendants denied him parole "based solely on his refusal to participate in the Sex Offender Program." Third Amended Complaint, ¶¶ 89, 91.  It is well-settled in this Circuit, as well as every other Circuit, that denial of parole is an adjudicatory or quasi-judicial act entitled to absolute immunity.[9]  Accordingly, the Court should grant summary judgment in Parole Board defendants' favor with respect to Wolfe's claims for damages.  See Nellom, supra, at *6-7.

---

[8]Parole board officials, like judges, are entitled to absolute immunity from suit for damages when they serve a quasi-adjudicative function in deciding whether to grant, deny or revoke parole. In contrast, a parole officer is not entitled to absolute immunity for his executive or administrative acts, such as investigations, searches and seizures, preparation of warrants and presentencing reports, or giving information to a parole board.  See Breslin v. Brainard, No. 01-7269, 2002 WL 31513425, at *7 n.10 (E.D.Pa. Nov.1, 2002).

In this case, it is clear that Wolfe is challenging the denial of his parole, which he asserts was illegal, and the factors the Parole Board defendants considered in making that decision.  See Third Amended Complaint, ¶¶ 71-72; 85-89.  All of this conduct falls within Parole Board defendants' adjudicatory function, and thereby entitles them to absolute immunity from Wolfe's damage claims.

[9] See Johnson v. Rhode Island Parole Bd. Members, 815 F.2d 5, 8 (1st Cir.1987); Montero v. Travis, 171 F.3d 757, 761-62 (2d Cir.1999); Franklin v. Shields, 569 F.2d 784, 798 (4th Cir. 1977), cert.denied, 435 U.S. 1003 (1978); Littles v. Board of Pardons & Paroles Div., 68 F.3d 122, 123 (5th Cir.1995)(per curiam);  Tillman v. Price, 113 F.3d 1236, 1997 WL 225993, *1 (6th Cir. 1997); Walrath v. United States, 35 F.3d 277, 281-82 (7th Cir.1994); Anton v. Getty, 78 F.3d 393, 396 (8th Cir.1996); Anderson v. Boyd, 714 F.2d 906, 908-10 (9th Cir.1983); Russ v. Uppah, 972 F.2d 300, 303 (10th Cir.1992); Fuller v. Georgia State Bd. of Pardons & Paroles, 851 F.2d 1307, 1310 (11th Cir.1988).

<u>DOC DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY</u>

A state official is immune from Section 1983 liability if a reasonable person in that position could have believed that his or her actions were proper in light of the existing law.  <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987). Qualified immunity is a complete defense to suit and the issue is properly resolved on motion for summary judgment because "[t]he entitlement is an immunity from suit rather than a mere defense to liability… and … is effectively lost if a case is erroneously permitted to go to trial." <u>Forbes v. Township of Lower Merion</u>, 313 F.3d 144, 147 (3d Cir. 2002)(quoting <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 526-27 (1985)).

An allegation of malice is insufficient to defeat the qualified immunity defense, as long as the official acted in an objectively reasonable manner. <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986).  Qualified immunity should be denied only if, in light of the existing law, the unlawfulness should have been apparent.  <u>Anderson</u>, 483 U.S. at 640.  A defendant is entitled to immunity if, on an objective basis, a "reasonably competent officer" would have reached the same conclusion as the defendant.  <u>Id</u>.

"[I]f officers of reasonable competence could disagree on this issue, immunity should be recognized." <u>Malley</u>, 475 U.S. at 341.  Even if the official's conduct violated the plaintiff's constitutional rights, the official is immune from liability if his conduct resulted from a mistake in judgment.  <u>Id</u>.; <u>see also</u> <u>Hunter v. Bryant</u>, 502 U.S. 228-29 (1991).

In this case, DOC defendants are entitled to qualified immunity for two separate and distinct reasons.  First, their action – voting against a favorable institutional recommendation for parole -- did not violate any clearly established law.  Neither the Supreme Court nor the Third Circuit has ever determined that an institutional recommendation against parole amounts to an adverse action sufficient to support a First Amendment retaliation claim.  A negative parole recommendation is just that, a recommendation: it is one of many factors that the Parole Board may consider in making its decision whether to grant or deny parole.  "[T]he ultimate decision always lies with the Parole Board."  McGrath v. Johnson, 155 F.Supp.2d 294, 306 (E.D.Pa.2001).

Moreover, even if Wolfe could somehow show that the DOC defendants recommended that the Parole Board deny Wolfe parole on account of his lawsuit, they would still be entitled to qualified immunity as a matter of law.  The DOC defendants' negative institutional recommendation amounts to negative information to a third party decisionmaker, the Parole Board.  It is not clearly established that a negative recommendation could support a retaliation claim in the absence of coercion.  In McLaughlin v. Watson, 271 F.3d 566 (3d Cir. 2001), the Third Circuit stated, "When a public official is sued for allegedly causing a third party to take some type of adverse action against plaintiff's speech, we have held that defendant's conduct must be of a particularly virulent nature.  It is not enough that defendant speaks critically of plaintiff or even urges or influences the third party to take adverse action.  Rather, the defendant must 'threaten' or 'coerce' the third party to act."  271 F.3d at 573

(emphasis added).  "Strongly urging" or "influencing" a third party to take

adverse action does not violate a plaintiff's civil rights.  Id.  Therefore, under

McLaughlin, the DOC defendants' negative recommendation to the Parole

Board did not violate Wolfe's rights under the First Amendment.

But even assuming for the sake of argument that the contours of the law

relating to the adverse action needed to support a retaliation claim were clearly

established at the time of their decisions, DOC defendants at all times acted

reasonably under the circumstances.  Reasonable officials in Wildenstein's and

Shannon's positions could have believed, despite an inmate's protected

activities, that it was nevertheless lawful to recommend that the Parole Board

deny parole where the inmate was a convicted rapist who refused to participate

in a sex offender treatment program.  Compare Weaver v. Pennsylvania Board

of Probation and Parole, 688 A.2d 766, 775 (Pa. Commw. 1997)(despite

existence of corrections 12- step rehabilitation program, prisoner has no claim

to parole where he has not taken steps to lessen danger he poses to society).

Reasonable officials in their positions could have believed it was lawful to

change an inmate's custody level from "2" to "3" where the change was minimal

and made no difference to the Parole Board, and, moreover, where they had

received direction from Central Office that inmates who refused to participate

in programming were to be more closely supervised.

Because there is no clearly established law that DOC defendants' actions

violated the First Amendment, and, furthermore, because their actions were at

all times objectively reasonable under the undisputed circumstances of this

case, defendants Shannon and Wildenstein are entitled to qualified immunity as a matter of law.

### WOLFE'S CLAIMS FOR INJUNCTIVE RELIEF ARE MOOT

As noted above, Wolfe was transferred from Mahanoy to Graterford in December 2001 and the transfer was made permanent in January 2002.  The DOC defendants no longer work at Mahanoy: both now work at Frackville, where Shannon is Superintendent and Wildenstein is Inmate Program Manager.  Consequently, neither Shannon nor Wildenstein, nor for that matter either of their successors at Mahanoy, has any custody or control over Wolfe. Since Wolfe's transfer to Graterford, neither has any say in his staffings for parole, the determination of his custody level, or the development of his Prescriptive Program Plan.  Thus, any claim for injunctive relief that Wolfe may have once had against them, or their successors at Mahanoy, is long moot.

With respect to the Parole Board defendants, of the six who participated in Wolfe's parole decisions, none is still a Parole Board member.  Because Withers, Shalon, DiBernardo and Descher have retired, and Castor is no longer a Parole Board member but a Hearing Examiner, any injunctive claim against them in their individual capacities is moot.

To the extent Withers, Shalon, DiBernardo, Descher, and Castor are sued in their official capacities for injunctive relief, their successors in office are automatically substituted as parties by operation of Federal Rule of Civil Procedure 25(d)(1).  However, Wolfe has not alleged and cannot show that any

of these successors participated in his parole.  Nor has he alleged or shown that any of the successors must be enjoined from violating his Constitutional rights.  <u>Compare</u> <u>City of Los Angeles v. Lyons</u>,  461 U.S. 95, 105 (1983)(plaintiff fails to state claim for injunctive relief where he has not established real and immediate threat that he would again be subjected to action without any improper conduct on his part).  Accordingly, Wolfe could not prevail in any claim for injunctive relief against any successor in his or her official capacity.

Finally, to the extent Wolfe sues Catherine McVey, the present Chairman of the Parole Board, for injunctive relief, Wolfe cannot present one valid reason for this Court to enjoin McVey in either her individual or official capacity. McVey did not take part in any of the Parole Board decisions to deny Wolfe parole.  As demonstrated above, it does not violate either the Ex Post Facto Clause or the First Amendment to deny parole to a convicted rapist who, among other things, refused to participate in sex offender programming. Because Wolfe's ex post facto and retaliation claims fail on the merits, he is not entitled to an injunction against McVey.

CONCLUSION

For all the reasons stated above, the Court should grant summary

judgment in favor of Commonwealth defendants and against plaintiff Wolfe.

Respectfully submitted,

THOMAS W. CORBETT, JR.
ATTORNEY GENERAL

BY:    s/Beth Anne Smith
       Beth Anne Smith
       Senior Deputy Attorney General
       Identification No. 47162

       Susan J. Forney
       Chief Deputy Attorney General
       Chief, Litigation Section

OFFICE OF ATTORNEY GENERAL
21 S. 12th Street, 3rd Floor
Philadelphia, PA 19107-3603

<u>CERTIFICATE OF SERVICE</u>

I, Beth Anne Smith, Senior Deputy Attorney General, hereby certify that the foregoing motion for summary judgment was filed electronically on November 14, 2005 and is available for viewing and downloading from the ECF system.  I further certify that a true and correct copy of said document was served on the same date by electronic mail notification to registered ECF users Mary Catherine Roper, Esquire at <u>Mroper@ACLUPA.ORG</u> and Viktoriya Meyerov, Esquire at <u>Viktoriya.Meyerov@dbr.com</u>.

<div style="margin-left:40%">

THOMAS W. CORBETT, JR.
ATTORNEY GENERAL


BY:    <u>s/ Beth Anne Smith          </u>
       Beth Anne Smith
       Senior Deputy Attorney General
       Identification No. 47162

       Susan J. Forney
       Chief Deputy Attorney General
       Chief, Litigation Section

</div>

OFFICE OF ATTORNEY GENERAL
21 S. 12th Street, 3rd Floor
Philadelphia, PA 19107-3603
Telephone: (215) 560-2130