IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| INMATES OF THE PENNSYLVANIA DEPARTMENT OF CORRECTIONS, | : | CIVIL ACTION |
| Plaintiffs | : | |
| v. | : | |
| THE PENNSYLVANIA DEPARTMENT OF CORRECTIONS, et al., | : | |
| Defendants | : | No. 02-2687 |

## ORDER

AND NOW, this        day of          , 2005, upon consideration of

Commonwealth defendants' motion for summary judgment, plaintiff's response,

and Commonwealth defendants' reply, it is hereby ORDERED that

Commonwealth defendants' motion is GRANTED.  Judgment is entered in favor

of defendants Catherine McVey, Allen Castor, Barbara Descher, Michael Green,

Jeffrey Imboden, Gary Lucht, Benjamin Martinez, Nicholas Muller, Sean Ryan,

Robert Shannon, William Ward, Michael Webster, Lloyd White, and Brenda

Wildenstein and against plaintiff Jessica Elaine Wolfe.

BY THE COURT:

_____
EDUARDO C. ROBRENO, J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

INMATES OF THE PENNSYLVANIA          :        CIVIL ACTION
DEPARTMENT OF CORRECTIONS,

             Plaintiffs          :

     v.                                  :

THE PENNSYLVANIA DEPARTMENT
OF CORRECTIONS, et al.,                :

            Defendants          :        No. 02-2687

## COMMONWEALTH DEFENDANTS' REPLY TO PLAINTIFF'S RESPONSE TO THEIR MOTION FOR SUMMARY JUDGMENT

In his response to Commonwealth defendants' motion for summary judgment, plaintiff Jessica Wolfe drops his claim that Commonwealth defendants violated his rights under the Ex Post Facto Clause when they denied, or recommended denial of, parole based on his refusal to participate in sex offender programming. He does not oppose the motion of the two DOC officials, defendants Shannon and Wildenstein, for summary judgment. He no longer seeks damages or declaratory relief against any defendant.

At this stage, Wolfe contends only that "state parole officials" applied "newer, harsher guidelines" – i.e., the 1996 Amendments -- to Wolfe in violation of the Ex Post Facto Clause, and retaliated against him by denying him parole on account of his lawsuits and grievances. He asks only that the Court "deny Parole Board Defendants' motion for summary judgment as to Plaintiff's claims for injunctive relief" (Plaintiff's Opposition to Defendants' Motion for Summary Judgment, at 1).

2

*Ex Post Facto Clause*

To succeed on his ex post facto claim, Wolfe must show (1) there was a change in the law or policy which has been given retrospective effect <u>and</u> (2) he was disadvantaged by that change.  <u>Richardson v. Pennsylvania Board of Probation and Parole</u>, 423 F.3d 282, 287-88 (3d Cir. 2005)(citing <u>Weaver v. Graham</u>, 450 U.S. 24, 29 (1981)).  In their motion, Commonwealth defendants attached the Declaration of Benjamin Martinez to demonstrate that the 1996 Amendments did not change parole law or policy.  This reply brief will address the second prong of the ex post facto analysis.

According to the Third Circuit, to show evidence of an ex post facto violation, the prisoner "might compare the parole rates for prisoner convictions before and after the 1996 Amendments, state whether the Parole Guidelines would indicate that the petitioner was a good parole candidate, or draw inferences from the statement of reasons provided by the Parole Board regarding the criteria used for the parole determination in that individual's case."  <u>Richardson v. Pennsylvania Board of Probation and Parole</u>, 423 F.3d 282, 292-93 (3d Cir. 2005).

In this case, Wolfe does not and cannot present evidence of a favorable recommendation based on pre-1996 Parole Guidelines.  Nor does he draw any inferences from the statement of reasons for denial of parole based on the Parole Board "green sheets."  His only evidence that he was disadvantaged by the application of "newer, harsher guidelines" consists of a chart of DOC statistics showing the number of inmates, whose primary offense was rape,

who were released each year from 1995 to 2005, whether on parole or after reaching their maximum sentence dates.  See Exhibit attached to Wolfe's Response.  But Wolfe's statistical analysis is based on his erroneous understanding of the chart.

Contrary to Wolfe's interpretation, the DOC chart does <u>not</u> show the "number of inmates serving time for rape" in any given year.  Rather, the "grand total" for any given year is the sum of (1) the number of rapists paroled within one year after reaching their minimum dates plus (2) the number of inmates paroled after one or more years of their minimum dates.  For example, of the 89 rapists paroled in 1995, 27 were paroled within one year after reaching their minimum date, and 62 were paroled after one or more years of their minimum dates.  Thus, Wolfe's purported "percentages" of the number of rapists yearly released on parole are invalid.[1]

_____

[1]Wolfe should have known that his interpretation of the DOC chart was erroneous.  In the response to his discovery request, Commonwealth defendants objected that "No statistics exist showing the rate of parole for rapists before or after December 18, 1996 (the date of the amendment at issue). Nor could such statistics be readily created given the number of inmates in the custody of the Pennsylvania Department of Corrections ("DOC") who are serving, or have served, sentences for rape convictions.  To give an idea of the numbers involved, **as of October 21, 2005, there were 3,792 inmates in DOC custody currently serving time for rape.**  Just to determine how many of these inmates are participating in sex offender treatment programs would require the review of 3,792 inmate files.  Defendants and the undersigned counsel do not have the time, man-hours, or resources necessary to even attempt creating the statistics requested in this interrogatory.  Accordingly, to the extent plaintiff requests defendants to compile information and generate the requested statistics, defendants object that such request is unduly burdensome."  See Plaintiff's Interrogatories and Document Requests Directed to Defendants Pursuant to the Court Order Dated September 1, 2005, attached hereto as Exhibit A; and Defendants' Response, attached hereto as Exhibit B.

The raw numbers cited by plaintiffs do not support Wolfe's ex post facto claim. As discussed above, the chart does not show the total number of rapists serving time for parole. Nor does it show the number of rapists who were eligible for parole consideration in any given year. It does not show the number of rapists who were denied parole after parole consideration. It does not show the Parole Board's articulated reasons for denying rapists parole. *Most importantly, the chart does not reveal whether prior to the 1996 Amendments, the Parole Board tended to grant parole to rapists even if they had refused to participate in sex offender programming, received negative institutional recommendations for parole, <u>and</u> received negative parole guidelines-based recommendations.*

In other words, Wolfe does not present any evidence that he is similarly-situated to those inmates who were granted parole prior to the 1996 Amendments. He has not shown that he was disadvantaged by the alleged application of "newer, harsher guidelines."

A comparison with the <u>Mickens-Thomas</u> case is instructive. In that case, the Third Circuit found the evidence of an ex post facto violation compelling, given the comparison between Thomas and similarly-situated inmates, i.e., prisoners whose life sentences had been commuted prior to 1996. Thomas demonstrated that out of all the prisoners whose life sentences had been commuted prior to 1996, he was the only one to be denied parole. <u>Mickens-Thomas v. Vaughn</u>, 321 F.3d 374, 387 (3d Cir. 2003). Yet, Thomas had obtained a parole guidelines-based recommendation for release as well as a

favorable institutional recommendation from the DOC -- including yes votes from all voting DOC staff. Id., at 381. He had also participated in sex offender programming. Id. As the <u>Mickens-Thomas</u> Court wrote, "a parole decision that fails to address any of the criteria mandated by Board policy, such as institutional recommendations [and] willingness to undergo counseling ...falls outside of the realm of the legitimate exercise of discretion under the pre-1996 policies." Id., at 387.

The facts in this case are a far cry from those laid out in <u>Mickens-Thomas</u>.[2] Wolfe has not presented more than a scintilla of evidence that the alleged application of the amended version of the Parole Act worked to his disadvantage. Unlike Thomas, Wolfe has consistently refused to participate in sex offender programming. Unlike Thomas, Wolfe has consistently received negative institutional recommendations for parole and negative parole guidelines-based recommendations. Unlike Thomas, Wolfe has not and cannot show that application of pre-1996 parole guidelines would have resulted in a favorable parole recommendation. Arguably, the Parole Board would abuse its discretion if it granted Wolfe parole despite his refusal to participate in sex offender programming, his negative institutional recommendation, and his

---

[2]The Third Circuit does not require a petitioner to proffer evidence as convincing as that presented in <u>Mickens-Thomas</u>, particularly in the absence of an evidentiary hearing. However, the petitioner must "proffer at least *some* evidence of disadvantage to warrant habeas relief." <u>Richardson</u>, 423 F.3d at 293. To withstand summary judgment in this civil action, Wolfe must present more than a scintilla of probative evidence; mere speculation and conjecture are not enough. <u>Gans v. Mundy</u>, 762 F.2d 338 (3d Cir.), <u>cert. denied</u>, 474 U.S. 1010 (1985).

negative parole-guidelines based recommendation.  See Mickens-Thomas, 321

F.3d at 387; Richardson, 423 F.3d at 293 (denying ex post facto claim where

prisoner provided no evidence of the rate of parole for similarly-situated

prisoners before and after the 1996 Amendments and did not show, as Thomas

did, that the Parole Guidelines developed prior to 1996 would have

recommended parole).

For all of these reasons, the state parole officials are entitled to judgment

as a matter of law on Wolfe's ex post facto claim.


*Retaliation*

To make a prima facie case of retaliation under the First Amendment, a

prisoner must show that 1) he engaged in constitutionally protected activity; 2)

he suffered "adverse action" at the hands of government officials; and 3) his

constitutionally protected conduct was a substantial or motivating factor in the

decision.  Carter v. McGrady, 292 F.3d 152, 158 (3d Cir. 2002)(citing Rauser v.

Horn, 241 F.3d 330, 333 (3d Cir.2001)(adopting Mount Healthy Bd. of Educ. v.

Doyle, 429 U.S. 274, 287 (1977)).

As more fully set forth in Commonwealth defendants' motion for

summary judgment, Wolfe's prima facie case fails because he cannot show that

his lawsuit was a substantial or motivating factor in any decision to deny him

parole: neither the Parole Board nor any parole official or employee was a

defendant in Wolfe's previous lawsuit.  All of the state defendants in that case

were DOC officials or employees.

Wolfe admits that Commonwealth defendants advised him of his need to participate in sex offender programming, even before he filed his lawsuit (Third Amended Complaint, ¶¶ 52-53). Moreover, *before* the 1996 Amendments, the courts determined that a sex offender's failure or refusal to participate in sex offender programming was a legitimate reason to deny parole. See, e.g., Weaver v. Pennsylvania Board of Probation and Parole, 688 A.2d 766 (Pa. Commw. 1997)(claims relating to Aug. 31, 1995 parole board decision); Eldridge v. Pennsylvania Board of Probation and Parole, 688 A.2d 273 (Pa. Commw. 1997)(claims relating to Sept. 14, 1995 parole board decision); Ramos v. Vaughn, No. 94-2596, 1995 WL 386573 (E.D. Pa. Jun. 27, 1995). In each of those cases, the Parole Board denied parole to a sex offender who refused to participate in sex offender programming.

In his response, Wolfe continues to point to two summarizations in his parole file which briefly referenced the settlement of his previous lawsuit (Wolfe deposition, at 12, 145). But as Wolfe concedes, these two documents were generated in 2002 and 2004 (id.). The Parole Board's initial decision to deny Wolfe parole at the expiration of his minimum was made in *2001*, and it was based on Wolfe's refusal to participate in the sex offender program: Wolfe concedes as much (Third Amended Complaint, ¶¶ 87, 89). Wolfe therefore cannot show any causal connection between his lawsuit and the Parole Board defendants' initial decision to deny him parole. As subsequent green sheets show, nothing changed between the initial denial of parole and subsequent denials: Wolfe continued to refuse to participate in sex offender programming

8

and fail to obtain a favorable institutional recommendation for parole, and the Parole Board continued to include those factors in the green sheets denying him parole.

But even if Wolfe could show a causal link between his previous lawsuit and the decision to deny him parole, Commonwealth defendants would still be entitled to summary judgment. As the Third Circuit has stated, even if "a prisoner has demonstrated that his exercise of a constitutional right was a substantial or motivating factor in the challenged decision, the prison officials may still prevail by proving *that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest.*" See Rauser, 241 F.3d at 334 (emphasis added). Wolfe argues that this defense applies only to a retaliation claim for damages, and has no bearing on a claim for injunctive relief. But Wolfe cites no case to support his argument, and the undersigned counsel is unaware of any case limiting the Mount Healthy and Rauser analysis to Section 1983 damage claims.

In this case, the quantum of evidence shows that state parole officials based their parole decisions on Wolfe's repeated refusal to participate in sex offender programming and failure to obtain a favorable institutional recommendation. Given this evidence, the Court should hold that defendants' decisions were not retaliatory, but within the broad discretion that must be afforded prison and parole officials. Carter v. McGrady, 292 F.3d 152, 159 (3d Cir. 2002)(citing Thornburgh v. Abbott, 490 U.S. 401, 413 (1989)); McGrath v.

Johnson, 155 F.Supp.2d 294, 306 (E.D.Pa.2001).   Accordingly, state parole

officials are entitled to summary judgment on Wolfe's retaliation claims.

In sum, for all the foregoing reasons as well as those set forth in their

motion for summary judgment, Commonwealth defendants should be granted

summary judgment in their favor.

Respectfully submitted,

THOMAS W. CORBETT, JR.
ATTORNEY GENERAL

BY:   s/Beth Anne Smith
Beth Anne Smith
Senior Deputy Attorney General
Identification No. 47162

Susan J. Forney
Chief Deputy Attorney General
Chief, Litigation Section

OFFICE OF ATTORNEY GENERAL
21 S. 12th Street, 3rd Floor
Philadelphia, PA 19107-3603
Telephone: (215) 560-2130

## CERTIFICATE OF SERVICE

I, Beth Anne Smith, Senior Deputy Attorney General, hereby certify that the foregoing reply brief was filed electronically on January 12, 2006 and is available for viewing and downloading from the ECF system. I further certify that a true and correct copy of said document was served on the same date by electronic mail notification to registered ECF users Mary Catherine Roper, Esquire at Mroper@ACLUPA.ORG and Viktoriya Meyerov, Esquire at Viktoriya.Meyerov@dbr.com.

THOMAS W. CORBETT, JR.
ATTORNEY GENERAL

BY:    s/ Beth Anne Smith
Beth Anne Smith
Senior Deputy Attorney General
Identification No. 47162

Susan J. Forney
Chief Deputy Attorney General
Chief, Litigation Section

OFFICE OF ATTORNEY GENERAL
21 S. 12th Street, 3rd Floor
Philadelphia, PA 19107-3603
Telephone: (215) 560-2130

**Exhibit A**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

"JESSICA ELAINE WOLFE©" on behalf of          :
herself and all similarly situated INMATES OF  :
THE PENNSYLVANIA DEPARTMENT OF                 :
CORRECTIONS,                                   :
                                               :
        Plaintiff                         :
                                               :
        v.                                :    CIVIL CLASS ACTION No. 02-2687
                                               :
THE PENNSYLVANIA DEPARTMENT OF                 :
CORRECTIONS, et al.,                           :
                                               :
                                               :
        Defendants.                       :

## PLAINTIFF'S INTERROGATORIES AND DOCUMENT REQUESTS DIRECTED TO DEFENDANTS PURSUANT TO THE COURT ORDER DATED SEPTEMBER 1, 2005

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and the Court Order

dated September 1, 2005 regarding Defendants' obligation to produce statistical information,

Plaintiff Jessica Elaine Wolfe© ("Plaintiff") requests that Defendants serve upon the undersigned

counsel written responses, made under oath, to the within interrogatories and any responsive

documents at the offices of Drinker Biddle & Reath LLP, One Logan Square, 18th & Cherry

Streets, Philadelphia, Pennsylvania 19103-6996, within thirty days of service of these

interrogatories and requests.

## DEFINITIONS

Unless the terms of a particular request specifically indicate otherwise, the following

definitions are applicable to each interrogatory and request set forth below:

    1.    The term "DOC" means the Pennsylvania Department of Corrections.

2.      The term "SOP" means the DOC's Sex Offender Treatment Program (SOP) or its equivalent.

3.      The term "document" is used in the broadest possible sense and refers to all information stored in any form whatsoever, including data stored or contained in computers, on computer tapes, computer discs or any other computer-related storage device, audio recordings, video recordings, still photographs, and all written or printed matter of any kind, including the originals and all non-identical copies, whether different from the original by reason of any notes made on such copies or otherwise.  Examples of documents include, but are not limited to, correspondence, memoranda, e-mails, notes (handwritten, typed or otherwise), affidavits, statements, letters, minutes, agendas, contacts, reports, studies, checks, statements, receipts, summaries, interoffice and intraoffice communications, ledgers, appointment calendars, offers, notations of any sort of conversation (including without limitation telephone conversations or meetings) and all drafts, alterations, modifications, changes or amendments of any of the foregoing, and any and all mechanical, magnetic or electronic recordings or reproductions of any kind of any of the foregoing.

4.      The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery requests all responses that might otherwise be construed to be outside of its scope.

5.      The terms "person" or "entity" mean any individual, corporation, company, organization, association, firm, agency, general partnership, limited partnership, joint venture, trust, business organization, or any other formal or informal subdivision thereof.

6.      The terms "identify," "describe," and "state" mean:

(a)    when used in reference to a natural person, to state his or her full name and present or last known address and telephone number, present or last known business or governmental position or affiliation, and his or her position and employer;

(b)    when used in any other context, to provide a complete, accurate and detailed description, explanation, or listing of the matters inquired of.

## GENERAL INSTRUCTIONS

1.    Pursuant to Rule 26(e) of the Federal Rules of Civil Procedure, these interrogatories and discovery requests are continuing and, if after serving responses, Defendants obtain or become aware of additional information, but not yet supplied, such information shall be supplied promptly as though expressly requested by separate interrogatory or request.

2.    Where an interrogatory or request has more than one part, answer each part separately and fully so that the answer is clearly understandable.  The fact that investigation is continuing or that discovery is not complete shall not be used as an excuse for failure to produce all information currently in your possession, custody or control or otherwise available to you.

3.    To the extent, if at all, you object to any interrogatory, whether in whole or in part, respond to as much of the interrogatory or request as to which no objection is asserted.

4.    If you are unable to answer fully any interrogatory or request herein, after exercising due diligence to secure the information requested, comply to the extent possible and provide a detailed explanation as to why full compliance is not possible.

5.    In any instance in which you deny knowledge or information sufficient to answer an interrogatory or request, or any part thereof, state the name and address of each person, if any,

believed to have such knowledge and describe the efforts made to locate information to answer such interrogatory or request.

6.     If any interrogatory or request is objected to or information responsive to any interrogatory or request withheld under a claim of privilege or otherwise, with respect to each such interrogatory or request state the privilege or protection asserted to apply, describe generally the subject matter of the information that is withheld and the form in which it is contained, including all documents involved, and set forth the facts upon which you rely as the basis for each such objection.  For each document involved provide the following information:

(a)     the nature of the privilege claimed;

(b)     date of the document;

(c)     the name and address of its author(s);

(d)     the name and address of all recipient(s) of the document or its contents or any part thereof or any copy;

(e)     the current locations and custodians of the document and any and all copies thereof;

(f)     a description of the document; and

(g)     the basis for each such asserted privilege.

7.     If you find any interrogatory or request or any term used therein to be vague, ambiguous, subject to varying interpretations or unclear, state what portion of the request or term you find to be vague, ambiguous, subject to varying interpretations or unclear, and state the construction employed by you in answering the interrogatory or request.

8.     The terms "and", "or", "all" and "each" should be construed so as to provide the most complete and comprehensive answer.

-4-

9.      If you exercise the option under Rule 33(d) of the Federal Rules of Civil

Procedure to produce documents in lieu of responding to any interrogatory, produce such

documents separately, designate the interrogatory or interrogatories to which the documents

respond, and identify the file or other source from which you obtained the documents.

10.     Unless specifically stated otherwise, the relevant time period is from January 1,

1976 to the present.

## INTERROGATORIES AND DOCUMENT REQUESTS

### INTERROGATORY NO. 1

Identify the number of sex offender inmates released on parole during the relevant time

period, and for each, please identify:

        (a)     offenses for which convicted;

        (b)     minimum and maximum sentence;

        (c)     the date of the release on parole;

        (d)     time served at the time of release on parole; and

        (e)     whether the inmate participated in the SOP while incarcerated and, if so, what Phases of the SOP (if any) he completed prior to the release.

### INTERROGATORY NO. 2

Identify the number of sex offender inmates whom the Department of Corrections

("DOC") recommended to be released on parole prior to completing all stages of the SOP during

the relevant time period, and for each, identify:

        (a)     offenses for which convicted;

        (b)     minimum and maximum sentence;

        (c)     the date of the recommendation;

        (d)     time served at the time of recommendation; and

(e)    whether the inmate participated in the SOP and, if so, what Phases of the
SOP (if any) he completed prior to the DOC's recommendation.

## DOCUMENT REQUEST NO. 1

Produce any documents you used, consulted or reviewed to compile information

responsive to Interrogatories 1 and 2, above.

Dated: October 5, 2005.

Viktoriya Meyerov (No. 85215)
Maresa H. Torregrossa (No. 90306)
DRINKER BIDDLE & REATH LLP
One Logan Square
18th and Cherry Streets
Philadelphia, PA 19103

OF COUNSEL:
Mary Catherine Roper
American Civil Liberties Union of Pennsylvania
P.O. Box 1161
Philadelphia, PA 19105

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I, Viktoriya Meyerov, hereby certify that on October 5, 2005 I caused a true and correct copy of PLAINTIFF'S SET OF INTERROGATORIES to be served via e-email upon the following counsel:

> Beth Anne Smith
> c/o Law Dept.
> Office of Attorney General
> 21 S. 12th Street, 3rd Floor
> Philadelphia, PA 19107-2130
> bsmith@attorneygeneral.gov

Viktoriya Meyerov

PHLIT\528995\1

# Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| INMATES OF THE PENNSYLVANIA DEPARTMENT OF CORRECTIONS, | : | CIVIL ACTION |
| Plaintiffs | : | |
| v. | : | |
| THE PENNSYLVANIA DEPARTMENT OF CORRECTIONS, et al., | : | |
| Defendants | : | No. 02-2687 |

## DEFENDANTS' RESPONSE TO PLAINTIFF'S INTERROGATORIES AND DOCUMENT REQUESTS PURSUANT TO THE COURT ORDER DATED SEPTEMBER 1, 2005

Defendants Castor, Descher, Green, Imboden, Lucht, Martinez, Muller, Ryan, Shannon, Ward, Webster, White, and Wildenstein, by their attorney, hereby respond to plaintiff Jessica Elaine Wolfe's interrogatories and request for production of documents as follows:

GENERAL OBJECTION

Defendants generally object that plaintiff's definition of "the relevant time period" as "January 1, 1976 to the present" is overbroad, unduly burdensome, seeks information that is irrelevant to this case, and is not reasonably calculated to lead to the discovery of admissible evidence. The plaintiff in this case is an inmate who was sentenced in 1996 (admittedly prior to the effective date of the 1996 amendment at issue) and has been incarcerated since that time. Therefore, while some information predating the effective date of the 1996 amendment may be arguably relevant to plaintiff's claims, there is no conceivable reason for the relevant time period to commence in January 1976, over twenty years before the amendment's effective date.

The following answers are made subject to and without waiving the foregoing objection.

SPECIFIC OBJECTIONS AND ANSWER TO INTERROGATORY NO. 1

Objection. The Pennsylvania Board of Probation and Parole ("Parole Board") does not keep, and has never kept, statistics as specific as those requested by plaintiff. No statistics exist showing the rate of parole for rapists before or after December 18, 1996 (the date of the amendment at issue). Nor could such statistics be readily created given the number of inmates in the custody of the Pennsylvania Department of Corrections ("DOC") who are serving, or have served, sentences for rape convictions. To give an idea of the numbers involved, as of October 21, 2005, there were 3,792 inmates in DOC custody currently serving time for rape. Just to determine how many of these inmates are participating in sex offender treatment programs would require the review of 3,792 inmate files. Defendants and the undersigned counsel do not have the time, man-hours, or resources necessary to even attempt creating the statistics requested in this interrogatory. Accordingly, to the extent plaintiff requests defendants to compile information and generate the requested statistics, defendants object that such request is unduly burdensome.

The statistical information in the possession, custody and control of the Parole Board is collectively attached as Exhibit A and includes the following:

The Declaration of Allen Castor, submitted in the case of Cooper v. Pennsylvania Board of Probation and Parole, No. 04-2577 (M.D. Pa.), contains a table on page 5, ¶ 10, which shows the percentage of paroles and reparoles granted during calendar years 1990 through 2004.[1]

---

[1] The undersigned counsel has redacted ¶¶ 17-26 from the Declaration, as these paragraphs contain specific facts relating to inmate Cooper's sentence as well as his interviews before the Parole Board and the reasons for the Parole Board's decisions to deny him parole. Such information has no bearing on Wolfe's claims and, further, may fall within the protection of the Pennsylvania Criminal History Record Information Act. 18 Pa.C.S.A. §§ 9101 et seq.

The table entitled "Total Considered and Percent Paroled Over Ten Years" identifies total number of inmates considered for parole, and percentage granted parole, for each year from 1995 to 2005.

The table entitled "Percent Paroled at Minimum and Review" shows the percentages of inmates paroled at their minimum sentence and inmates paroled at a subsequent review, from January 1998 to June 2005 (six month interval).

The table entitled "Percent Paroled Violent Offense Classified" shows the breakdown of those paroled from January 1998 to June 2005 (six month interval), by violent and non-violent offense. (Wolfe's crime, rape, is classified as a violent offense.)

The following page includes a table from the Weekly Reporting Series, shows numbers and percentages of inmates paroled during the six month period before December 18, 1996 and the six month period after December 18, 1996. On the same page, there is a table entitled "Annual Summary" showing the numbers and percentages of violent offenders and non-violent offenders paroled for each year from 1996 to 2003.

At present, it is possible but not certain that the DOC may be able to generate statistics showing the number of inmates in DOC custody for rape who were paroled within a year of their minimum sentences, from 1995 to the present. Assuming the DOC can obtain this information, it should be available shortly and will be provided to plaintiff's counsel upon its receipt.

ANSWER TO INTERROGATORY NO. 2

Neither the Parole Board nor the DOC maintains any statistics of the number of sex offender inmates whom the DOC recommended to be released on parole prior to completing all stages of the SOP during the relevant time period. As stated above, given the number of inmates

3

presently serving time for rape, it would be unduly burdensome, if not impossible, for the Parole

Board and/or the DOC to compile the information needed to generate the requested statistics.

DOCUMENT REQUEST NO. 1

See documents collected at Exhibit A.

THOMAS W. CORBETT, JR.
ATTORNEY GENERAL

BY:    _Beth Anne Smith_

Beth Anne Smith
Senior Deputy Attorney General
Identification No. 47162

Susan J. Forney
Chief Deputy Attorney General
Chief, Litigation Section

OFFICE OF ATTORNEY GENERAL
21 S. 12th Street, 3rd Floor
Philadelphia, PA 19107-3603
Telephone: (215) 560-2130

4

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

HARRY COOPER,                       :
                Petitioner :
                        : No. 1:CV-04-2577
        v.                 :
                        : Judge Caldwell
PENNSYLVANIA BOARD OF               :
PROBATION AND PAROLE, et            :
al.,                                :
            Respondents :

## DECLARATION OF ALLEN CASTOR

I, Allen Castor, hereby state subject to the penalties of perjury under 28

U.S.C. § 1746 that the following facts are true and correct based upon my personal

knowledge or from official records of the Pennsylvania Board of Probation and

Parole, maintained in the ordinary course of carrying out its obligations to the

citizens of this Commonwealth:

1.    I am a Member of the Pennsylvania Board of Probation and Parole

(hereinafter "the Board"). I have been a Member of the Board since June 16, 1992,

and served as its Chairman from February 24, 1993 to July 1, 1995. I began my

employment with the Board on May 18, 1972, as a Parole Agent. Thereafter, I was

promoted to Parole Supervisor, Deputy District Director and then, on June 11,

1987, Parole Hearing Officer.

2.    As a Board Member and employee of the Board for over 32 years, I am familiar with the Board's policies and procedures over my entire tenure with the Board.

3.    An institutional parole representative (most commonly, an institutional parole agent) completes the first part of a form, styled "Parole Decision Making Guidelines" form (hereafter "internal 'guidelines' form"), before an offender is interviewed by one or more representatives of the Board. The task of completing the internal "guidelines" form, which is actually a parole risk assessment form, and not truly a set of guidelines, is a clerical task and the parole agent is not authorized by the Board to exercise any discretion in completing the form. This has been practice since 1981 when the Board started using its first internal "guidelines" form.

4.    Thereafter, representatives of the Board, after considering all the factors set out in Section 19 of the Probation and Parole Law, Pa. Stat. Ann. tit. 61, § 331.19 (West 1999) (hereinafter referred to as "§ 19"), in the exercise of their discretion, determine whether the offender is sufficiently rehabilitated to warrant his release on parole, and whether his release would constitute an unreasonable risk to public safety.

5.    Although Section 1 of the Probation and Parole Law, Pa. Stat. Ann. tit. 61, § 331.1 West 1999) (hereinafter referred to as "§ 1"), was amended in 1996,

the Board does not now interpret, nor has it ever interpreted, that amendment to affect its parole decision making authority. Therefore, that amendment of the declaration of public policy did not increase the likelihood that any offender would be refused parole.

6.    The state supreme court's decision in *Winklespecht v. Pennsylvania Board of Probation & Parole,* 813 A.2d 688, 691 (Pa. 2002), decided on December 31, 2002, accepted the Board's argument and confirmed its interpretation that the "rewording of 61 P.S. § 331.1 did not create a substantial risk that parole would be denied any more frequently than under the previous wording, nor did the addition of this language create a new offense or increase the penalty for an existing offense." That decision informs all the Board's decisions as of December 31, 2002.

7.    The Board has not exercised its discretion to parole offenders differently since the 1996 amendment of § 1 than it did before December 18, 1996. Both before and after the 1996 amendment to § 1, the Board would not release an offender when, in the Board's opinion, the interests of the Commonwealth in preventing crime would be injured by the offender's release.

8.    The Board does not interpret the amendment of § 1 to change the public policy as to which offenders should be paroled and when they should be paroled, but rather as a legislative emphasis of the Board's statutory charge to

3

make paroling decisions in accordance with the original intent of § 19 and Pa. Stat. Ann. Tit. 61, § 331.21 (West 1999) (hereinafter referred to as § 21)-whether "the interests of the Commonwealth will be injured" by the release of the offender. It has always been the Board's mandate to protect the safety of the public. Therefore, each of the factors outlined in § 19 and § 21 are considerations that go to assess the same question. The Board interprets the amendment of § 1 as only a reemphasis of the pre-existing consideration of public safety contained in § 21.

9.    The Board has implemented no new criteria in the parole decision-making process because of the 1996 amendment. Only the factors contained in § 19 and § 21 were considered in this case, as they are in all cases. The Board applied the pre-1996 statute and corresponding rules, and the pre-1996 standards, in this case.

10.    Statistics compiled by the Board show that the rate of parole and reparole decreased each year from 1992 to 1996-before the amendment of § 1 (which was not enacted until December 18, 1996)-but that the rate of parole and reparole has actually been greater than it was in 1996 in every year since the amendment was passed. Indeed, the lowest rate for any quarter occurred during the first quarter of 1996 (that is, from January 1, 1996, through and including March 31, 1996) when the rate of parole and reparole was 29%. The following table shows these statistics.

4



**Calendar year Percent of Paroles and Reparoles Granted**

| Calendar year | Percent of Paroles and Reparoles Granted |
|---|---|
| 1990 | 73.1% |
| 1991 | 78.9% |
| 1992 | 77.4% |
| 1993 | 75.3% |
| 1994 | 68.2% |
| 1995 | 53.3% |
| 1996 | 38.8% |
| 1997 | 41.8% |
| 1998 | 41.7% |
| 1999 | 48.3% |
| 2000 | 49.8% |
| 2001 | 52.5% |
| 2002 | 50.9% |
| 2003 | 58% |
| 2004 | 59% |

As can be seen from this table, the percentage of offenders paroled or reparoled did not decrease following the enactment of the amendment of § 1 on December 18, 1996, but rather increased from approximately 39% in 1996, to approximately 42% in 1997 and most recently, to approximately 59%.

11.    In the majority of the seven years since the enactment of the amendment of § 1 of the Probation and Parole Law, the percentage of offenders paroled or reparoled increased every year, falling slightly only in 1998 and again in 2002.

12.    The first of many steps in the parole decision-making process involves filling in the blanks on an internal "guidelines" form to arrive at a numerical score recommendation. In addition to the internal "guidelines" form recommendation, the Board also considers other factors to the extent applicable, such as:

- the recommendations of the prison warden or superintendent in charge of the institution in which the offender is confined;
- the recommendation(s) of the sentencing judge(s);
- the recommendation(s) of the prosecuting attorney(s);
- victim input (if any);
- prior parole supervision history;
- the statements of the offender during a parole interview;
- the demeanor of the offender during a parole interview;
- the viability of offender's proposed parole plan;
- any sex offender reports;
- any mental health reports;
- any medical reports that would imply a physical inability to commit further antisocial acts;
- any detainers reflecting unresolved criminal charges, other sentences of confinement, or potential deportation;
- the notes of testimony from the trial(s) and sentencing hearing(s);
- the complete criminal record of the offender;
- the complete nature and circumstances of the offense(s);
- physical history of the offender;
- mental history of the offender;
- behavior history of the offender; and
- the offender's history of family violence.

The majority of these factors are not reflected in any way in the internal "guidelines" form's numerical score.

13.     Beginning with my appointment as a Hearing Examiner on June 11, 1987, I have interviewed offenders for parole and voted on whether to parole them-both before and after the December 18, 1996, amendment to § 1 of the Probation and Parole Law.

14.     The criteria used by the Board in exercising its discretion to parole offenders have not changed at any time since my appointment as a Board Hearing Examiner.

15.     Probably the most important factor that affected parole rates during the mid-1990's, was the change in the membership of the Board. The terms of Board Members Dahle Bingaman, Raymond McGinnis and Mary Ann Stewart expired July 9, 1994, May 12, 1995, and May 12, 1995, respectively, and the Governor did not reappoint them. Beginning July 9, 1994, one of the five Board Member positions was vacant when Dahle Bingaman's term expired. On May 12, 1995, a total of three of the five Board Member positions were vacant when the terms of Raymond McGinnis and Mary Ann Stewart expired. On May 23, 1995, the number of Board vacancies was reduced by one when Michael Webster was appointed and on June 19, 1995, the Board returned to its then full complement when Nicholas Muller and Sean Ryan were appointed. On December 18, 1996,

Section 2 of the Probation and Parole Law, Pa. Stat. Ann. tit. 61, § 331.2 (West 1999) was amended to increase the number of Board Members from 5 to 9. Since December 18, 1996, William F. Ward (February 10, 1997), Richard Kipp (June 10, 1997), Barbara Descher (June 10, 1997), Benjamin Martinez (June 3, 1998), Gary R. Lucht (June 14, 1999), Lloyd White (June 6, 2001), Jeffrey R. Imboden (October 28, 2003), Michael L. Green (October 28, 2003), Gerard N. Massaro, Ph.D., (February 10, 2004) and I (June 14, 1999) were appointed or reappointed to six-year terms as Board Members, effective the dates within the parentheticals following each name. The differences in the exercise of discretion by Board members reflect the differences in their viewpoints and approaches and are not the result of any change in the Board's parole criteria, standards or policy.

16. Throughout the time I have been an employee and official of the Board, the criteria, standards and policy used by the Board Members to exercise their discretion whether to parole offenders have been embodied in § 19 and § 21. That is, the Board does not release an offender when, in the Board Members' opinion, the interests of the Commonwealth in preventing crime would be injured by the prisoner's release. The Board has not changed its parole criteria, standards or policy at any time during this period. No recommendation of any Senate Committee, assessment or decision of the Pennsylvania Inspector General or report

by the Chairman of the Senate Judiciary caused a change in the Board's parole criteria, standards and policy.

**[Paragraphs 17 to 26 Redacted]**

**Executed this _____ day
of February, 2005**

_____

**Allen Castor
Member, Pennsylvania Board
of Probation and Parole**

# Establishment of the BOARD



**Total Considered and Percent Paroled Over Ten Years**

Total    - - Parole Rate

- to revoke the parole of technical parole violators and those convicted of new crimes;

- to make pre-sentence investigations and reports as provided by law;

- to collect, compile and publish statistical and other information relating to probation and parole work in all courts and such other information the Board may deem of value in probation service;

- to supervise offenders sentenced by the courts to imprisonment for less than two years where a request is made by the sentencing court;

- to supervise offenders sentenced by other states where a request is accepted pursuant to the "Interstate Compact for Adult Offender Supervision," and;

- to release from parole persons under supervision who have served their entire sentence in compliance with the conditions governing their parole.

## Continuum of Service

Public safety is achieved through a continuum of criminal justice services in our communities. When someone has broken the law, the offender is arrested, prosecuted, adjudicated, and sentenced to an appropriate sanction, which can include incarceration and/or probation or parole. In order for this continuum to function smoothly, it is necessary for all components of the system to work cooperatively. This includes law enforcement, the courts, correctional facilities, and probation and parole.

The Board of Probation and Parole evaluates state offenders' suitability for release to parole supervision. If approved for parole, the Board also provides supervision services in the community. The Board must balance the demands of protecting the safety of the public while facilitating the offender's reintegration into the community. Additionally, the Board strives to promote cooperation with its fellow community corrections organizations and encourages development of new strategies for the delivery of services.

# *Office of* BOARD SECRETARY

inmates for parole interviews. The Board then made the decision to add the following locations in June 2005: SCI-Forest, SCI-Rockview, SCI-Fayette, SCI-Graterford, SCI-Houtzdale and SRCF-Mercer.

To date, a total of 415 inmates have been interviewed via videoconference; 316 were classified as non-violent offenders, and the remaining 99 were classified as violent. The Board plans to continue developing the effective use of videoconferencing with various inmate population types during the next fiscal year.

Another effective use of the videoconferencing technology is to connect employees to training sites that they would otherwise have to travel hours to obtain. Data is currently gathered and studied for future consideration of implementation of video conferencing at various levels for training purposes.

## Hearing Examiner Planning System

A new Hearing Examiner Planning System is being developed with the goal to be

implemented by September 2005. This system will centralize hearings and interviews, improve efficiency, and help to coordinate the workload of Hearing Examiners. This system will enable parole agents in the field to directly schedule hearings and begin to expedite the entire process from start to finish. Hearing coordinators will be key actors in the Planning System and were integral to it's development.

## Grant Activity

The Office of Board Secretary along with other Senior Staff continues to seek out grant opportunities for further development and referral to the appropriate department within the Board for grant generation, preparation and development. Joint grants initiatives between common agencies are constantly in pursuit by Board Staff.

13





**Weekly Reporting Series**

| Dates | Violent Offense | Not violent Offense | Unknown | Total Actions | Violent Offense Parole | Not Violent Parole | % Violent Parole | % Not Violent Parole |
|---|---|---|---|---|---|---|---|---|
| 6/3/96 to 6/30/96 | 170 | 142 | 134 | 446 | 26 | 74 | 16% | 12% |
| 7/1/96 to 7/28/96 | 237 | 236 | 111 | 584 | 55 | 183 | 23% | 30% |
| 7/29/96 to 9/1/96 | 384 | 440 | 69 | 893 | 65 | 278 | 22% | 63% |
| 9/2/96 to 9/29/96 | 398 | 359 | 217 | 974 | 115 | 193 | 20% | 54% |
| 9/30 to 10/27 | 668 | 489 | 216 | 1,373 | 153 | 285 | 23% | 54% |
| 10/28 to 11/3 | 833 | 636 | 305 | 1,774 | 190 | 353 | 23% | 56% |
| 11/4 to 12/1 | 313 | 252 | 166 | 731 | 77 | 128 | 25% | 51% |
| 12/2/96 to 12/29/96 | 383 | 389 | 208 | 980 | 115 | 128 | 30% | 33% |
| **Yearly Total** | 3,386 | 2,943 | 1,426 | 7,755 | 616 | 1,582 | 24% | 64% |
| 12/30/96 to 2/2/97 | 686 | 504 | 250 | 1,440 | 158 | 260 | 23% | 52% |
| 2/3/97 to 3/2/97 | 879 | 715 | 389 | 1,983 | 221 | 374 | 25% | 52% |
| 3/3/97 to 3/30/97 | 440 | 365 | 230 | 1,035 | 108 | 279 | 25% | 76% |
| 3/3/97 to 4/27/97 | 728 | 622 | 355 | 1,705 | 250 | 359 | 34% | 58% |
| 4/28/97 to 6/1/97 | 584 | 574 | 311 | 1,469 | 211 | 332 | 36% | 58% |
| 6/2/97 to 6/29/97 | 401 | 406 | 216 | 1,023 | 123 | 248 | 31% | 61% |
| **Yearly Total** | 3,718 | 3,186 | 1,751 | 8,655 | 1,071 | 1,852 | 29% | 58% |

**Annual Summary**

| Year | Violent Offense | Not violent Offense | Subtotal | Unknown | Total | Violent Offense Parole | Not Violent Parole | % Violent Parole | % Not Violent Parole |
|---|---|---|---|---|---|---|---|---|---|
| 1996 | 4,194 | 3,689 | 7,883 | 3,966 | 11,849 | 918 | 1,976 | 22% | 54% |
| 1997 | 6,689 | 5,410 | 12,099 | 3,029 | 15,128 | 1,985 | 3,179 | 30% | 59% |
| 1998 | 7,824 | 5,098 | 12,922 | 2,544 | 15,466 | 2,373 | 2,849 | 30% | 56% |
| 1999 | 7,863 | 5,351 | 13,214 | 1,605 | 14,819 | 3,071 | 3,102 | 39% | 58% |
| 2000 | 6,150 | 5,858 | 12,008 | 129 | 12,137 | 2,383 | 3,532 | 39% | 60% |
| 2001 | 6,194 | 6,337 | 12,531 | 16 | 12,547 | 2,418 | 4,115 | 39% | 65% |
| 2002 | 6,133 | 6,562 | 12,695 | 2 | 12,697 | 2,393 | 4,196 | 39% | 64% |
| 2003 | 5,346 | 7,040 | 12,045 | 19 | 12,064 | 2,501 | 5,074 | 47% | 72% |

## CERTIFICATE OF SERVICE

I, Beth Anne Smith, Senior Deputy Attorney General, hereby certify that defendants' response to plaintiff's interrogatories and request for production of documents was served on November 4, 2004 by regular United States mail, postage prepaid, to:

Viktoriya Meyerov, Esquire
Drinker Biddle & Reath LLP
18th & Cherry Streets
One Logan Square
Philadelphia, Pa 19103-6996

THOMAS W. CORBETT, JR.
ATTORNEY GENERAL

BY:    _Beth Anne Smith_

Beth Anne Smith
Senior Deputy Attorney General
Identification No. 47162

Susan J. Forney
Chief Deputy Attorney General
Chief, Litigation Section

OFFICE OF ATTORNEY GENERAL
21 S. 12th Street, 3rd Floor
Philadelphia, PA 19107-3603
Telephone: (215) 560-2130