IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| "JESSICA ELAINE WOLFE©" on behalf of herself and all similarly situated INMATES OF THE PENNSYLVANIA DEPARTMENT OF CORRECTIONS, | : CIVIL CLASS ACTION No. 02-2687 |
| Plaintiff | : |
| v. | : |
| THE PENNSYLVANIA DEPARTMENT OF CORRECTIONS, et al., | : |
| Defendants. | : |

**PLAINTIFF'S SUPPLEMENTAL BRIEF IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

At the October 18, 2006 oral argument on Defendants' Motion for Summary Judgment, the Court asked the parties to explore the availability of statistical evidence to support Plaintiff's claim that Defendants' consideration of her requests for parole under the revised statutory standard has reduced her likelihood of being granted parole. Defendants have produced statistical data regarding the parole of inmates with the same primary offense code as Plaintiff and that data has been explained by the Department of Corrections statistician who performed the analysis. This evidence establishes that the change in parole standards embodied in the 1996 statutory change has lengthened the time that inmates with Plaintiff's primary offense code spend in prison. That evidence entitles Plaintiff to pursue her Ex Poste Facto claim for injunctive relief and mandates the denial of Defendants' motion for summary judgment on that claim.

**The Legal Framework for Plaintiff's Ex Poste Facto Claim**

In Count V, Ms. Wolfe alleges that the Parole Board members violated the Ex Post Facto Clause because they applied an amended version of the Pennsylvania Parole Act to determine her parole eligibility notwithstanding the fact that she was sentenced prior to the enactment of the amendments. A new law or policy violates the Ex Post Facto Clause (1) when it is retrospective, *i.e.*, when it "appl[ies] to events occurring before its enactment," and (2) when it "disadvantage[s] the offender affected by it." *Weaver v. Graham*, 450 U.S. 24, 29 (1981); *see Coady v. Vaughn*, 251 F.3d 480, 488 (3d Cir. 2001). In determining whether the 1996 change in Pennsylvania's parole statute violates the Ex Poste Facto Clause when applied to inmates sentenced before its passage, "[t]he essential matter before us is … whether, in practice, the new language has altered the fundament for reviewing parole applications." *Mickens-Thomas v. Vaughn*, 321 F.3d 374, 384 (2003) (citing *Garner v. Jones*, 529 U.S. 244, 256 (2000)).

In December 1996, the Pennsylvania Parole Act was amended to make public safety the paramount factor in determining parole eligibility and to instruct Parole Board members to consider whether the "fair administration of justice" and particularly public safety could be served by granting parole to an individual inmate. 61 P.S. § 331.1 (1996). In *Mickens-Thomas v. Vaughn*, 321 F.3d 374 (2003), the Third Circuit engaged in an extensive analysis of the background and official statements regarding the change, to determine – as the Pennsylvania Board of Probation and Parole denied – "whether, in practice, the new language has altered the fundament for reviewing parole applications."

The Third Circuit concluded that the statutory change wrought an unambiguous change in Pennsylvania's parole standards:

> The record is convincing that after 1996, the Board applied to the public safety interest far greater weight. The evidence here demonstrates that

> since 1996, the Board has given special weight to the risk to public safety. Pre-1996, a prisoner could be denied parole because of public safety concerns only if those concerns together with other relevant factors outweighed, by a preponderance, the liberty interests of the inmate. The 1996 policy change placed first and foremost the public safety to the disadvantage of the remaining liberty interest of the prisoner.
>
> . . .
>
> We conclude, then, that prior to 1996, the Board's concern for potential risks to public safety could not be the sole or dominant basis for parole denial under the existing Guidelines. Considerations of public safety were already incorporated into its Guidelines analysis; the Board had to point to "unique" factors as a basis for its rejection of the Guidelines. Moreover, the Board had to weigh all factors, militating for and against parole, and make its decision on the totality of the factors pertinent to parole, and give appropriate weight to the interests of the inmate. Heavy foot application on one factor could not have been the basis of granting or rejecting parole. Policy declarations in and after 1996 demonstrate that Board stance shifted and that, indeed, post-1996 considerations of public safety became the dominant concern of the Board.

*Mickens-Thomas v. Vaughn*, 321 F.3d at 385, 386.

The Third Circuit then considered the practical effect on Mr. Mickens-Thomas's request for parole by comparing the outcomes of similarly situated inmates' requests for parole prior to the statutory change: "The statistical evidence is quite staggering here, and strongly confirms the change in policy in 1996: of the 266 historical instances of commuted sentences on which the Board has kept records, all were granted parole on the first or second application." *Mickens-Thomas*, 321 F.3d at 385. The court noted that these inmates were not identically situated to Mr. Mickens-Thomas, and that the composition of the Parole Board has changed over the years, but nonetheless found overwhelming evidence that the change in the statute reflected a real change in the parole standards that resulted in a longer period of incarceration for Mr. Mickens-Thomas, entitling him to an injunction directing the Parole Board to reconsider his parole application under the pre-1997 standard.

**The Statistical Support for Plaintiff's Ex Poste Facto Claim**

Defendants argue, in support of their Motion for Summary Judgment, that Plaintiff cannot prove that she has been disadvantaged by the change in the parole statute.[1] Plaintiff has not been permitted to ask the Parole Board members who considered her applications for parole which standard they applied and therefore has no direct evidence that the application of the post-1997 standard impaired her bid for parole. But she can demonstrate, "by evidence drawn from the rule's practical implementation by the agency charged with exercising discretion, that its retroactive application … result[s] in a longer period of incarceration than under the earlier rule." *Garner v. Jones*, 529 U.S. 244, 247 (2000).

Defendants have produced the chart appended as Exhibit A, which sets forth, for inmates with the same primary offense designation as Plaintiff, the total number of DOC inmates with that code in each year from 1995 through 2005,[2] and, for each of those years, the number of those inmates who were paroled at completion of their minimums (within one year), no more than 2 years after their minimums, no more than 3 after their minimums, and those who were paroled more than three years after completion of their minimums. Exhibit A. The purpose of this analysis, as explained by Mark Emory, the DOC employee who provided the data, was to determine, for inmates with primary offense code CC 3121, how soon after the expiration of

---

[1] To grant summary judgment, the Court must find that there is no genuine issue of material fact. Fed. R. Civ. P. 56(c). The Court must view the facts in the light most favorable to Plaintiff, as the nonmoving party, and must make all reasonable inferences in her favor. *Marzano v. Computer Sci. Corp.*, 91 F.3d 497, 501 (3d Cir. 1996). Although entitled to all reasonable inferences, the nonmoving party must present more than a "scintilla" of evidence to withstand summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

[2] The chart includes "year to date" numbers for 2006 (it was produced in October 2006), which this discussion omits for the purpose of simplicity.

their minimums they were paroled in the selected years.  Deposition of Mark Emory ("Emory Dep.") at 20-22 (attached as Exhibit B).[3]

The chart below restates the data collected by Mr. Emory in terms of percentages.  The data from Mr. Emory's charge is presented in plain type; the percentages calculated from those numbers appear in bold.  In each case, the percentage is not intended to represent the percentage of those eligible for parole who were successful, but the percentage of those paroled who were successful within one year, between one and three years after, or more than three years after completing their minimums.

---

[3] The parties have determined and stipulated that CC 3121 is Plaintiff's primary offense code. Emory Dep. at 43.

|  | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Total # paroled in the year | 53 | 15 | 39 | 44 | 80 | 94 | 64 | 56 | 45 | 50 | 39 |
| # paroled w/in year of minimum | 27 | 4 | 10 | 4 | 9 | 6 | 10 | 9 | 9 | 13 | 5 |
| **% paroled w/in year of min** | **51%** | **27%** | **26%** | **9%** | **11%** | **6%** | **16%** | **16%** | **20%** | **26%** | **13%** |
| # paroled 1-3 years after min.[4] | 21 | 9 | 22 | 18 | 43 | 41 | 30 | 24 | 22 | 17 | 10 |
| **% paroled 1-3 years after min.** | **40%** | **60%** | **56%** | **41%** | **54%** | **44%** | **47%** | **43%** | **49%** | **34%** | **26%** |
| # paroled more than 3 years after min. | 5 | 2 | 7 | 22 | 28 | 47 | 24 | 23 | 14 | 20 | 24 |
| **Total % paroled no more than 3 years after minimum** | **91%** | **87%** | **82%** | **50%** | **65%** | **50%** | **63%** | **59%** | **69%** | **60%** | **39%** |
| **% paroled more than 3 years after min** | **9%** | **13%** | **18%** | **50%** | **35%** | **50%** | **38%**[5] | **41%** | **31%** | **40%** | **62%**[6] |
|  |  |  |  |  |  |  |  |  |  |  |  |

Not surprisingly, the percentages vary from year-to year. Therefore, it is necessary to average the percentages to determine whether the DOC's information suggests that the change in

---

[4] The number of inmates paroled between 1 and 3 years after the completion of their minimum sentences was obtained by subtracting the number who waited more than 3 years for parole (seventh line of Mr. Emery's chart) from the number who were waited more than 1 year for parole (fifth line of Mr. Emery's chart).

[5] The percentages for 2001 add up to 101% because they are rounded to the nearest whole percentage point. The precise percentages for 2001 are as follows: 15.625% paroled within one year; 46.875% paroled between 1 and 3 years; 37.5% paroled more than three years after completion of minimum.

[6] The percentages for 2005 add up to 101% because they are rounded to the nearest whole percentage point. The precise percentages for 2005 are as follows: 12.82% paroled within one year; 25.64% paroled between 1 and 3 years; 61.54% paroled more than three years after completion of minimum.

law made parole less available for inmates with Plaintiff's primary offense code. The following chart presents the averaged percentages:

|  | 1995-1996 | 1997-2005 |
|---|---|---|
| **Average % paroled w/in year of min** | 39% | 16% |
| **Average % paroled 1-3 years after min.** | 50% | 44% |
| **Average % paroled no more than 3 years after min.** | 89% | 60% |
| **Average % paroled more than 3 years after min** | 11% | 41[7]% |

These statistics show a significant change in how soon inmates who obtained parole did so. In the 1995-1996 time period, 39% of the inmates serving time for rape were paroled within a year of completing their minimum sentence, while in that 1997-2005 time period, that percentage was cut, by more than half, to 16%. A less dramatic, but no less certain, decrease occurred in the percentage of inmates who obtained parole in more than one but less than three years. The overall change is summarized in the last line of this second chart: 41% of inmates with Plaintiff's offense code who were paroled after the statutory change had waited more than three years for parole, as compared with 11% of those who were paroled prior to the statutory change.[8] This is far more than a "scintilla" of evidence that the purpose of the 1996 statutory

---

[7] The percentages for 1997-2005 total to 101% because they incorporate the rounding-up of the previous table.

[8] Defendants have noted that these numbers do not provide a "rate of parole" for inmates like Plaintiff because the DOC is unable to identify how many such inmates applied for parole in any given years. That is true. Emory Dep. at 44. It is a safe bet, however, that virtually all inmates apply for parole upon completion of their minimum sentences, and that is the range in which the DOC's statistics show the most dramatic change: prior to the statutory change, 39% of those being paroled had just completed their minimums; after the statutory change, only 16 % of those being paroled had just completed their minimums.

change has been carried out: for inmates like Plaintiff, "[the] retroactive application [of the statute] will result in a longer period of incarceration than under the earlier rule." *Garner v. Jones*, 529 U.S. at 247.

The Court should deny Defendants' motion for summary judgment as to Plaintiff's claim for injunctive relief under the Ex Poste Facto Clause.

Respectfully submitted,

*/s/ Mary Catherine Roper*
Mary Catherine Roper
American Civil Liberties Union of Pennsylvania
P.O. Box 40008
Philadelphia, PA 19106
(215) 592-1513, ext. 116
Fax (215-592-1343
mroper@aclupa.org


Viktoriya Meyerov
Andrea D'Ambra
Maresa Torregrossa
DRINKER BIDDLE & REATH LLP
One Logan Square
18th and Cherry Streets
Philadelphia, PA 19103-6996
(215) 988-2700 (Phone)
(215) 988-2757 (Fax)
Attorneys for Plaintiffs

Dated: January 21, 2007.

CERTIFICATE OF SERVICE

**I certify that I filed the foregoing document using the Court's ECF system and that the following is a ECF user such that she will receive service automatically:**

>Beth Anne Smith
>Office of Attorney General
>21 S. 12th Street, 3rd Floor
>Philadelphia, PA 19107-2130
>(215) 560-2130 (phone)
>Attorney for Defendants

>**/s/ Mary Catherine Roper**
>**Mary Catherine Roper**

Dated: January 21, 2007.