UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
- - -

"JESSICA ELAINE WOLFE"  :
on behalf of herself    :
and all similarly       :
situated INMATES OF THE:
PENNSYLVANIA DEPARTMENT:
OF CORRECTIONS,         :
                        : CIVIL CLASS ACTION
        vs.             : NO. 02-2687
                        :
THE PENNSYLVANIA        :
DEPARTMENT OF           :
CORRECTIONS, et al.,    :
                        - - -
        Philadelphia, Pennsylvania
        Monday, December 18, 2006

                - - -

        Deposition of MARK EMERY held at
Drinker Biddle & Reath LLP, One Logan Square,
18th and Cherry Streets, on the above date,
beginning at approximately 10:10 a.m., before
Kimberly A. Overwise, a Certified Realtime
Reporter and Notary Public.
                - - -
        V A R A L L O  Incorporated
        Litigation Support Services
        1835 Market Street, Suite 600
        Philadelphia, PA  19103
        215.561.2220     215.567.2670

1

APPEARANCES:
    MARY CATHERINE ROPER, ESQ.
    American Civil Liberties Union of
    Pennsylvania
        P.O. Box 40008
        Philadelphia, PA  19106
        Counsel for Plaintiff

    BETH A. SMITH, ESQ.
    Office of Attorney General
        Litigation Section
        21 S. 12th Street, 3rd Floor
        Philadelphia, PA  19107

        Counsel for Defendants

    (INDEX at end of transcript.)

2

1
2      (E-mail, 10/25/06, to Smith
3   from Emery marked Emery Exhibit 1.)
4              - - -
5      ...MARK EMERY, after having
6   been duly sworn, was examined and
7   testified as follows:
8   BY MS. ROPER:
9      Q   Good morning, Mr. Emery.
10      A   Good morning.
11      Q   As I said before, my name is Mary
12   Catherine Roper and I represent the plaintiff
13   in this case.  Let me ask first, have you
14   given a deposition before?
15      A   No.
16      Q   Okay.  There's a pretty simple
17   procedure.  I'll explain it to you and make
18   sure you understand.  If at any point you have
19   any questions, you can stop and ask me.  The
20   deposition is pretty straightforward.  I ask
21   questions.  You answer them.  You are, of
22   course, under oath and everything that we say
23   is being taken down.  Because everything we
24   say is being taken down, it's absolutely
25   important that we follow two rules.  One is

3

                Mark Emery
1
2   that every answer you give must be oral and
3   verbal in that you can't say uh-huh or unh-unh
4   because the court reporter can't distinguish
5   between those things.  Is that clear?
6      A   Yes.
7      Q   And you passed the first practice
8   test of that.  The second rule is that she
9   cannot take down two people talking at the
10   same time.  So however painfully obvious it is
11   what it is I'm asking you, you need to wait
12   until I finish asking the question before you
13   give your answer.  Okay?
14      A   Okay.
15      Q   And I will try to make sure I wait
16   until you finish your answer.  And if I ever
17   haven't waited, I've come in on a pause or
18   just rudely interrupted you, feel free to tell
19   me that you are not finished and finish your
20   answer.
21      A   Okay.
22      Q   You should only answer questions
23   that you understand.  So if you do answer a
24   question, I will assume you understood it.
25   You have every right to ask me to clarify a

4

Mark Emery

1 question, break it down, explain what I mean.
2 There is nothing about this that should be a
3 trap. Okay?
4    A   Okay.
5    Q   If ever you want to confer with your
6 counsel, you are free to do that, but I would
7 ask that you do it not when you're about to
8 answer a question. So if I've asked a
9 question, please give the best answer you can,
10 then tell me you want to take a break rather
11 than going out while the question is pending.
12       MS. SMITH: I'll object to that
13    only to the extent there's something
14    involving privilege which he does need to
15    consult with me before answering the
16    question.
17 BY MS. ROPER:
18    Q   Absolutely. The exception would be
19 to find out from your counsel if there's some
20 issue of confidentiality, attorney-client
21 privilege that you should protect in your
22 answer. And I do not intend any of my
23 questions to ask you to reveal communications
24 you've had with your counsel and I'll try my

5

Mark Emery

1 best to phrase them to avoid that, but we may
2 run into a little bit of that.
3    A   Okay.
4    Q   You are not chained to the chair.
5 If you want to take a break, get another soda,
6 just walk, you are free to do that. This is
7 not an endurance contest. So feel free to
8 tell me any time that you need a break.
9    A   Okay.
10    Q   And, finally, are you taking any
11 medication today or do you have any condition,
12 medical condition or such that would interfere
13 with your ability to recall and testify
14 accurately?
15    A   No.
16    Q   Okay. Good. Thank you. Let's
17 start at the beginning. Mr. Emery, where are
18 you employed?
19    A   I'm employed with the Pennsylvania
20 Department of Corrections.
21    Q   And what is your position?
22    A   I am the state and county data
23 analyst.
24    Q   And what are your job duties that

6

Mark Emery

1 position?
2    A   I perform routine database
3 operations such as the inmate misconduct
4 system, reporting system, the informal
5 resolution system, RISP, which is random
6 inmate selection process, which is just a term
7 used for our drug testing program, as well as
8 ad hoc data queries such as this, so database
9 really.
10    Q   Okay. Are there other state and
11 county data analysts who work for the
12 Department of Corrections?
13    A   There are other data analysts, but
14 we're compartmented in the different things
15 that we do and my niche is -- well, my niche
16 is county data, but I do predominantly
17 actually more state data. In other words,
18 there's the county jail system which they have
19 to report information to the DOC, and I
20 coordinate that. And then there's the state
21 data, which is the Department of Corrections
22 data, and that's a major part of my job.
23    Q   And that would be several different
24 kinds of data, so, for instance, data about

7

Mark Emery

1 you said misconduct records, data about drug
2 testing, all different streams of data come to
3 you and you manage or report regarding them;
4 is that correct?
5    A   Yes, yes. There are monthly reports
6 that we put out to the different institutions
7 about their misconduct rates, the drug
8 testing, as well as I did, as I said, some of
9 the ad hoc queries from determining how many
10 lifers we have to determine the average length
11 of stay for certain subset of our inmates to,
12 for example, this one here.
13    Q   And where do those ad hoc inquiries
14 come from?
15    A   They come from all over. Primarily,
16 we work directly for the Secretary of
17 Corrections. And, of course, his queries take
18 precedence, but they come from outside
19 government agencies such as Council of State
20 Governments and they come from law firms.
21 Really, they come from all over.
22    Q   And who is your supervisor?
23    A   My supervisor is Bob Flaherty,
24 F-L-A-H-E-R-T-Y.

8

2 (Pages 5 to 8)

Mark Emery

1
2    Q   And what is his position?
3    A   I'll just -- I don't know his
4    official title so I'll just say acting data
5    chief.
6    Q   And do you know --
7    A   He's the chief data analyst.
8    Q   Okay.  And do you know to whom he
9    reports?
10   A   Yes.  He reports to James Schaefer,
11   S-C-H-A-E-F-E-R.
12   Q   And do you know Mr. Schaefer's
13   position?
14   A   He is the acting director for
15   planning, research, statistics, and grants.
16   Q   And do you know to whom Mr. Schaefer
17   reports?
18   A   Yes, Kathleen Gnall, G-N-A-L-L.  And
19   she is the chief -- I don't know her title.
20   She oversees PRSG, our office, and inmate
21   services.  She reports to Secretary Beard.
22   Q   Apart from ad hoc inquiries, do you
23   in any routine fashion deal with statistics
24   regarding parole?
25   A   Yes, yes.

9

Mark Emery

1
2    regular reports regarding misconduct and drug
3    testing and some other issues?
4    A   Correct.
5    Q   Okay.  Do you without any ad hoc
6    inquiry generate any regular reports regarding
7    parole, length of stay, or recidivism?
8    A   Yes and no.  Yes to recidivism
9    because I assist Bob Flaherty in preparing our
10   annual recidivism study, but no to parole in
11   that sense, only in the sense of recidivism.
12   Q   Okay.  But is part of the recidivism
13   study to make note of length of incarceration
14   as it relates to recidivism?
15   A   No.
16   Q   What are the factors that you look
17   at or report in the recidivism study?
18   A   Primarily demographics: gender,
19   race -- there's a third.  It escapes me at
20   this point but it's not -- I know what it's
21   not.  It's not, for example, the crime or the
22   length of stay, but it's demographics and
23   whether or not the person is on their initial
24   parole or re-parole.
25   Q   And to whom is that annual study

11

Mark Emery

1
2    Q   And how do you do that?
3    A   We have -- well, we do not have
4    access to the data from probation and parole,
5    the Pennsylvania Board of Probation and
6    Parole.  The parole data that we work with is
7    from the DOC tables, and they are primarily
8    things such as determining when people are
9    released on their initial parole to determine
10   length of stay and recidivism.
11   Q   Can you explain to me what it means
12   for you to analyze those things, length of
13   stay and recidivism?
14   A   I'll need a clarification.
15   Q   Okay.  Perhaps this is the easiest
16   way to ask it:  Are you preparing reports for
17   someone regarding these parole statistics?
18   A   Yes.  Whenever I work with an ad hoc
19   parole query, it's usually a very defined
20   question presented from some outside agency or
21   office and I respond through Bob to them.
22   Q   Okay.  Let me backtrack a minute.
23   What I had wanted to find out was whether --
24   let me put this in context.  Am I correct that
25   without any ad hoc inquiry, you generate

10

Mark Emery

1
2    given?  Who is it prepared for?
3    A   The executive staff, Secretary Beard
4    and his deputy secretaries.  And those
5    statistics are also published through the DOC
6    web site.
7    Q   So am I correct then that any work
8    that you do with length of stay and how
9    quickly after a minimum an inmate is paroled
10   is purely in response to ad hoc inquiries?
11   A   Correct.
12   Q   And by the way, how long have you
13   been in your current position?
14   A   About 19 months.
15   Q   And where did you work before that?
16   A   I worked for the Department of
17   Corrections, same office.  I was a grants
18   administrator for three years.
19   Q   And how about prior to that?
20   A   With the Department of Health in the
21   Bureau of Chronic Disease Intervention.
22   Q   Was that also a position in which
23   you worked primarily with data and statistics?
24   A   Yes.
25   Q   And what about prior to the

12

3  (Pages 9 to 12)

**Mark Emery**

1  Department of Health?
2  Department of Health?
3     A  I was with the Department of Public
4  Welfare and I was a welfare worker.
5     Q  What training do you have in data
6  analysis and statistics?
7     A  I served for about 12 years in the
8  military as an intelligence analyst and
9  received professional education in the
10  analytical process through the military at the
11  entry and then there was essentially two other
12  courses, an apprentice course and a journeyman
13  course.  In college, I had a statistics class,
14  what's called finite math -- these are things
15  that are specific to statistical analysis --
16  finite math, which dealt with statistics and
17  proper and improper interpretation of them,
18  what was termed innumeracy, which is not a
19  word.  I'm sorry.
20     Q  Where did you go to college?
21     A  Indiana University of Pennsylvania.
22     Q  And do you have a degree or
23  concentration in statistics or math?
24     A  No.
25     Q  What did you major in?

13

**Mark Emery**

1     A  English lit.
2     A  English lit.
3     Q  Me too.  Now, you stated that you do
4  not have data from the parole board; is that
5  correct?
6     A  We do not have access to that data.
7     Q  What data regarding length of stay
8  and parole do you have access to?
9     A  None that we don't create or
10  generate.  We have access to data tables on
11  our servers, and then we would develop queries
12  from the data tables to give us length of stay
13  and other parole-related questions.
14     Q  What raw data is contained in those
15  tables?
16     A  There are probably 200 data tables
17  on different servers.  And the type of data on
18  there ranges, everything, demographics,
19  sentence, sentence length, more recently
20  inmate testing, inmate diagnostic testing.
21  Excuse me.  So it's a lot.
22     Q  Do you have any tables regarding
23  inmate completion of prescriptive programs?
24     A  No.
25     Q  So, for instance, would these data

14

**Mark Emery**

1  tables contain the minimum and maximum
2  tables contain the minimum and maximum
3  sentence for DOC inmates?
4     A  Yes.
5     Q  And the crime for which they were
6  sentenced?
7     A  The data tables will show the
8  controlling offense but not all of the
9  convictions.
10     Q  Is another way to say that the
11  primary offense?
12     A  Yes.
13     Q  So, for instance, if an inmate was
14  convicted of one count of rape and a count of
15  assault and a count of resisting arrest, how
16  would the sentences for -- would you be able
17  to tell the breakdown in sentencing for those
18  convictions or only know the total length of
19  time expected to be served?
20        MS. SMITH:  Objection to the
21     form.
22        Do you understand the question?
23        THE WITNESS:  I believe I do.
24        MS. SMITH:  Then you can answer
25     it to the best of your ability.

15

Mark Emery

1        THE WITNESS:  It didn't work
2        THE WITNESS:  It didn't work
3  like that.  The inmates will serve
4  concurrent sentences or one after the
5  other.  So it -- and if someone had
6  multiple convictions, they were to serve
7  one after the other, they would have an
8  inmate number that would change with the
9  new sentence.  And then the data field
10  such as their min, their max, and the
11  sentence length would also change.  So
12  they're overwritten if a new sentence
13  starts.  So there's no aggregate min, max
14  for an inmate if they're convicted of
15  multiple offenses and they're serving
16  them one after the other.
17  BY MS. ROPER:
18     Q  Okay.  And if they are serving them
19  concurrently, would you only have information
20  about the primary offense?
21     A  Yes.
22     Q  Do you know the source of that data,
23  how it gets into the data tables you access?
24     A  Yes.  The data is put in by clerks
25  at the diagnostic centers for men in Camp

16

4 (Pages 13 to 16)

Mark Emery

1 Hill, for women in Muncy. Primarily, that's
2 where the data is put in. However, that's
3 overwritten at SCIs if information changes.
4    Q   And would an example of that be if
5 an inmate's sentence is modified on appeal,
6 then that information would be changed by the
7 folks at the institution?
8    A   I would speculate yes. I've
9 never -- I don't have familiarity with the
10 appeal and how they change the records.
11    Q   Now, do you also have access to raw
12 data about when an inmate is paroled?
13        MS. SMITH: Objection to the
14    form. Do you mean after his minimum?
15        MS. ROPER: Yes.
16        MS. SMITH: You're talking
17    about how long after his minimum he's
18    paroled? Is that what you're talking
19    about?
20        MS. ROPER: Not yet.
21 BY MS. ROPER:
22    Q   So my first question is, what
23 information do you have regarding when an
24 inmate is paroled? What information do you

17

Mark Emery

1 receive?
2    A   We have a data table called MOVREC,
3 M-O-V-R-E-C. And the MOVREC table creates a
4 new record every time there is some type of
5 move for an inmate, be it a transfer, rollover
6 to a new sentence. So when an inmate is
7 paroled, in the MOVREC there will be a new
8 record created with the sentence status code
9 changing to P and the parole status code
10 either SP or RP, state parole, which is for
11 initial parole, and RP is re-parole. The
12 MOVREC is not overwritten unlike a lot of the
13 other data tables. A new record is always
14 created.
15    Q   And do you know who enters the data
16 that appears in the MOVREC database?
17    A   The clerks at the SCIs. SCI is
18 state correction institution.
19    Q   Now, as you've made reference to,
20 you're here because of an ad hoc inquiry that
21 you received. Can you tell me what
22 information you were asked to produce?
23    A   I responded to an e-mail inquiry. I
24 have a copy of it here.

18

Mark Emery

1    Q   May I see that?
2        MS. SMITH: Yes. I'll waive
3    any attorney-client privilege for that.
4        MS. ROPER: Thank you. I'm
5    trying to find a way to get around it.
6        MS. SMITH: I'm not sure there
7    is a way.
8        (Discussion off the record.)
9 BY MS. ROPER:
10    Q   Do you have the original e-mail
11 saying what it was that you should retrieve?
12    A   I thought it was on this. It's not.
13 No, I do not.
14    Q   Is that something that you would be
15 able to retrieve from your e-mail system?
16    A   I don't think so. I get those
17 annoying administrator things about my thing's
18 over its limit, so I periodically have to
19 purge.
20    Q   Understanding that the inquiry may
21 have evolved over time, can you tell me to the
22 best of your recollection what the initial
23 inquiry asked you for?
24    A   I believe I was asked to expand upon

19

Mark Emery

1 an earlier inquiry about the number of persons
2 convicted of rape and how many were paroled.
3 I believe I was asked to expand because I did
4 within one year and then more than one year,
5 and I think they needed it broken down for
6 one, two, and three years, one, two, and three
7 years after minimum.
8    Q   Would it be accurate to say that
9 what you were trying to determine was for
10 people with the primary offense of rape how
11 soon after their minimums they were paroled in
12 a series of years?
13    A   It would be accurate with one
14 clarification. It was only for the offense
15 code CC3121, the most common offense code for
16 rape or sexual assault. It was only drawn for
17 that offense code. So the other offense codes
18 listed are not included in the data table.
19 That offense code was part of the original
20 query.
21    Q   So what you set out to do was for
22 this particular type of rape offense, one
23 offense code, you set out to determine how
24 soon after their minimums inmates sentenced

20

Mark Emery

1  under this code were being paroled in
2  specified years; is that correct?
3        MS. SMITH: Okay. I was going
4  to object except you said in specified
5  years. I think that is probably where
6  you should start, from that point, in
7  terms of the query. It wasn't just
8  tracking an inmate and seeing how soon.
9  It was seeing in a given year how many
10 inmates were paroled. I believe that was
11 my query.
12       MS. ROPER: Let me try to
13 rephrase that.
14 BY MS. ROPER:
15   Q   Did you understand what you were
16 doing to be comparing for the years 1995 and
17 subsequent how soon inmates with this primary
18 offense code were getting paroled after their
19 minimums?
20       MS. SMITH: Objection to the
21 form.
22       But if you understand, you can
23 answer.
24   A   I believe I understand the question,

21

Mark Emery

1  the Department of Corrections with that
2  primary offense code?
3    A   Correct, in our SCIs.
4    Q   Right, not in county jail?
5    A   Or our community corrections
6  centers.
7    Q   Okay. Go on. What was the next
8  step?
9    A   The next step to find the parole
10 total was to match that base table with the
11 MOVREC file to find any of those inmates who
12 had a sentence status code of P and a parole
13 status code of SP for initial parole, state
14 parole or initial parole, and a move code of
15 D, which is for delete. That just means
16 they're out of our system. The record itself
17 is not deleted. It's just it's a move code.
18 So that tells you who received initial parole
19 in 1995.
20   Q   And were there 53 such inmates?
21   A   There were. For the max out, I
22 matched through the MOVREC file move code D --
23 I guess I should also clarify. There's also a
24 move date and I cut it down to 1995. There's

23

Mark Emery

1  and, yes, I believe that's what I was seeking
2  to accomplish.
3    Q   Okay. Well, let's take this year by
4  year. And it might get a little bit
5  repetitive, but it will be easier to explain.
6        MS. SMITH: Off the record.
7        (Discussion off the record.)
8  BY MS. ROPER:
9    Q   So, for instance, for the year 1995,
10 can you tell me what information you looked at
11 and what procedure you went through to obtain
12 what you were looking for?
13   A   Yes. 1995, for 1995 I looked at a
14 data table that has general inmate information
15 and contains the offense code for the
16 controlling offense, for the primary offense.
17 So I ran a query to give me a base table of
18 inmates with the primary offense code CC3121.
19 That number is represented as 1,816 in 1995.
20 There was nothing else as far as drawing down
21 that number. It was just how many people had
22 that code.
23   Q   And does that mean that there were
24 1,816 inmates presently within the custody of

22

Mark Emery

1  a move date in the MOVREC file. For max out,
2  who was move code D, sentence status code is
3  SC for sentence complete, and parole status
4  code is NA, which means they were never
5  paroled.
6    Q   So of the 1,816 inmates in the
7  Department of Corrections' custody in 1995
8  with the primary offense code that you've
9  previously mentioned, there were 36 who had
10 been released because they completed their
11 maximum in that year and 53 who had been
12 released on parole on initial parole that
13 year?
14   A   Yes, with one clarification for max
15 out. There are two types of max outs.
16 There's a true max out and then a parole max
17 out. Essentially, if someone was released on
18 parole, they violate parole, they come back on
19 that sentence, and then they end up maxing
20 out, those people are not included in 36, the
21 number 36. Thirty-six is folks who have never
22 been on parole. They're what we call true max
23 outs.
24   Q   Okay, rather than people who were

24

6 (Pages 21 to 24)

Mark Emery

1           Mark Emery
2  paroled and then had their parole revoked and
3  ended up fulfilling the rest of their sentence
4  in an SCI?
5    A   Yes.  So that's how I got the parole
6  and the max out number.  Then for the next
7  three, four rows within one year, after one
8  year, after two years, and so forth, that is
9  when I match it with a field and a table with
10  their min date, their minimum date.  I match
11  that and then I see of those who were paroled,
12  what was their min date and how far away from
13  their min date were they when they were
14  paroled.  So the 1,816 includes all inmates,
15  irrespective of whether or not they've
16  exceeded their min.
17    Q   So for 1995, we're looking at 53
18  initial paroles for people with this offense
19  code.  Twenty-seven of them were paroled
20  within a year of completing their minimums.
21  Twenty-six of them were paroled more than one
22  year after completing their minimums.
23  Correct?
24    A   Correct.
25    Q   And then the two years and three

25

1           Mark Emery
2  years are a subset, not a complete listing but
3  a subset of the number 26?
4    A   Correct.
5    Q   And what is the after one year
6  total?
7    A   That is adding the 26 for after one
8  year and the true max outs.
9      MS. ROPER:  At this point let
10  me mark Emery Exhibit 2 because it's the
11  color chart and it might be easier at
12  this point.
13      (E-mail, 10/24/06, to Roper
14  from Smith marked Emery Exhibit 2.)
15      (Discussion off the record.)
16      MS. ROPER:  Let's mark this as
17  Emery Exhibit 3.  I may refer back to 2.
18  I don't know.
19      I'd like to take a couple
20  minutes, five minutes so I can finish
21  reading Emery Exhibit 1.  Stretch your
22  legs, walk around, whatever you'd like.
23      (Data table marked Emery
24  Exhibit 3.)
25

26

1           Mark Emery
2  BY MS. ROPER:
3    Q   Let's look at Emery 3.  So if we
4  look at this table -- and I'm going to direct
5  you to three lines in particular, the line
6  parole total and then within one year and
7  after one year.  So am I correct in stating
8  that in 1995, of the total inmates with this
9  offense code who were paroled, it's almost
10  50/50 how many of them were being paroled upon
11  completion of their minimum and how many of
12  them were being paroled after some greater
13  length of time?
14    A   Yes.
15    Q   Now, in the next year, 1996, it's a
16  smaller -- it's a much smaller number we're
17  looking at, only 15 paroled as opposed to 53.
18  Of those 15, fewer were paroled within a year
19  of the minimum than waited longer than the
20  completion of their minimum; correct?
21    A   Yes.
22    Q   And as we continue looking across
23  the years, we find that to be repeated so that
24  in every year after 1995, a greater number of
25  inmates with this offense code were being

27

1           Mark Emery
2  paroled later than in the first year after
3  their minimums were completed?
4    A   Yes.
5    Q   By the way, why did you choose this
6  offense code?
7    A   It was specified in the original
8  query.
9    Q   Did you perform the same sort of
10  analysis for any other offense code?
11    A   No.
12    Q   Let's look at Emery 1.  This is the
13  copy of the e-mails you brought with you.  And
14  I'm going to look at the first page.  Now,
15  carrying over from the first page to the
16  second page of Emery 1, I see a long list of
17  sex offenses; correct?
18    A   Yes.
19    Q   And their offense codes?
20    A   Yes.
21    Q   And, for instance, the first one is
22  CC3121, forcible rape.  That is the offense
23  code you analyzed; correct?
24    A   Correct.
25    Q   And the second one, CC3121-1, other

28

V A R A L L O   Incorporated
(215) 561-2220

Mark Emery

1       **Mark Emery**
2   **Part II offenses, if you had run the same**
3   **analysis with that offense code, there would**
4   **have been different numbers; correct?**
5     A  Yes.
6     **Q  Do you have any reason -- do you**
7   **have any belief or opinion as to whether those**
8   **numbers would have shown a different**
9   **relationship between first year parole and**
10   **parole more than a year after completing the**
11   **minimum?**
12        MS. SMITH: Objection to the
13     form. Your question assumes a
14     relationship in Emery 3.
15   BY MS. ROPER:
16     **Q  You can answer the question if you**
17   **understand it.**
18     A  Could you repeat the question?
19     **Q  Sure. Having not performed the same**
20   **analysis on say CC3121-1, do you have any**
21   **opinion or any understanding of how the**
22   **numbers would have played out for that offense**
23   **code?**
24     A  No. And likely they would have had
25   smaller numbers and, therefore, anything that

29

Mark Emery

1       Mark Emery
2     **Q  Are you more confident, however,**
3   **that 3121 would be a greater number than**
4   **3121-1, -2, -3, -4?**
5     A  Yes.
6     **Q  Can you explain to me what CC3121-1,**
7   **-2, -3, -4 indicate?**
8     A  No.
9     **Q  So you don't know the difference?**
10     A  No, I do not know. That's coding
11   done by our records department.
12     **Q  Now, on the second page, I'm looking**
13   **at the paragraph of text after the long list**
14   **of sexual assault offenses. And the first**
15   **sentence -- by the way, this is something you**
16   **wrote; correct?**
17     A  Correct.
18     **Q  And in the first sentence, you**
19   **write: As you can see, any change in the**
20   **coding changes the number of inmates counted**
21   **for this query.**
22       That's what we basically just
23   **discussed, that for any of these offense codes**
24   **there will be a unique total number of**
25   **inmates?**

31

Mark Emery

1      Mark Emery
2   might be present would be statistically
3   worthless to look at them individually.
4     **Q  So by that do I understand that**
5   **CC3121, the code you used, is the most common**
6   **offense code for inmates who are convicted of**
7   **rape?**
8     A  Correct.
9     **Q  And, therefore, yielded the largest**
10   **sample size for you to look at?**
11     A  Correct, it would have.
12     **Q  Do you know when --**
13     A  Well, actually, now that I look at
14   statutory rape, I believe we do have a great
15   deal of statutory rape offenses, CC3122.
16     **Q  Okay. But in terms of forcible**
17   **rape -- do you have an understanding of what**
18   **statutory rape means?**
19     A  Yes. The more I look over the list,
20   IDSI, involuntary deviant sexual intercourse,
21   I'm not really -- I really am not so certain
22   that -- I know we have a number of IDSI
23   inmates and I wouldn't be able to ballpark how
24   close that is to the number for 3121, in other
25   words, one which might be larger.

30

Mark Emery

1       **Mark Emery**
2     A  Correct.
3     **Q  The next sentence, the manual coding**
4   **has no effect on sentencing parole, et cetera,**
5   **can you explain what that means?**
6     A  What I meant by that is that the
7   coding is an administrative code and, as such,
8   it doesn't trigger any type of -- it has no
9   relationship -- how can I explain this? It's
10   an administrative code. And in terms of --
11   I'm just trying to think how I can explain it.
12   As an administrative code, it really
13   doesn't -- it's an administrative code on a
14   data table and really doesn't exist outside of
15   our data table, so to speak. So I don't
16   think, for example --
17     **Q  Well, let me ask you a question and**
18   **see if I can clarify what you're trying to get**
19   **at. Is it your understanding that there is a**
20   **different statutory definition for forcible**
21   **rape than for statutory rape?**
22     A  Yes.
23     **Q  Those are different crimes?**
24     A  Yes.
25     **Q  But when we look at Code 3121 and**

32

V A R A L L O   Incorporated
(215) 561-2220

Mark Emery

```
 1           Mark Emery
 2  compare it to 3121-1, -2, -3, -4, is what
 3  you're telling me that you do not believe
 4  there is a different crime associated with
 5  each of those codes?
 6     A.  No.  I really -- no, I wouldn't say
 7  that.  I don't know what's entailed so there
 8  could be, there could not be.  I don't code
 9  the offenses.  It would be our records
10  department that does it.  And I imagine they
11  have a criteria.
12     Q.  But you don't know why someone would
13  be a 3121 as opposed to a 3121-1?
14     A.  Correct.  Yeah, I see how that
15  sentence can be confusing.  I apologize.
16     Q.  No, there's no need to apologize.
17  I'm just trying to figure out what you meant.
18     A.  It's more of inside my head.  It has
19  no effect for developing the query.  It has no
20  effect in answering the question that was
21  given to me because it's an administrative
22  code.  I guess what I'm saying is I would have
23  used the same process, and, therefore, the
24  answers in terms of sentencing and parole are
25  sort of independent.  I'm just being more
```
33

```
 1           Mark Emery
 2  confusing.
 3     Q.  Let me ask you this:  You were asked
 4  to perform an analysis on a specific offense
 5  code; correct?
 6     A.  Yes.
 7     Q.  And if you had instead been asked to
 8  determine the same figures for all rapists
 9  confined within the Department of Corrections,
10  you would have done something different;
11  correct?
12     A.  I would have included other offense
13  codes.
14     Q.  Okay.  Otherwise, your analysis
15  would have been the same; correct?
16     A.  The same methodology.
17     Q.  And is that what you mean by the
18  second sentence of this paragraph?
19     A.  Yes.
20     Q.  And is that the reason why a couple
21  of sentences further on you say that it would
22  be a false conclusion to say that the table we
23  have looked at can tell us the rate of parole
24  for rapists?
25     A.  Yes.
```
34

```
 1           Mark Emery
 2     Q.  But the table we have looked at can
 3  show us the rate of parole for this specific
 4  offense code; correct?
 5     A.  Yes.
 6     Q.  A couple sentences further on, you
 7  say:  I may define the terms differently and
 8  easily draw the number higher or lower.
 9          Is what you're talking about there
10  including different or more offense codes to
11  get a different total number and, therefore,
12  different composite numbers?
13     A.  Taken together, the two or three
14  sentences, what I was trying to convey is to a
15  layperson they would use the term "rapist" and
16  not, for example, know that there are several
17  different offense codes.  And I guess when I
18  say that it's more -- the inflexion isn't
19  there, but it's I may define the terms
20  differently.  In other words, lay people can
21  define these terms differently and not
22  understand that there's subtleties that need
23  to be taken into account for.  So if the
24  layperson -- and I use myself as sort of the
25  example.  If they broadly define it or
```
35

```
 1           Mark Emery
 2  misdefine -- that's not even a word -- the
 3  term differently, they can have this number go
 4  higher or lower and perhaps still not get
 5  exactly what they think that they're looking
 6  for.
 7     Q.  Okay.  So if we were looking to draw
 8  conclusions about parole of rapists, because
 9  that term does not directly correspond to a
10  particular offense code, we would not be able
11  to draw these kinds of conclusions from the
12  analysis you did?  Let me withdraw that
13  question and try a new one.
14          Am I correct that your concern is
15  with people thinking that this table says
16  something about the parole of rapists as
17  opposed to the parole of inmates with a single
18  offense code?
19     A.  That's one of my concerns.
20     Q.  Okay.  Can you explain what your
21  other concerns would be?
22     A.  Well, I listed them.  And some of
23  them, for example, is -- we kind of touched on
24  this earlier is there's no indication of
25  inmate rehabilitation programming, whether
```
36

9 (Pages 33 to 36)

Mark Emery

1 they had succeeded, failed, refused treatment,
2 whether they've admitted guilt, whether
3 they've shown remorse. These are all factors
4 that could play in and are simply not
5 reflected and can't be captured or at least
6 aren't captured by our current data tables.
7    Q  Well, let me ask you a question
8 about that. Let's take just one factor that I
9 understand is a factor concerning parole,
10 whether or not the inmate has accepted
11 responsibility for the crime. Your table does
12 not distinguish in any of these numbers
13 between inmates who have accepted
14 responsibility for their crimes and inmates
15 who in the view of the department or the
16 parole board have not accepted responsibility
17 for their crime; correct?
18    A  Correct.
19    Q  Do you have access to any data
20 tables that would enable you to factor that
21 consideration into the analysis you did?
22    A  No, we don't have access. And I
23 don't know if probation and parole even has
24 the tables, but that would be probation and

37

Mark Emery

1 edit checks that keep database tables clean
2 may not have been in place, can you explain to
3 me what you mean by that?
4    A  Yes. When you design a database,
5 you can lock down the fields so that you can
6 only enter numbers or text less than 25
7 spaces. You can define the fields. These are
8 data tables that were never really designed
9 for database use. They were just more for
10 information collection. So human error can
11 come into here in anything from typing in the
12 wrong code to misspelling names to wrong
13 gender to all these normal edit checks that a
14 database will stop you with. Some of those
15 edit checks aren't in place to stop fat finger
16 problems, just hitting the wrong key. Now,
17 some are in place, but the older records, you
18 know, they were sort of migrated from the
19 system that we originally used into our
20 current, using Access, Microsoft Access. Some
21 of the older data is just not as clean as it
22 should be.
23    Q  When you say "older data," give me a
24 year when you think it might have improved.

39

Mark Emery

1 parole and we don't have access to their data
2 tables.
3    Q  Now, similarly, the next thing that
4 you've listed here is there's no indication of
5 inmate misconduct history, which also can
6 affect how soon someone is paroled after the
7 minimum; correct?
8    A  I believe that's one of the factors,
9 but it is correct that it has no -- there's no
10 indication of misconduct history in these
11 numbers.
12    Q  Is the reason you mention misconduct
13 history because you believe that to be a
14 factor in parole?
15    A  I speculated. My specialty is not
16 parole so I speculated.
17    Q  But that is the reason you put it
18 here because you speculated that it was a
19 factor in parole?
20    A  Correct.
21    Q  Now, the last sort of factor you've
22 listed here, the data tables were not
23 originally designed as database tables, they
24 are raw information tables and as such many

38

Mark Emery

1    A  I really can't because it's not like
2 it happened in one month. My understanding --
3 and this predated my time -- it was over a
4 period of time. And we're still sort of
5 updating our systems as we go. Otherwise, it
6 would have just been too much money I guess.
7 I have no idea.
8    Q  So when we look at the chart on
9 Emery 3 and we see there are columns for 1995,
10 1996, 1997, 1998, et cetera, up through
11 2005 --
12       MS. SMITH: 2006 year to date.
13    Q  -- 2006 year to date, is there any
14 particular year or years that you would
15 identify as having more or less reliable data?
16    A  No. I think the table is okay
17 because the fields I used, I think the
18 likelihood of getting bad data in those fields
19 is probably -- the likelihood is not very
20 great. So I think it's okay. It's just I
21 guess I was just more cautious about the
22 coding because again that's an administrative
23 code and I'm just not sure whether that
24 would -- how much that would affect it and if

40

V A R A L L O   Incorporated
(215) 561-2220

Mark Emery

1  there were entry code errors in there.
2  
3      Q   When you say coding, you're pointing
4  to the offense code?
5      A   Offense code. I'm sorry.
6      Q   But then looking back at the long
7  table on Emery 3 just to make sure I'm correct
8  here and quell the panic that has arisen in
9  me, you have no reason to believe that there's
10  any difference in the reliability of these
11  numbers from 1995 to 2005; is that correct?
12      A   Correct, because they seemed to hold
13  somewhat consistent, which would make sense if
14  the data was clean and reliable.
15      Q   Now, I understand that you don't do
16  the offense codding, but do you know of any
17  changes in the way that offense codes were
18  assigned from say 1995 through 2005?
19      A   I am not familiar with the data
20  entry of offense codes.
21      Q   Again, what I want to do is refer
22  back to the long chart on Emery 3. You can't
23  tell me any differences in what the use of
24  this particular offense code means from 1995
25  through 2005?

41

Mark Emery

1      A   Correct.
2  
3      Q   Back to Emery 1, in your indented
4  list of factors here where you say no notation
5  for changes in sentencing guidelines, are you
6  aware of any changes in sentencing guidelines
7  for the crime of forcible rape from 1995
8  through 2005?
9      A   I am only aware in the sense that
10  when I was originally e-mailed about the
11  query, I was told to start at 1995 because
12  there was some type of change. However, I
13  have not read the laws or any administrative
14  policies regarding that.
15      Q   Okay. So you don't have any view as
16  to how anything concerning this sentencing
17  would have changed these numbers?
18      A   Correct.
19      Q   Now, am I correct again looking back
20  at the indented list on the second page of
21  Emery 1 that this is in part a list of things
22  that you surmised or speculated might change
23  how soon after a minimum an inmate was
24  paroled?
25      A   Some of those are, yes.

42

Mark Emery

1      Q   But because you don't actually deal
2  firsthand with parole, you don't know whether
3  any of these things actually has an effect on
4  parole or whether any of these things has been
5  treated differently since 1995?
6      A   Correct.
7      Q   Are you familiar with the types of
8  data kept by the parole board?
9      A   No.
10          MS. ROPER: Can we take just a
11  few minutes?
12          MS. SMITH: Sure.
13          (Short recess.)
14          MS. ROPER: So the parties are
15  stipulating that the offense code
16  assigned to the plaintiff in this case
17  is, in fact, 3121, the same offense code
18  that Mr. Emery used in doing his
19  analysis.
20          And with that, unless I have
21  some followup to your counsel's
22  questions, I am finished. And thank you.
23          THE WITNESS: Thank you.
24  
25

43

Mark Emery

1  BY MS. SMITH:
2      Q   Does the chart that has been marked
3  as Emery 3 show how many inmates in a given
4  year were considered for parole?
5      A   No.
6      Q   Do you have access to that
7  information?
8      A   No. I would have to ask probation
9  and parole that information.
10      Q   And you're assuming that they would
11  have access to how many convicted rapists were
12  considered for parole in a given year?
13      A   I am assuming that, yes.
14      Q   Would that information be necessary
15  to determine a rate of parole in a given year?
16      A   Yes, yes. If you would have a base,
17  a base number of who are eligible and who are
18  considered, then you'd find out how many of
19  that pool were paroled. That would give you a
20  rate of parole for that offense code.
21          MS. SMITH: Thank you. I have
22  nothing further.
23  BY MS. ROPER:
24      Q   Just one followup question. Does

44

V A R A L L O   Incorporated
(215) 561-2220

Mark Emery

1                 Mark Emery
2   the chart marked as Emery 3, even though it
3   doesn't provide us with a rate of parole for
4   those who were considered, am I correct that
5   it does provide us with a rate of parole for
6   the offense code 3121 for those who were
7   eligible for parole in the designated years?
8     A   No.  It tells you how many were
9   paroled, but for the rate, the reason why I
10  wouldn't say it gives you a rate is because of
11  the base number looking at 1995 of 1,816,
12  that's the total population, but it's not the
13  total that were eligible for parole.
14    Q   Okay.  But, for instance, we can get
15  the rate of inmates with this offense code who
16  first were eligible for parole in 1995 and
17  were paroled in 1995; correct?
18        MS. SMITH:  Objection to the
19    form.  Are you saying you can tell from
20    this chart how many were considered for
21    parole within the first year?
22        MS. ROPER:  No.
23        MS. SMITH:  Could you just
24    restate your question?
25        MS. ROPER:  Okay.  I'll try

45

1                 Mark Emery
2   again.
3  BY MS. ROPER:
4    Q   Am I correct that from this chart we
5   can determine the number of and, therefore, a
6   rate of those with this offense code who first
7   became eligible for parole in 1995 and were
8   paroled during this first year of eligibility?
9    A   The term "rate," I'm not as
10  comfortable with using it, but in a very broad
11  sense, yes, it would give you a rate in a very
12  broad sense, but, you know, you may be
13  comparing very dissimilar records.  For
14  example, some of these might be lifers with
15  zero shot at parole.
16    Q   But in that case they would have no
17  minimum and they would not --
18    A   But that 1,816 number, that was just
19  by the offense code.  It wasn't by minimums.
20  Now, I don't know the number of lifers.  And I
21  would suspect if there are lifers with this
22  code, there aren't a great deal of them, but
23  I'm saying the folks who make it out on
24  parole have, you know, a great deal of -- it's
25  a very particular group that they've exceeded

46

1                 Mark Emery
2   their min and have the offense code.  So, yes,
3   you can call it a rate of parole, but it would
4   be one that I'd put an asterisk next to to try
5   to make sure we don't take too much of a
6   conclusion from it.  That's all.
7    Q   Okay.  Let's not use the word "rate"
8   then.  But from this chart, we can determine
9   how many inmates with this offense code in
10  each year were paroled essentially upon
11  completion of minimum; correct?
12    A   Yes.
13    Q   And we can also see how many were
14  paroled in that year who had waited longer
15  than the completion of their minimum?
16    A   Yes.
17        MS. ROPER:  Okay.
18        MS. SMITH:  Nothing further?
19  That's it?
20        MS. ROPER:  Nothing further.
21    (Whereupon the deposition
22  adjourned at 11:50 a.m.)
23        ---
24
25

47

1
2            INDEX
3  WITNESS:            Page
4  MARK EMERY
5    By Mr. Roper        3, 44
6    By Ms. Smith        44
7
8
9
10           EXHIBITS
11  No.       Description     Page
12  Emery 1    E-mail, 10/25/06,    3
             to Smith from
13         Emery
14  Emery 2    E-mail, 10/24/06,   26
             to Roper from
15         Smith
16  Emery 3    Data table     26
17
18
19
20
21
22
23
24
25

48

12 (Pages 45 to 48)

```
 1
 2              CERTIFICATE
 3        I HEREBY CERTIFY that the
 4   proceedings, evidence, and objections are
 5   contained fully and accurately in the
 6   stenographic notes taken by me upon the
 7   deposition of MARK EMERY taken on
 8   December 18, 2006, and that this is a
 9   true and correct transcript of same.
10
11   _____
     Kimberly A. Overwise
12   Certified Realtime Reporter
     Notary Public
13
14
15
16
17        (The foregoing certification of
18   this transcript does not apply to any
19   reproduction of the same by any means
20   unless under the direct control and/or
21   supervision of the certifying reporter.)
22
23
24
25
                                49
```

**Emery, Mark**

**From:**    Emery, Mark
**Sent:**    Wednesday, October 25, 2006 9:56 AM
**To:**    'Smith, Beth'
**Subject:** FW: Requested Data

Reviewing my email, I'm not sure I actually attached the file I said I would.  I apologize.

: was great working with you and I hope our office can assist in the future.

Mark

-----Original Message-----
**From:** Emery, Mark
**Sent:** Tuesday, October 24, 2006 11:38 AM
**To:** 'Smith, Beth'
**Subject:** RE: Requested Data

ve attached a scaled down copy of the spreadsheet used for the numbers.  Hopefully, it can clear some things up.

The "After 1 year" does include those released "After 2 years" and "After 3 years."  "After 2 years" includes those also listed in
After 3 years" because, by definition, an inmate staying eight years after Min has stayed both "after 2 years" and "after three
ears."

Refer to the 1998 tab and it might make more sense than me trying to explain it.

> -----Original Message-----
> **From:** Smith, Beth [mailto:bsmith@attorneygeneral.gov]
> **Sent:** Monday, October 23, 2006 4:59 PM
> **To:** Emery, Mark
> **Subject:** RE: Requested Data
>
> In your chart, you indicate that "Parole Total" (in black) includes (1) all rapists paroled in a given year within one year of
> their minimum sentence AND (2) those paroled after one year of their minimum.  Based on our conversation, it was my
> understanding that the category "after one year" of minimum necessarily includes as subsets the numbers of rapists
> paroled after 2 years, after 3 years, and so forth.
>
> I can follow this from 1995 to 1997.  Then I get lost.
>
> Starting in 1998 it seems that the category "after 1 year" does NOT include those paroled after 2 years, etc.  The numbers
> for after 2 years and after 3 years are too large.  What am I missing?

>> **From:** Emery, Mark [mailto:maemery@state.pa.us]
>> **Sent:** Monday, October 23, 2006 4:03 PM
>> **To:** Smith, Beth
>> **Subject:** RE: Requested Data
>>
>> Beth,
>> Below is the latest table, with some updated numbers.  There are several limiting factors that I should
>> note.  First, the offense code used was CC3121, "Rape."  The offense codes are manually entered into
>> our system and there are other offense codes that indicate forced sexual assault.  Here is a brief sample:
>>
>> | CC3121   | Forcible Rape           | RAPE |
>> |----------|-------------------------|------|
>> | CC3121-1 | Other Part II Offenses  | RAPE |
>> | CC3121-2 | Other Part II Offenses  | RAPE |
>> | CC3121-3 | Other Part II Offenses  | RAPE |
>> | CC3121-4 | Other Part II Offenses  | RAPE |

10/25/2006



EXHIBIT

Emery 1

12/18/06

| | | |
|---|---|---|
| CC3121C | Other Part II Offenses | RAPE OF A CHILD |
| CC3121D | Other Part II Offenses | RAPE OF A CHILD W/SERIOUS BODILY INJURY |
| CC3122 | Statutory Rape | STATUTORY RAPE |
| CC3122.1 | Statutory Rape | STATUTORY SEXUAL ASSAULT |
| CC3123 | Forcible Rape | INVOLUNTARY DEVIATE SEXUAL INTERCOURSE |
| CC3123-1 | Other Part II Offenses | INVOLUNTARY DEVIATE SEXUAL INTERCOURSE |
| CC3123-2 | Other Part II Offenses | INVOLUNTARY DEVIATE SEXUAL INTERCOURSE |
| CC3123-3 | Other Part II Offenses | INVOLUNTARY DEVIATE SEXUAL INTERCOURSE |
| CC3123-4 | Other Part II Offenses | INVOLUNTARY DEVIATE SEXUAL INTERCOURSE |
| CC3123-5 | Other Sex Offenses | INVOLUNTARY DEVIATE SEXUAL INTERCOURSE |
| CC3123A | Other Part II Offenses | INVOLUNTARY DEVIATE SEXUAL INTERCOURSE |
| CC3123C | Other Part II Offenses | INVOLUNTARY DEVIATE SEXUAL INTERCOURSE W/ A CH |
| CC3123D | Other Part II Offenses | INVOLUNTARY DEVIATE SEXUAL INTERCOURSE W/ A CH |
| CC3124 | Other Sex Offenses | VOLUNTARY DEVIATE SEXUAL INTERCOURSE |
| CC3124.1 | Other Part II Offenses | SEXUAL ASSAULT |
| CC3124.2 | Other Part II Offenses | INSTITUTIONAL SEXUAL ASSAULT |
| CC3125 | Other Part II Offenses | AGGRAVATED INDECENT ASSAULT |
| CC3125A | Other Part II Offenses | AGGRAVATED INDECENT ASSAULT |
| CC3125B | Other Part II Offenses | AGGRAVATED INDECENT ASSAULT OF A CHILD |
| CC3126 | Other Sex Offenses | INDECENT ASSAULT |
| CC3126-1 | Other Part II Offenses | INDECENT ASSAULT |
| CC3126-2 | Other Part II Offenses | INDECENT ASSAULT |
| CC3126-3 | Other Part II Offenses | INDECENT ASSAULT |
| CC3126-4 | Other Part II Offenses | INDECENT ASSAULT |
| CC3126-5 | Other Part II Offenses | INDECENT ASSAULT |
| CC3127 | Other Sex Offenses | INDECENT EXPOSURE |
| CC3127B | Other Part II Offenses | INDECENT EXPOSURE WHEN PERSON PRESENT UNDER |
| CC3128 | Other Part II Offenses | SPOUSAL SEXUAL ASSAULT |
| CC3128A | Other Part II Offenses | SPOUSAL SEXUAL ASSAULT |
| CC3128A1 | Other Part II Offenses | SPOUSAL SEXUAL ASSAULT |
| CC3128A2 | Other Part II Offenses | SPOUSAL SEXUAL ASSAULT |
| CC3128A3 | Other Part II Offenses | SPOUSAL SEXUAL ASSAULT |
| CC3128B | Other Part II Offenses | SPOUSAL SEXUAL ASSAULT |
| CC3128B1 | Other Part II Offenses | SPOUSAL SEXUAL ASSAULT |
| CC3128B2 | Other Part II Offenses | SPOUSAL SEXUAL ASSAULT |
| CC3128B3 | Other Part II Offenses | SPOUSAL SEXUAL ASSAULT |

As you can see, any change in the coding changes the number of inmates counted for this query. The manual coding has no effect on sentencing, parole, etc. It's an internal data table for raw data collection. So, while it has no effect on the inmate's time served, it can effect data runs. The data set is also very specific and drawing broad conclusions from a narrowly defined subset can be complicated and it's not uncommon for intelligent folks to draw false conclusions. An example of a false conclusion would be, "The rate of parole for rapists is X%." As you see, there are several offense codes and varying definitions of rape/sexual assault. I may define the terms differently and easily draw the number higher or lower. Though an honest mistake, it remains a mistake. If folks look to draw conclusions from the data, please ensure they are mindful of the limiting factors:

> Narrowly defined offense code
> No notation for changes in sentencing guidelines
> No indication of inmate rehabilitation programming success/failure/participation/refusal
> No indication of inmate misconduct history
> The parole subset **only** includes first time parole and does **not** include re-paroles.
> The data tables were not originally designed as database tables. They are raw information tables and, as such, many edit checks that keeps database tables "clean" may not have been in place.

Of course, the table I send you is only raw data and doesn't include many qualitative factors used to determine eligibility for parole. Some examples are inmate participation in rehabilitation programs, inmate misconduct history, inmate mental capacity and home plan suitability, etc. I'm sure there are more factors, but parole is not my area of specialty.

With all that said, here's the updated table (red and blue make purple, red and black make dark red):

| Min Category | Sentence category | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 200 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Inmates With Code CC3121 | | 1816 | 1990 | 2028 | 2072 | 2045 | 1996 | 2013 | 2047 | 2107 | 210 |
| | Max Out | 36 | 33 | 45 | 66 | 73 | 77 | 73 | 72 | 72 | 6 |
| | Parole Total | 53 | 15 | 39 | 44 | 80 | 94 | 64 | 56 | 45 | 5 |
| Within 1 year | Parole | 27 | 4 | 10 | 4 | 9 | 6 | 10 | 9 | 9 | |
| After 1 year | Parole | 26 | 11 | 29 | 40 | 71 | 88 | 54 | 47 | 36 | 3 |
| After 2 years | Parole | 11 | 5 | 14 | 32 | 53 | 67 | 44 | 38 | 27 | 2 |
| After 3 years | Parole | 5 | 2 | 7 | 22 | 28 | 47 | 24 | 23 | 14 | 2 |
| After 1 year Total | Max out and Parole | 62 | 44 | 74 | 106 | 144 | 165 | 127 | 119 | 108 | 10 |
| All Max Outs and Parole | | 89 | 48 | 84 | 110 | 153 | 171 | 137 | 128 | 117 | 11 |

Have a good day.

Mark T. Emery
Data Analyst
Planning, Research, Statistics, and Grants
Department of Corrections
(717) 731-7149







## Mary Catherine Roper

| | |
|---|---|
| **From:** | Smith, Beth [bsmith@attorneygeneral.gov] |
| **Sent:** | Tuesday, October 24, 2006 3:06 PM |
| **To:** | Mary Catherine Roper |
| **Subject:** | Wolfe - DOC statistics |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Red |

Mary Catherine,

Attached are the raw numbers for the years 1995 to the present showing:

Number of DOC prisoners whose primary offense is rape ("Code CC3121")

Number of rapists who maxed out (in red)

Total number who were paroled (bold) – please note that this number includes within one year and after one year.

Number who were paroled within one year of minimum

Number who were paroled after one year of minimum (in blue). Maybe a better way of stating this would be "after *at least* 1 year of minimum" – because at this point, the chart becomes confusing. The "After 1 year" **includes** those released "After 2 years" and "After 3 years." "After 2 years" includes those also listed in "After 3 years" because, by definition, an inmate staying eight years after Min has stayed both "after 2 years" and "after three years."

To see this more clearly, if you added "within 1 year", "after 1 year", "after 2 years" and "after 3 years", you would arrive at a number larger than the number of total inmates actually released on parole in a given year.

The analyst who prepared this chart helpfully put "max out" in red and "after 1 year" in blue. If you add the two together, you get – appropriately enough -- the purple number. If you add that purple number to "within 1 year," you get the brown number: total number of rapists released that year for first parole or having maxed out.

So, in 1995:

      36 inmates whose primary offense was rape maxed out.
      27 inmates "    "    "    "    " were paroled, for the first time, within one year of their minimum.
      26 inmates "    "    "    "    " were paroled, for the first time, after one year of their minimum.

Total: 89 inmates "    "    "    "    " were either paroled for the first time or maxed out.

Please keep in mind that these are raw numbers. **You cannot derive a rate of parole for rapists from these numbers. Neither the DOC nor the Parole Board keeps statistics on the number of rapists *considered* for parole in any given year. (It is my understanding that the Parole Board keeps stats on the number of *violent offenders* considered for parole, but obviously that number cannot be applied to this chart.)**

Other limiting factors include:



EXHIBIT

Emery 2

Narrowly defined offense code. (This chart deals with only one code. But there are several offense codes and varying definitions of rape/sexual assault not included here, including but not limited to rape of a child, rape of a child with seriously bodily injury, statutory rape, involuntary deviant sexual intercourse, sexual assault, institutional sexual assault, aggravated indecent assault, aggravated indecent assault of a child, spousal sexual assault, etc.)

No notation for changes in *sentencing* guidelines

No indication of inmate rehabilitation programming success/failure/participation/refusal

No indication of inmate misconduct history

No indication of other qualitative factors used in parole consideration, such as inmate mental capacity and home plan suitability

The parole subset only includes first time parole and does not include reparoles

The data tables were not originally designed as database tables. They are raw information tables and, as such, many edit checks that keep database tables "clean" may not have been in place.

If you have any questions, or wish to discuss this further, I can be reached at 215-560-2130.

| Min Category | Sentence category | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 20 |
|---|---|---|---|---|---|---|---|---|---|
| Total Inmates With Code CC3121 | | 1816 | 1990 | 2028 | 2072 | 2045 | 1996 | 2013 | 20 |
| | Max Out | 36 | 33 | 45 | 66 | 73 | 77 | 73 | |
| | Parole Total | 53 | 15 | 39 | 44 | 80 | 94 | 64 | |
| Within 1 year | Parole | 27 | 4 | 10 | 4 | 9 | 6 | 10 | |
| After 1 year | Parole | 26 | 11 | 29 | 40 | 71 | 88 | 54 | |
| After 2 years | Parole | 11 | 5 | 14 | 32 | 53 | 67 | 44 | |
| After 3 years | Parole | 5 | 2 | 7 | 22 | 28 | 47 | 24 | |
| After 1 year Total | Max out and Parole | 62 | 44 | 74 | 106 | 144 | 165 | 127 | 1 |
| All Max Outs and Parole | | 89 | 48 | 84 | 110 | 153 | 171 | 137 | 1 |

12/18/2006

Other limiting factors include:

Narrowly defined offense code. (This chart deals with only one code. But there are several offense codes and varying definitions of rape/sexual assault not included here, including but not limited to rape of a child, a child with seriously bodily injury, statutory rape, involuntary deviant sexual intercourse, sexual assault, institutional sexual assault, aggravated indecent assault, aggravated indecent assault of a child, spousal sexual assault, etc.)

No notation for changes in sentencing guidelines

No indication of inmate rehabilitation programming success/failure/participation/refusal

No indication of inmate misconduct history

No indication of other qualitative factors used in parole consideration, such as inmate mental capacity and home plan suitability

The parole subset only includes first time parole and does not include reparoles

The data tables were not originally designed as database tables. They are raw information tables and, as such, many edit checks that keep database tables "clean" may not have been in place.

If you have any questions, or wish to discuss this further, I can be reached at 215-560-2130.

| Min Category | Sentence category | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 YTD | 2006 YTD | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Inmates With Code CC3121 | | 1816 | 1990 | 2028 | 2072 | 2045 | 1996 | 2013 | 2047 | 2107 | 2108 | 2132 | 2053 | |
| | Max Out | 36 | 33 | 45 | 66 | 73 | 77 | 73 | 72 | 72 | 68 | 64 | 57 | 736 |
| | Parole Total | 53 | 15 | 39 | 44 | 80 | 94 | 64 | 56 | 45 | 50 | 39 | 42 | 621 |
| Within 1 year | Parole | 27 | 4 | 10 | 4 | 9 | 6 | 10 | 9 | 9 | 13 | 5 | 6 | 112 |
| After 1 year | Parole | 26 | 11 | 29 | 40 | 71 | 88 | 54 | 47 | 36 | 37 | 34 | 36 | 509 |
| After 2 years | Parole | 11 | 5 | 14 | 32 | 53 | 67 | 44 | 38 | 27 | 27 | 27 | 26 | 371 |
| After 3 years | Parole | 5 | 2 | 7 | 22 | 28 | 47 | 24 | 23 | 14 | 20 | 24 | 18 | 234 |
| After 1 year | Max out and Parole Total | 62 | 44 | 74 | 106 | 144 | 165 | 127 | 119 | 108 | 105 | 98 | 93 | 1245 |
| All Max Outs and Parole | | 89 | 48 | 84 | 110 | 153 | 171 | 137 | 128 | 117 | 118 | 103 | 99 | 1387 |



tabbies®
EXHIBIT
Emery 3
12/18/06
6