IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

INMATES OF THE PENNSYLVANIA      :
DEPARTMENT OF CORRECTIONS,        :      CIVIL ACTION
                                  :      NO. 02-2687
            Plaintiffs,           :
                                  :
        v.                        :
                                  :
THOMAS W. CORBETT, JR.,           :
et al.,                           :
                                  :
            Defendants.           :


M E M O R A N D U M

────────────────────────

EDUARDO C. ROBRENO, J.                        APRIL 25, 2007


The question before the Court is whether a Pennsylvania state inmate was improperly denied parole by the Parole Board. The inmate alleges that (1) the Parole Board violated the Ex Post Facto Clause by applying the wrong standard to her parole application and/or (2) Department of Corrections officials improperly retaliated against her, causing the Parole Board to reject her application. Defendants have moved for summary judgment.

For the reasons that follow, the Court will grant the motion.


I.  BACKGROUND

Plaintiff Jessica Elaine Wolfe,[1] a transgender person serving prison time in Pennsylvania for rape, brings this putative class action[2] suit against the Pennsylvania Department of Corrections (DOC), the Board of Probation and Parole (Parole Board), two DOC employees, and several Parole Board members, alleging, inter alia, that she was improperly denied parole.

The facts, as drawn from the second amended complaint, are detailed more fully in the Court's previous opinion, Wolfe v. Pennsylvania Department of Corrections, 334 F. Supp. 2d 762, 765-67 (E.D. Pa. 2004).  Presented here are those facts relevant to her two remaining claims, for an Ex Post Facto Clause violation and for retaliation.

In July 1996, pursuant to a plea agreement, Wolfe was convicted of raping her eight-year-old stepdaughter and sentenced to five to fifteen years in the custody of the DOC.  After two initial transfers, she was assigned to the prison at SCI-Mahanoy.

In December 1996, the Pennsylvania legislature amended the preamble to parole statute, 61 Pa. Cons. Stat. § 331.1.[3]  Prior

---

[1] The Court will refer to Plaintiff, whose legal name was changed from James Elliott Wolfe to Jessica Elaine Wolfe, in the feminine form, as the Court did in its previous opinion.  Not surprisingly, Plaintiff's filings use the feminine pronoun and Defendants' filings use the masculine.

[2] At this stage of the suit, Wolfe is the sole plaintiff.

[3] The 1996 changes to the parole law are detailed in Mickens-Thomas v. Vaughn, 321 F.3d 374, 377-80, 384-86 (3d Cir. 2003).

to the amendment, the Parole Board was not specifically told
which factors to use, or how to weigh them, in deciding
prisoners' parole applications.[4]  Post-1996, the Parole Board is
to consider "first and foremost the protection of the public" in
deciding parole applications.[5]

Because Wolfe was sentenced before the amendment took
effect, the Parole Board is required to use the pre-1996 standard
in deciding her parole applications.  Use of the post-1996 parole

---

[4] Pre-1996, § 331.1 read as follows:

The value of parole as a disciplinary and corrective
influence and process is hereby recognized, and it is
declared to be the public policy of this Commonwealth
that persons subject or sentenced to imprisonment for
crime shall, on release therefrom, be subjected to a
period of parole during which their rehabilitation,
adjustment and restoration to social and economic life
and activities shall be aided and facilitated by guidance
and supervision under a competent and efficient parole
administration, and to that end it is the intent of this
act to create a uniform and exclusive system for the
administration of parole in this Commonwealth.

[5] Post-1996, § 331.1 reads as follows:

The parole system provides several benefits to the
criminal justice system, including the provision of
adequate supervision of the offender while protecting the
public, the opportunity for the offender to become a
useful member of society and the diversion of appropriate
offenders from prison.

In providing these benefits to the criminal justice
system, the board shall first and foremost seek to
protect the safety of the public. In addition to this
goal, the board shall address input by crime victims and
assist in the fair administration of justice by ensuring
the custody, control and treatment of paroled offenders.

standard <u>might</u> give rise to an Ex Post Facto Clause violation.
<u>See</u> <u>Mickens-Thomas v. Vaughn</u>, 321 F.3d 374, 386 (3d Cir. 2003).

In 1997, Wolfe filed suit against the DOC, alleging its
failure to provide her with hormone treatments and a sex change
operation violated her Eighth Amendment rights.  <u>Wolfe v. Pa.
Dep't of Corr.</u>, Civ. No. 97-3114 (E.D. Pa., filed Apr. 30, 1997)
(Brody, J.).  The case was settled in 2002.  In the case sub
judice, Wolfe alleges that she was retaliated against for filing
this prior lawsuit.  (Plaintiff's Deposition at 9-10.)

Shortly after she began serving her sentence, in November
1996, the DOC gave Wolfe a Prescriptive Program Plan that
recommended she complete sex offender treatment programming
(SOP).  She refused, claiming that the program's requirement that
participants fully disclose past misconduct violated her Fifth
Amendment rights against self-incrimination.[6]  Each year, an
inmate receives both a Prescriptive Program Plan for the upcoming
year and a review of the inmate's compliance with the previous
year's plan.  In 1997, 1998, 1999, and 2000, her Prescriptive
Program Plan recommended participation in SOP, and her review
noted her past refusal to do so.  Each of these program reviews
stated that she was misconduct-free during the relevant time
period.

---

[6] Plaintiff's Fifth Amendment claim has been dismissed by
the Court.  334 F. Supp. 2d at 773.

4

In March 2001, Wolfe made her first appearance before the Parole Board.  She was denied parole.  The Board's memorialization of its decision (known as a "Green Sheet") stated that the Board would consider Wolfe's compliance with the Prescriptive Program Plan at its next review.  The Green Sheet's reason for her denial of parole parroted the language from the post-1996 parole statute: "the fair administration of justice cannot be achieved through your release on parole."  In July 2001, Wolfe received her fifth Prescriptive Program Plan and review, which were identical in all material respects to the previous four.

In July 2001, Plaintiff's security level was increased from 2 to 3, which in some respects restricted her activities and amenities in the prison.  When she inquired as to the reason for the increase (in an "Inmate's Request to a Staff Member" form), she was told in a letter from defendant Brenda Wildenstein, the manager of Wolfe's housing unit at Mahanoy, that the increase was due to her non-compliance with the Prescriptive Program Plan.  Thereafter, she filed a formal grievance with defendant Robert Shannon, the superintendent of Mahanoy.  Plaintiff's complaint alleges that Defendants retaliated against her for "her protestation against the conduct of all named defendants and for filing a lawsuit concerning the same."  Third Am. Compl. ¶ 132.  The "protestation" is presumably comprised of the "Inmate's

Request to a Staff Member" form and the formal grievance.

In December 2001, she was transferred to the prison at SCI-Graterford.  Neither Wildenstein nor Shannon work at Graterford; in fact, both now work at the prison in Frackville.

In July 2002, Wolfe received her sixth Prescriptive Program Plan and review, which were identical in all material respects to the previous five.  She also had an interview with the Graterford prison staff to determine the prison's possible recommendation of parole to the Parole Board.  The prison did not recommend parole because, according to Wolfe, she did not complete SOP.  In September 2002, Wolfe was again denied parole by the Board and again given a Green Sheet that stated that "the fair administration of justice cannot be achieved through your release on parole."

In July 2004, Wolfe was again denied parole.  This time, however, the Green Sheet parroted the language from the pre-1996 parole statute: "your best interests do not justify or require you being paroled/reparoled; and, the interests of the Commonwealth will be injured if you were paroled/reparoled."[7]

---

[7] While this third denial of parole is not included in Plaintiff's third amended complaint, it is described in Plaintiff's response to Defendants' motion for summary judgment, Pl.'s Mem. at 3 n.1, and the Green Sheet is attached as Exhibit 7D to Defendants' motion for summary judgment.

Wolfe brought the case at bar on May 3, 2002.[8]  On August 26, 2004, the Court dismissed four of Plaintiff's six claims. Wolfe, 334 F. Supp. 2d at 776.  With leave of the Court, Plaintiff has amended her complaint to seek injunctive relief, in addition to other damages.  See Third Am. Compl. (doc. no. 94). Defendants now move for summary judgment on the two remaining claims.  Count V is a § 1983 claim for violation of the Ex Post Facto Clause against the chairperson and individual members of the Parole Board.  Count VI is a § 1983 claim for retaliation in violation of the First Amendment against the individual members of the Parole Board and DOC employees Brenda Wildenstein and Robert Shannon.

---

[8] Wolfe filed the complaint pro se.  On October 20, 2003, on Wolfe's application for appointment of counsel, the Court appointed Mary Catherine Roper, Esq., then of Drinker Biddle & Reath, LLP, to represent her (doc. no. 43).  Several Drinker Biddle attorneys, including Ms. Roper, entered their appearances on behalf of Wolfe.  In early 2005, Ms. Roper left Drinker Biddle and joined the ACLU of Philadelphia.  She continued, along with Drinker Biddle's attorneys, to serve as Wolfe's counsel in this matter.

On March 21, 2007, Wolfe filed a motion stating her desire to fire Drinker Biddle and its attorneys for "bad acts and ineffective assistance" (doc. no. 123).  On March 30, 2007, Wolfe wrote a letter to the Court and attached a letter she had written to Ms. Roper, in which Wolfe expressed displeasure with Ms. Roper's representation of her (doc. no. 125).  On April 6, 2007, Drinker Biddle moved to withdraw as counsel (doc. no. 126), and on April 7, 2007, Ms. Roper followed suit (doc. no. 127).  The Court will rule on these motions to withdraw after it disposes of the summary judgment motion.

In the Court's opinion, Wolfe's attorneys' have done an exemplary job representing her in this case.

II.  <u>The Proper Defendants and Possible Remedies</u>

Both the DOC and the Parole Board have been dismissed as Defendants from the case.  The only remaining Defendants are the two DOC employees (Brenda Wildenstein and Robert Shannon) and the Parole Board's chairperson (Catherine McVey) and relevant past and present members (Allen Castor, Barbara Descher, Michael Green, Jeffrey Imboden, Gary Lucht, Benjamin Martinez, Nicholas Mutter, Sean Ryan, William Ward, Michael Webster, and Lloyd White).

Here, the Parole Board members and DOC employees are immune from suit for damages.  Members of the Parole Board are absolutely immune from suit for damages for actions taken pursuant to their quasi-judicial role.[9]  <u>See</u> <u>Harper v. Jeffries</u>, 808 F.2d 281, 284 (3d Cir. 1986).  The DOC employees (Shannon and Wildenstein) enjoy qualified immunity from § 1983 liability for damages because a reasonable person in their position could have believed that his or her actions were proper under the existing law.[10]  <u>See</u> <u>Anderson v. Creighton</u>, 483 U.S. 635, 638 (1987).

Therefore, because none of the Defendants is subject to damages, Plaintiff can seek only equitable relief.

In addition, only the current members of the Parole Board have the power to remedy any constitutional or statutory

---

[9]  Plaintiff does not address this contention in her brief.

[10]  Plaintiff does not address this contention in her brief.

violation; therefore, all claims for equitable relief against the
Defendants who are no longer members of the Parole Board are
inappropriate.

The two DOC employees (Shannon and Wildenstein) are not in a
position to remedy any alleged violations.  First, both worked at
Mahanoy, but Wolfe contends that it was the Graterford DOC staff
that gave the Parole Board an unfavorable recommendation.  Wolfe
was transferred to Graterford in December 2001.  Second, neither
DOC employee defendant continues to work at Mahanoy; both now
work at Frackville.  Therefore, any claim against Shannon or
Wildenstein, or their successors at Mahaony, is now moot.  See
Spruill v. Gillis, 372 F.3d 218, 225 (3d Cir. 2004) (holding that
once an inmate is transferred out of a prison, the inmate's claim
for injunctive relief against officials at that prison becomes
moot).

The claim against the six Parole Board members who
participated in Wolfe's parole determination but are no longer
members of the Parole Board cannot proceed.  The current
chairperson and members of the Parole Board are the proper
Defendants; they are the persons who are in a position to prevent
future constitutional violations.  Defendants' contention that
the present chairperson of the Parole Board, Catherine McVey,
cannot be enjoined because she did not take part in any of the
parole decisions affecting Wolfe, is without merit.  As the Court

9

suggested in its March 23, 2005, Order, the chairperson and current members of the Parole Board are the only proper parties against whom Wolfe may have a viable claim for injunctive relief. (Doc. No. 92.)

Therefore, Plaintiff can only seek injunctive relief, and then only against the current Parole Board members.[11]

III.  DISCUSSION

    A.  <u>Summary Judgment Standard</u>

A court may grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is "material" if its existence or non-existence would affect the outcome of the suit under governing law. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  An issue of fact is "genuine" when there is sufficient evidence from

---

[11] In most other cases alleging an ex post facto violation as a result of the alleged application of the post-1996 parole standard, the Parole Board was a party to the case and the court therefore had the option of remanding the case to the Board to re-hear the petitioner's application for parole under the pre-1996 law.  Here, the Parole Board is no longer a defendant.  The Court cannot remand the case to the Board to reconsider its actions.  The only viable remedy is to enjoin the members of the Board from evaluating Wolfe's subsequent parole applications under the post-1996 law.

which a reasonable jury could find in favor of the non-moving
party regarding the existence of that fact.  <u>Id.</u> at 248-49.  "In
considering the evidence, the court should draw all reasonable
inferences against the moving party."  <u>El v. Se. Pa. Transp.
Auth.</u>, 479 F.3d 232, 238 (3d Cir. 2007).  "[S]ummary judgment is
essentially 'put up or shut up' time for the non-moving party:
the non-moving party must rebut the motion with facts in the
record and cannot rest solely on assertions made in the
pleadings, legal memoranda, or oral argument."  <u>Berckeley Inv.
Group, Ltd. v. Colkitt</u>, 455 F.3d 195, 201 (3d Cir. 2006).

B.  <u>Ex Post Facto Clause</u>

The Third Circuit held in <u>Mickens-Thomas v. Vaughn</u> that
application of the post-1996 parole standard to inmates sentenced
under the pre-1996 standard <u>may</u> violate the Ex Post Facto
Clause.[12]  321 F.3d 374, 386 (3d Cir. 2003).  Then, in <u>Richardson</u>

---

[12] While the pre-1996 statute did not have a specific focus,
the post-1996 statute focuses on the interests of society:

> The pre-1996 policies place significant weight on
> factors relating to an inmate's potential to adapt to
> life on the outside, and on the recommendations of the
> institutional staff.  The pre-1996 policies suggest
> that no single factor should be controlling in a
> decision to deny parole to an applicant. . . .
> [A]lthough the risk of potential danger to the public
> has always been a factor, it became the controlling
> feature of the Board's decision after 1996.

<u>Mickens-Thomas</u>, 321 F.3d at 388.

v. Pennsylvania Board of Probation and Parole, the Third Circuit

clarified the test to be applied: an inmate must show both that

the Parole Board applied the new parole standard to her

application and that application of the new standard personally

disadvantaged the inmate by significantly increasing the risk of

being denied parole.[13]  423 F.3d 282, 291 (3d Cir. 2005).

_____

Defendants argue that they are entitled to summary judgment because inmates have no "liberty interest" in parole.  The Third Circuit's opinion in Mickens-Thomas forecloses this argument; the opinion is littered with references to inmates' liberty interests vis-a-vis the interests of society.  For example, "The Board does not dispute that the possibility of parole at sentencing based on some explicit criteria gave rise to a liberty interest."  321 F.3d at 391.  Moreover, Defendants misunderstand Wolfe's use of the phrase "liberty interest."  In Bonilla v. Vaughn, 1998 WL 480833 (E.D. Pa. Aug. 14, 1998), and Cohen v. Horn, 1998 WL 834101 (E.D. Pa. Dec. 2, 1998), the two cases cited by Defendants, the plaintiffs were asserting that their liberty interests under the Due Process Clause of the 14th Amendment were violated when they were not granted parole.  Wolfe does not assert that she has a liberty interest under the 14th Amendment.  Rather, Wolfe claims that the Parole Board's decision-making process pre-1996 focused on the "liberty interests" of the inmate, while post-1996 it focused on the "interests" of society.

[13] The substantive law of this ex post facto claim--an inmate's allegation that the Parole Board applied a newer, harsher standard to his parole application--is drawn from habeas corpus jurisprudence.  Indeed, every reported case to address whether the Pennsylvania Parole Board unconstitutionally applied the post-1996 parole standard to an inmate's parole application has been a habeas corpus case.

This case is different; it is a § 1983 action.  In the reported cases in this area, the habeas petitioner bears the burden of showing that the application of the post-1996 standard personally disadvantaged him by significantly increasing his risk of being denied parole.  In a § 1983 case at the summary judgment stage, however, the defendants have the burden of showing that there is no genuine issue of a material fact and that they are entitled to judgment as a matter of law.

1.  <u>Which Standard Was Applied?</u>

Determining which standard the Board applied is not an easy task.  Defendants argue that the Board used the pre-1996 standard; Plaintiff argues that the Board used the post-1996 standard.  Given the inability to penetrate literally the Parole Board members' minds, the Court must look to other evidence that might serve as a proxy for which standard the Board applied.  This other evidence consists of (1) the Green Sheets and (2) the declaration of a Board member.

The Board's language in Wolfe's 2001 and 2002 Green Sheets parrots the language of the post-1996 parole statute.[14]  In this

---

Although the line is fine, these two positions are not in conflict.  Once Defendants have introduced evidence that Wolfe would likely have been denied parole pre-1996, Wolfe can survive summary judgment only by pointing to evidence that shows she would likely have <u>not</u> been denied parole pre-1996.  In other words, if no reasonable juror could find that Wolfe would likely have been granted parole pre-1996, then there is no genuine issue of material fact.

[14] The 2001 and 2002 Green Sheets, attached as Exhibits 7B and 7C to Defendants' motion for summary judgment, state simply: "Following an interview and review of your file, the Pennsylvania Board of Probation and Parole has determined that the fair administration of justice cannot be achieved through your release on parole."

The 2004 Green Sheet, attached as Exhibit 7D to Defendants' motion for summary judgment, states: "Following an interview with you and a review of your file, and having considered all matters required pursuant to the Parole Act of 1941, as amended, 61 P.S. § 331.1 et seq., the Board of Probation and Parole, in the exercise of its discretion, has determined at this time that: your best interests do not justify or require you being paroled/reparoled; and, the interests of the Commonwealth will be injured if you were paroled/reparoled; therefore, you are refused

respect, Wolfe's case is factually identical to Richardson's:

> It is plain from each of Richardson's denials of parole
> between 1999 and 2003 that the Board did rely on the
> amended Parole Act in making its determination.  In
> 1999 and 2000, the denial of parole mirrored the
> language of the 1996 Amendments, and justified
> Richardson's parole denial on the basis of "mandates to
> protect the safety of the public and to assist in the
> fair administration of justice."

Richardson, 423 F.3d at 292.  The Third Circuit was clear that

the Parole Board's quoting of the post-1996 parole statute in

denying an inmate parole is sufficient evidence that the Parole

Board improperly applied the new standard in making its

determination.  See id.

Defendants point to the declaration of Benjamin Martinez, a

member of the Parole Board, as evidence that the Parole Board,

and its constituent members, do not view the 1996 amendments as

changing public policy.  Defs.' Mem. at 19.  Mr. Martinez

declares that the amendment is interpreted by the Board "as only

a reemphasis of the pre-existing consideration of public safety,"

and he assures the Court that "the Board applied to James Elliott

Wolfe only the standards, criteria and interests for deciding

whether to parole an offender that the Probation and Parole Law

contained when he committed his crime."  Martinez Decl. ¶¶ 7-8.

However, the Parole Board's statements in the Green Sheets

belie Mr. Martinez's contention.  And, as the Court is required

---

parole/reparole at this time."

to draw all inferences in favor of Plaintiff at the summary
judgment stage, it is fair to say that the Parole Board applied
the post-1996 standard in deciding her parole application.

### 2. Was Plaintiff Personally Disadvantaged?

To establish an ex post facto violation, an inmate must put
forth evidence that he was personally disadvantaged by
application of the new (and allegedly harsher) standard.[15] Here,
the evidence must demonstrate that the inmate would likely have
been paroled under the pre-1996 standard.

The Third Circuit approvingly cited to the Pennsylvania
Supreme Court for the proposition that an inmate must provide
"'the requisite evidence that he faces a significant risk of an
increase in punishment' by showing that 'under the pre-1996
Parole Act, the Board would likely have paroled the inmate.'"[16]

_____

[15] Note that while the ex post facto discussion in this
section is drawn from habeas corpus jurisprudence, the case is
being evaluated under the Rule 56 paradigm.  Defendants have put
forth evidence that Wolfe would likely not have been paroled
under the pre-1996 standard.  Therefore, in order to defeat
summary judgment, Wolfe must point to evidence that creates a
genuine issue of material fact, i.e. evidence that shows she
likely would have been paroled under the pre-1996 standard.  In
this sense, Wolfe's burden at this stage of the proceeding is
akin to a habeas petitioner's: she must point to evidence that
she would likely have been paroled under the pre-1996 standard.

[16] The contours of the prisoner's burden are fine.  While
the Richardson court approved of Cimaszewski's "would likely have
been" standard, it rejected Cimaszewski's suggestion that a
prisoner must demonstrate he would have been granted parole but-
for the 1996 amendments.  423 F.3d at 292 n.5.  In other words, a

<u>Richardson</u>, 423 F.3d at 291 (quoting <u>Cimaszewski</u>, 868 A.2d at 427).  An inmate must "adduce some evidence that this new law or policy disadvantaged him by creating 'a significant risk of increasing his punishment.'"  <u>Id.</u> at 292 (quoting <u>Garner v. Jones</u>, 529 U.S. 244, 255 (2000)).  "[T]he key question is whether 'the change affected the petitioner's <u>own</u> sentence detrimentally.'"  <u>Id.</u> at 291 (quoting <u>Mickens-Thomas</u>, 321 F.3d at 393).  Although such evidence may be difficult to adduce, the strict evidentiary requirement must nevertheless be honored.  <u>Id.</u> at 292.

Following <u>Richardson</u>, several federal courts in Pennsylvania have been confronted with the question of whether an inmate has shown personal disadvantage by application of the new parole standard.  Plaintiff has not cited any case (and this Court has not found one in its research) in which an inmate has met this burden.  Ultimately, the court's holding in <u>Mickens-Thomas</u>--that the inmate was personally disadvantaged by application of the new standard--has proved to be the exception rather than the rule.  Indeed, lack of persuasive evidence of personal disadvantage has proved fatal to several inmates' ex post facto claims.  <u>See, e.g.</u>, <u>Burkholder v. Wolfe</u>, 2007 WL 90427, at *8 (M.D. Pa. Jan. 9,

---

prisoner must show that his parole application <u>would likely have been</u> granted under the pre-1996 standard; he need not meet the higher burden of demonstrating that he <u>would have been</u> granted parole under the pre-1996 standard.

2007); <u>Simmons v. Pa. Bd. of Probation & Parole</u>, 2006 WL 2054345, at *1 (W.D. Pa. July 24, 2006); <u>Tyler v. Gillis</u>, 2006 WL 2038398, at *8 (M.D. Pa. July 19, 2006); <u>Shuhayda v. Wilson</u>, 2006 WL 1455606, at *1 (W.D. Pa. May 22, 2006); <u>McCoy v. Pa. Bd. of Probation & Parole</u>, 2006 WL 59329, at *5 (M.D. Pa. Jan. 10, 2006).

While the Third Circuit noted the difficulty that an inmate faces in presenting sufficient evidence that he was prejudiced by application of the newer (and likely stricter) standard, it explicitly disallowed an inmate to rest his case on the "intuitive . . . argument that adjudication under stricter standards is more likely to lead to an adverse result." <u>Richardson</u>, 423 F.3d at 292. In short, an inmate must present sufficient evidence to support this allegation.

The Third Circuit faulted Richardson primarily on two points: (1) he did not show whether the Parole Guidelines[17] would have recommended parole and (2) he did not provide "any evidence of the rate of parole for similarly situated prisoners before and

_____

[17] The Parole Guidelines "provide a prediction of the likelihood of parole by assigning a numerical value to certain criteria, based on past patterns of recidivism and an assessment of risk to the community. The Parole Guidelines include a worksheet and a formal numerical protocol . . . . Prior to 1996, [d]epartures from the Guidelines required a written explanation to explain the policy exception . . . ." <u>Richardson</u>, 423 F.3d at 284-85 & n.1 (internal citation omitted). Neither party in this case has described what role, if any, the Parole Guidelines played or should have played.

17

after the 1996 Amendments." Id. at 293. Both points are proxies
for the ultimate question of whether the inmate would likely have
been paroled under the pre-1996 standard.

    a. <u>The Parole Guidelines's recommendation</u>

    Plaintiff has not put forth any evidence that the Parole
Guidelines would have recommended parole pre-1996. It seems that
failure to participate in sex-offender programming was grounds
for denial of parole both pre- and post-1996. See <u>Burkholder v.
Wolfe</u>, 2007 WL 90427, at *10 (M.D. Pa. Jan. 9, 2007); <u>McCoy v.
Pa. Dep't of Probation & Parole</u>, 2006 WL 59329, at *5 (M.D. Pa.
Jan. 10, 2006). Indeed, the pre-1996 statute's focus on an
inmate's ability to adapt to life outside of prison, or, in other
words, the degree to which the inmate has been rehabilitated,
arguably provides a more compelling reason for denying a
rapist's[18] parole application for failure to complete sex-
offender therapy than does the post-1996's statute's emphasis on
public safety: without completing SOP, a rapist is not likely to
be deemed "rehabilitated."

    Plaintiff has not put forth evidence based on the Parole
Guidelines (or similar evidence) that an inmate in her position--
a convicted rapist who has not participated in sex-offender

---

[18] Sex-offender programming is designed to provide therapy
to "sex offenders," a broad grouping that includes the narrower
category of "rapist," Wolfe's technical classification.

treatment--would likely have been paroled pre-1996.[19]
Plaintiff's case is thus far different from the petitioner's in
Mickens-Thomas.   There, the inmate had complied with the
prerequisites stated by the Parole Board in its previous denial
of his parole, notably that he obtained a favorable
recommendation from the DOC and he was participating in a
sex-offender therapy program (although it was a "deniers"
program).   321 F.3d 381-82.

     The Third Circuit recently addressed a similar situation in
Shaffer v. Meyers, 163 Fed. App'x 111 (3d Cir. 2006) (per curiam)
(non-precedential).   Shaffer, who was sentenced for rape pre-
1996, argued, based on Mickens-Thomas, that the Parole Board
violated the Ex Post Facto Clause by applying the post-1996
parole guidelines to his parole application.   Id. at 112-13.
Shaffer had not completed SOP.   Id. at 112.   The Third Circuit
affirmed the district court's denial of his ex post facto claim:

> Prima facie it does not seem likely that the criteria
> cited by the Board in Shaffer's case--participation in
> a treatment program for sex offenders, the
> recommendation of the Department of Corrections,
> Shaffer's conduct record and whether he completed any

---

[19] Defendants overstate their case when they argue that
Wolfe must present evidence that the Parole Board did not
consider an inmate's failure to participate in SOP prior to 1996.
Defs.' Mem. at 17.   Wolfe need not show that the Board did not
include participation in SOP as a factor in parole considerations
pre-1996; rather, she can sustain her burden by showing that the
Board gives more weight to an inmate's failure to complete sex
offender programming post-1996 than pre-1996.   Wolfe, however,
does not make this showing, or indeed even address this argument.

> prescribed programs--would not have been considered by
> the Board pre-amendment, and Shaffer cites no evidence
> to persuade us otherwise. But even if we assume that
> the Board would have used different criteria
> pre-amendment, Shaffer has not provided adequate
> reasons to support the contention that application of
> those criteria would likely have resulted in his
> release on parole.

Id. at 114.

Similarly, the court in Tyler v. Gillis, 2006 WL 2038398

(M.D. Pa. July 19, 2006), denied the petitioner's ex post facto

claim. The Parole Board had denied the petitioner parole in part

because he had not completed (though he was apparently enrolled

in) SOP. Id. at *5. The court found that the facts of Tyler

were indistinguishable from those in Shaffer:

> [T]he Board in our case used largely the same criteria
> that the Board used in inmate Shaffer's case, including
> participation and successful completion of a sex
> offenders treatment program, the recommendation of the
> DOC, the inmate's conduct record, and completion of
> prison programs. . . . [T]he record in our case shows,
> as it did in the Shaffer case, that the reasons for the
> Board's decisions denying our Petitioner parole were
> not based on new standards of parole from the 1996
> amendments which were applied to our Petitioner's case;
> rather, they were legitimate reasons which the Board
> considered pre-1996 amendments.

Id. at *7.

Burkholder v. Wolfe, 2007 WL 90427 (M.D. Pa. Jan. 9, 2007),

is illustrative. There, as here, the inmate had raped an

underage family member, and had been sentenced to prison for the

crime prior to the enactment of the 1996 Amendments. Id. at *2.

The inmate did not complete SOP because, as here, he was

20

concerned about the program's requirement that he admit to past sexual misconduct.  Id. at *3.  He sought habeas relief, claiming that his denial of parole violated the Ex Post Facto Clause. "[T]he inmate must show actual disadvantage by the retroactive application of the changed law."  Id. at *8.  The court noted that because the factors cited by the Parole Board in denying the petitioner parole, including his refusal to complete SOP, would have been applicable at the time he was sentenced, his ex post facto claim was "undermin[ed]."  Id. at *10.  The petitioner presented no evidence of "individual disadvantage": "He has not shown that he was a good candidate for parole under criteria in effect before 1996."  Id.

In short, Wolfe cannot show that she was a good candidate for parole under the pre-1996 guidelines, because her failure to participate in sex offender therapy was a compelling reason to deny her parole even under the pre-1996 guidelines.  In McCoy v. Pennsylvania Department of Probation and Parole, 2006 WL 59329, at *5 (M.D. Pa. Jan. 10, 2006), the court found it "apparent that Petitioner would have been denied parole regardless of the subsequent enactment of the 1996 amendments to the Parole Act." The Parole Board had denied the petitioner parole in part because of the "[n]oteworthy" reason that the petitioner "should have continued participation in a sex offender treatment program." Id.  Similarly, in Simmons v. Pennsylvania Board of Probation and

21

<u>Parole</u>, 2006 WL 2054345, at *1 (W.D. Pa. July 24, 2006), even though the petitioner alleged that he had completed all the required programs offered by the DOC--an allegation noticeably absent from Plaintiff's complaint here--the petitioner's ex post facto claim failed because he "offered no evidence that he would have been likely to be paroled under the pre-1996 guidelines." "Petitioner certainly cannot obtain a writ of habeas corpus by citing <u>Mickens-Thomas</u> and saying 'me too.'" <u>Id.</u> at *2.

At bottom, Defendants put forth competent evidence that an inmate in Wolfe's position (serving prison time for rape and refusing to complete SOP) would likely not have been paroled under the pre-1996 standard. Wolfe did not put forth any evidence to the contrary (i.e., that she would likely have been paroled under the pre-1996 standard). Therefore, Wolfe has failed to raise a genuine issue of material fact that either the Parole Guidelines (or similar evidence) would have recommended that she be paroled under the pre-1996 parole statute.

### b. <u>Statistical Evidence</u>

The Third Circuit has counseled that an inmate can demonstrate he would likely have been paroled under the pre-1996 standard through use of statistical evidence. <u>Richardson</u>, 423 F.3d at 293; <u>Mickens-Thomas</u>, 321 F.3d at 385. The statistical evidence must be sufficiently tailored to that particular inmate,

though; an allegation that the overall parole rate has declined after 1996 is insufficient to state an ex post facto claim.

Indeed, in the few cases in which an inmate has put forth some statistical evidence regarding the rates of parole, courts have soundly rejected the argument because the statistics have been too generalized. In Tyler v. Gillis, 2006 WL 2038398, at *8 (M.D. Pa. July 19, 2006), the petitioner did proffer some statistics that parole rates dropped post-1996, but the court held that the statistics were not sufficiently individualized. "[G]eneral parole statistics and parole rates do not show that the 1996 Amendments were applied in his case to his disadvantage." Id. Indeed, an ex post facto claim cannot stand solely on an allegation "that, in the aggregate, parole rates have declined after 1996." Shuhayda v. Wilson, 2006 WL 1455606, at *1 (W.D. Pa. May 22, 2006). The statistical evidence must show that the inmate's personal chances of being paroled have diminished.

Moreover, the statistical evidence available in Mickens-Thomas (the case that Plaintiff here attempts to emulate) was particularly compelling. Of the 266 inmates whose sentences had ever been commuted by the governor, 265 were granted parole on their first or second application.[20] Mickens-Thomas was the sole

---

[20] It is unclear from the opinion whether the population of the 266 prisoners included or excluded the petitioner. Compare 321 F.3d at 385 ("The Thomas application is distinguished from

23

exception.  Id.  The only factor that distinguished Mickens-
Thomas's application from the 265 that came before him was that
the Parole Board made its decision on his application after the
enactment of the new parole standard.  Id.  Indeed, Richardson
recognized that Mickens-Thomas was "an exceptional case because
of the compelling nature of the evidence of prejudice."  423 F.3d
at 293.

    The one recent decision finding an ex post facto violation
is instructive for its distinct characteristics.  In Pennsylvania
Prison Society v. Rendell, 419 F. Supp. 2d 651 (M.D. Pa. 2006),
the court was confronted with a change in the Board of Pardons's
voting requirements.  Under the old law (under which the
plaintiffs were sentenced), the Board of Pardons could recommend
to the governor commutation of an inmate's sentence on a majority
vote.  Under the new law, a unanimous vote of the Board was
required to recommend commutation.  Id. at 661.  The plaintiffs
presented statistical evidence--and a report from an expert in
applied mathematics and statistical analysis--that the Parole
Board recommended far fewer prisoners for commutation following
the enactment of the 1997 amendments.  The court held that there
was a significant risk of increased punishment stemming from the
amendments, because it is more difficult to garner a unanimous

---

these 266 cases . . . ."), with id. at 387 ("He is the only
prisoner out of 266 commuted sentences . . . .").

vote than it is a majority vote.  Id. at 661-62.

Pennsylvania Prison Society is notable because of (1) the
starkness of the statistics--commutation recommendations were far
less likely after the voting requirements changed--and (2) the
presence of an expert report interpreting the statistical
evidence.

Here, Plaintiff hinges her argument on the rates of parole
pre- and post-1996.  She has introduced statistical evidence
purporting to show that a rapist is less likely to be paroled
post-1996 than pre-1996.  Defendants hotly contest this point.

Unfortunately, the "parole rate" for prisoners with similar
convictions is not readily accessible.[21]  According to
Defendants, such data does not currently exist among the
statistics kept by the DOC and the Parole Board.  Instead, both
parties base their arguments on statistics that they claim can
serve as a proxy for parole rates.

The "parole rate" is, mathematically, for each given year,
the number of inmates who applied for parole divided by the
number of inmates who were granted parole.  If, on average, this
number was significantly higher before the Parole Board began
applying the 1996 Amendments than afterwards, there is some

---

[21] The Court has afforded Wolfe the opportunity to take
additional discovery to attempt to capture this data.  (Doc. No.
118.)  Indeed, Plaintiff was permitted to submit additional
briefing to bolster her statistical evidence argument.  (See Doc.
No. 120).

evidence that it is more difficult for an inmate to be paroled under the new guidelines as opposed to the old guidelines.

However, the Third Circuit has counseled that statistics involving the <u>overall</u> parole rate are insufficient for the requisite <u>individualized</u> showing that an inmate must make. <u>Richardson</u>, 423 F.3d at 292. Instead, an inmate must point to the parole rate for inmates serving sentences for comparable crimes. In other words, Wolfe can meet her evidentiary burden by showing that the parole rate for <u>rapists</u>[22] has significantly decreased.

The ideal population is thus the number of rapists[23] who applied for parole in a given year. This number has not been presented to the Court. Instead, Wolfe uses as her population

---

[22] One court has implied that the category of "rapist" is itself too broad. The court in <u>Burkholder v. Wolfe</u>, 2007 WL 90427, at *10 (M.D. Pa. Jan. 9, 2007), suggested that the inmate needed to put forth statistics on the parole rates of "inmates convicted of violent sexual assaults of young girls to whom they were related." Wolfe stands in a similar situation to Burkholder: they were both convicted of raping a young stepdaughter.

[23] The DOC does not use the classification "rapist." Each inmate is classified according to the "primary offense code" for the crime for which he was convicted. (For inmates serving time for multiple crimes, there is apparently a decision made by the DOC as to which crime is "controlling.") Here, the statistics provided to the Court are for the primary offense code of "forcible rape." There are other crimes that one might think of as "rape"--such statutory rape, involuntary deviate sexual intercourse, sexual assault, rape of a child, etc.--that each carries its own offense code and is not included in the statistics here. <u>See</u> Emery Deposition at 30-37; Emery Decl. ¶7a.

the number of rapists who <u>were paroled</u> each year.  For each of these paroled inmates, Wolfe presents the length of time (broken down into three categories: under one year, one to three years, and over three years) each inmate was eligible for parole before he was granted parole.

On the other hand, Defendants use as their population each year's total number of rapists serving time in prison.  They divide this rather large number by the rather small number of the number of rapists who were paroled in that year.

So, Wolfe's statistics purportedly show that, post-1996, rapists are being paroled after a longer period of parole-eligibility than they were pre-1996[24] (and, by inference, that

_____

[24] For each year 1995 through 2005, Plaintiff presents the number of rapists paroled.  That population is then divided into three categories: the number paroled within one year of parole eligibility (<1), between one and three years of parole eligibility (1-3), and over three years of parole eligibility (>3).

    1995: 53 total: 27 (<1), 21 (1-3), 5 (>3)
    1996: 15 total: 4 (<1), 9 (1-3), 2 (>3)
    1997: 39 total: 10 (<1), 22 (1-3), 7 (>3)
    1998: 44 total: 4 (<1), 18 (1-3), 22 (>3)
    1999: 80 total: 9 (<1), 43 (1-3), 28 (>3)
    2000: 94 total: 6 (<1), 41 (1-3), 47 (>3)
    2001: 64 total: 10 (<1), 30 (1-3), 24 (>3)
    2002: 56 total: 9 (<1), 24 (1-3), 23 (>3)
    2003: 45 total: 9 (<1), 22 (1-3), 14 (>3)
    2004: 50 total: 13 (<1), 17 (1-3), 20 (>3)
    2005: 39 total: 5 (<1), 10 (1-3), 24 (>3)

Plaintiff then aggregates the averages of the percentages for each year to reach the following conclusion: for the years 1995-1996, 39% of rapists were paroled within one year of being parole-eligible, 50% between one and three years, and 11% over

inmates are less likely to be paroled post-1996).  Defendants'
statistics purportedly show that there is no trend in the parole
rate for rapists.[25]

Neither party's statistics are without fault.  Defendants'
population (all rapists serving time in prison in a given year)

---

three years; for the years 1997-2005, 16% within one year, 44%
between one and three years, and 41% over three years.

Of course, using the percentages for each year is itself
misleading.  A truer measure would be to combine the raw data for
each year and then take the percentages.  Such a method would
yield, for the period 1995-1996, 45% within one year, 44% between
one and three years, and 10% over three years; and for the period
1997-2005, 15% within one year, 44% between one and three years,
and 41% over three years.

[25] Defendants use as their population the total number of
inmates serving time in prison for rape for each given year.
Unfortunately, Defendants did not provide the Court with these
raw numbers.  (The Court itself obtained these numbers by
dividing, for each year, the number of rapists paroled by the
percentage of those paroled.)  For instance, in 1995, of the 1828
rapists serving time, 53 (or 2.9%) were paroled.

        1995: 1828 total, 53 paroled (2.9%)
        1996: 1875 total, 15 paroled (.8%)
        1997: 2053 total, 39 paroled (1.9%)
        1998: 2095 total, 44 paroled (2.1%)
        1999: 2051 total, 80 paroled (3.9%)
        2000: 2000 total, 94 paroled (4.7%)
        2001: 2065 total, 64 paroled (3.1%)
        2002: 2074 total, 56 paroled (2.7%)
        2003: 2143 total, 45 paroled (2.1%)
        2004: 2083 total, 50 paroled (2.4%)
        2005: 2167 total, 39 paroled (1.8%)

These statistics show that the percentage of rapists paroled
in a given year does not follow a particular pattern.

In the aggregate, for the years 1995-1996, a given rapist
had a 1.8% chance of being paroled.  For the years 1997-2005, a
given rapist had a 2.7% chance of being paroled.

is so large as to be almost irrelevant.  In addition, Defendants
ignore the fact that an inmate cannot be granted parole unless he
is (1) eligible for parole and (2) applies for parole.

   For her part, Plaintiff's interpretation of the raw data is
not particularly reliable.  She presents data from only two years
prior to the change in the law (compared to nine years after the
change).  Her sample set is relatively small.  In addition, not
every inmate who is eligible for parole necessarily applies for
parole (though it is likely that most do).  Importantly,
Plaintiff's statistics do not account for the fact that the
Parole Board might not necessarily have applied the new standard
to all applications after 1996; it might have, knowing the law of
ex post facto, applied the new standard only to inmates sentenced
after 1996.  Indeed, the Pennsylvania Supreme Court's
jurisprudence lends support to this idea, given that the court
offered several conflicting views of the 1996 Amendments' ex post
facto implications.  See Richardson, 423 F.3d at 289-91
(recounting the holdings of Winklespecht v. Pa. Bd. of Probation
& Parole, 813 A.2d 688 (Pa. 2002), Finnegan v. Pa. Bd. of
Probation & Parole, 838 A.2d 684 (Pa. 2003), Hall v. Pa. Bd. of
Probation & Parole, 851 A.2d 859 (Pa. 2004), and Cimaszewski v.
Pa. Bd. of Probation & Parole, 868 A.2d 416 (Pa. 2005)).  It is
likely that the Parole Board was unsure of which standard it was
supposed to apply at any given time, and thus any data compiling

parole decisions from this time period are suspect.

Aside from the substance of the statistics, Defendants at least submitted an affidavit from a data analyst, Mark Emery. Mr. Emery's affidavit argues both that there is no statistically significant change in parole rates for rapists pre- and post-1996, and that Plaintiff's interpretation of the data is unreliable on several counts.  Plaintiff rests on the statistics themselves.  Regrettably, as explained above, the statistics do not speak for themselves.

Plaintiff has certainly made a stronger statistical showing than most other inmates, who merely rely on <u>Mickens-Thomas</u> and/or general parole rates.  However, the Court concludes that Plaintiff's showing does not rise to the level of an ex post facto violation.  Defendants have put forth compelling evidence that Plaintiff would not likely have been paroled even if the Parole Board had considered her application under the pre-1996 standard.  Plaintiff has failed to raise a genuine issue of material fact, i.e. she has failed to point to competent[26] evidence that would show that she would likely have been paroled under the pre-1996 standard.

Therefore, Defendants are entitled to summary judgment on

_____

[26] The requirement that the evidence be "competent" is of particular import here because without an expert report interpreting the data, the Court cannot conclude that the data reliably demonstrate anything.

Plaintiff's Ex Post Facto Clause claim.

C.  <u>Retaliation</u>

Plaintiff claims she was retaliated against by the Parole Board members and DOC officials, in violation of § 1983, for filing her previous lawsuit and submitting the inmate request form and grievance.[27]

The Third Circuit explained the standard for a prison retaliation claim in <u>Rauser v. Horn</u>, 241 F.3d 330 (3d Cir. 2001). First, "a prisoner-plaintiff in a retaliation case must prove that the conduct which led to the alleged retaliation was constitutionally protected."  <u>Id.</u> at 333.  Second, the prisoner must show "that he suffered some 'adverse action' at the hands of prison officials."  <u>Id.</u>  The plaintiff satisfies this requirement by demonstrating that the action 'was sufficient to deter a person of ordinary firmness from exercising his constitutional rights.'"  <u>Id.</u> (quoting <u>Allah v. Seiverling</u>, 229 F.3d 220, 225 (3d Cir. 2000) (alterations omitted)).  Plaintiff has met these two threshold requirements, because filing a lawsuit and

--------

[27] Defendants make a cursory assertion that because none of the Defendants was named in Wolfe's previous suit, none has the requisite motive to retaliate against her.  This argument is not particularly convincing: a successor prison official can retaliate against an inmate for the inmate's actions against a predecessor official.  Defendants have not provided a compelling reason why the retaliation has to be personal to the particular prison official.

submitting grievances are constitutionally protected activities, and the denial of parole is an adverse action.

According to Rauser, Plaintiff must now show a causal link between the protected activity and the adverse action.  Id. There is a burden-shifting framework for the showing of this causal link.  The prisoner must "demonstrate[] that his exercise of a constitutional right was a substantial or motivating factor in the challenged decision."  Id.  The defendant prison officials can still prevail, though, "by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest."  Id.

Wolfe cannot demonstrate that her engaging in constitutionally protected activities was a substantial or motivating factor in the Parole Board's denial of parole. Defendants argue that the protected activity and the alleged retaliatory actions are too far removed in time to support an inference that they are related.  Wolfe filed the previous lawsuit in 1997 and submitted her grievance in July 2001.  The adverse actions (the denials of parole) took place in March 2001, September 2002, and July 2004.  Thus, Wolfe was first denied parole four years after filing her lawsuit, and then denied parole again fourteen months after filing her grievance.

Plaintiff does not dispute Defendants' contention that the actions are too far apart to give rise to an inference of

32

retaliation.  And she concedes that she has no "direct evidence that her constitutionally protected actions were a factor in any actions taken by the Defendants."  Pl.'s Mem. at 7.

Moreover, Defendants are also entitled to summary judgment on the retaliation claim based on evidence that they would have made the same decision (to deny Wolfe parole) "absent the protected conduct for reasons reasonably related to a legitimate penological interest."  See Rauser, 241 F.3d at 334.  Plaintiff has only one response to this argument: that Rauser applied only to a claim for damages, in which case it would not make sense that Defendants could prevail by showing that they would have made the same decision for legitimate reasons.  Pl.'s Mem. at 8.  A claim for injunctive relief, though, is prospective.

Plaintiff's argument here is unavailing.  One, Plaintiff requests an injunction "against further retaliatory action."  Pl.'s Mem. at 8.  In order for an injunction to issue, the Court would first need to find past retaliatory action.  Two, Plaintiff has not pointed to any caselaw or put forth a persuasive argument why Rauser was or should be limited to claims for damages.  In fact, the appellant's brief in Rauser states that the plaintiff "sought injunctive and declaratory relief, as well as monetary damages," Brief for Plaintiff-Appellant, Rauser v. Horn, 241 F.3d 330 (3d Cir. 2001) (99-4013), 2000 WL 33982394, at * 7, and the appellees' brief states that the plaintiff "asked for declaratory

33

and injunctive relief," Brief for Appellees, <u>Rauser v. Horn</u>, 241 F.3d 330 (3d Cir. 2001) (99-4013), 2000 WL 33982395, at *3. Therefore, while the Third Circuit's opinion did not specify that Mr. Rauser sought injunctive relief, it is evident from the litigants' briefs that he did.  There is therefore no reason that <u>Rauser</u> should be limited to claims for damages.

The result is that Defendants are entitled to summary judgment on the retaliation claim because they would have made the same decision (to deny Wolfe parole) for legitimate penological reasons.[28]

IV.  CONCLUSION

Defendants are entitled to summary judgment on Wolfe's two remaining claims.  Defendants have put forth convincing evidence both that they did not violate the Ex Post Facto Clause and that they did not retaliate against Wolfe.  Plaintiff has failed to rebut this evidence with convincing evidence of her own.  She has not shown that the Parole Board would likely have granted her parole under the pre-1996 parole standard (and thus cannot make out an Ex Post Facto Clause violation), and she has not put forth sufficient evidence that she was retaliated against.

Therefore, there is no genuine issue of material fact as to the two remaining claims, and Defendants are entitled to judgment

---

[28] Plaintiff does not refute this contention.

as a matter of law on both claims.

The Court reminds the members of the Parole Board that, at Wolfe's next parole hearing, they are to evaluate her parole application under the pre-1996 standard.[29]

---

[29] Even if Wolfe had prevailed here--and indeed even if she had prevailed at trial--her only possible remedy would still be to have the members of the Parole Board evaluate her future parole applications under the pre-1996 standard.  By virtue of this Court's decision here--and the Third Circuit's decisions in Mickens-Thomas and Richardson and the Pennsylvania Supreme Court's decision in Cimaszewski--the members of the Parole Board surely now know that it is their duty to evaluate Wolfe's future parole applications under the pre-1996 standard.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

INMATES OF THE PENNSYLVANIA      :
DEPARTMENT OF CORRECTIONS,        :      CIVIL ACTION
                                  :      NO. 02-2687
            Plaintiffs,           :
                                  :
        v.                        :
                                  :
THOMAS W. CORBETT, JR.,           :
et al.,                           :
                                  :
            Defendants.           :

## O R D E R

**AND NOW**, this **25th** day of **April 2007**, for the reasons stated in the accompanying Memorandum, it is hereby **ORDERED** that Defendants' motion for summary judgment (doc. no. 105) as to Counts IV (Ex Post Facto Clause) and V (retaliation) of the third amended complaint is **GRANTED**.

**AND IT IS SO ORDERED.**

 S/Eduardo C. Robreno
**EDUARDO C. ROBRENO, J.**

36